## THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____
)
EUGENE MOROZOV and MEM CONSULTING )
INC., )
)
        Plaintiffs, )
)
      v. )    **CIVIL ACTION NO. _____**
)
ICOBOX HUB INC., ICOBOX, ALEX )    **JURY TRIAL DEMANDED**
MOSKOVSKY, DARIA GENERALOVA, )
ANAR BABAYEV, NICKOLAY EVDOKIMOV, )
MICHAEL RAITSIN, 1280 VENTURES LLC, )
GVA VESTOR.IN PARTNERS FUND, L.P., )
)
        Defendants. )
_____)

## COMPLAINT

Plaintiffs Eugene Morozov and MEM Consulting Inc. ("MEM"), by their undersigned

counsel, hereby bring this complaint against Defendant ICOBOX HUB INC. ("Defendant

ICOBOX HUB"), its parent company, a Cayman Islands offshore entity ICOBOX ("Defendant

ICOBOX"), and their main shareholders (the "Shareholder Defendants"), all funded by Russian

money laundered through bitcoins and other cryptocurrencies, and allege as follows.

## NATURE OF THE ACTION

1.     In November 2017, Plaintiffs agreed to enter into a series of agreements with

Defendants ICOBOX HUB and EVDOKIMOV for employment and consulting services in the

field of cryptocurrencies and initial coin offerings ("ICOs"), effective January 1, 2018.

2.     When Plaintiff Morozov relocated to San Francisco and started working as

Defendant ICOBOX HUB's CEO in January 2018, he quickly discovered that the Defendants

were prone to cutting corners in their compliance with the U.S. labor, immigration, tax and

sanctions laws. Plaintiff Morozov reported those violations to Defendants in writing and orally, seeking to persuade them that in the U.S., the business must be carried out in a legal way even if that means having to spend more money for compliance. Plaintiff then retained legal, accounting and tax advisors to bring Defendant ICOBOX HUB in compliance with these laws.

3.     Between December 2017 and February 2018, however, the market value of the Bitcoin, the primary non-fiat currency in which Defendants conducted their operations, including in the U.S., crashed, losing 70% of its value and causing Defendants to lose any appetite (of which there was not much to begin with) for spending any money on outstanding compliance matters, to renege on their contractual commitments to Plaintiffs, to terminate those contracts, to delay wages due Plaintiff Morozov, and to fire him in retaliation for his insistence on conducting business the legal way.

4.     Defendant ICOBOX HUB's shareholders of record are Defendants ICOBOX, EVDOKIMOV, 1280 VENTURES LLC, and GVA VESTOR.IN PARTNERS FUND, L.P. Upon information and belief, the corporate shareholders of Defendant ICOBOX HUB are merely fronts and an *alter egos* of the true ultimate beneficial owners and control persons of Defendant ICOBOX HUB, Defendants MOSKOVSKY, GENERALOVA, BABAYEV, EVDOKIMOV, and RAITSIN.

5.     Accordingly, Plaintiffs bring this action against all Defendants for delayed wages in violation of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201 *et seq*., New York Labor Laws (the "NYLL"), § 191 *et seq*., seeking to hold the shareholders of Defendant ICOBOX HUB, Defendants MOSKOVSKY, GENERALOVA, BABAYEV, EVDOKIMOV, RAITSIN, 1280 VENTURES LLC and GVA VESTOR.IN PARTNERS FUND, L.P. liable under New York Business Corporation Law ("NYBCL"), § 630, pursuant to which foreign

shareholders of out-of-state companies are personally liable for employment violations committed in New York; retaliatory discharge in violation of the FLSA, 29 U.S.C. § 215(a)(3) and NYLL § 215; and breach of contract, and seek actual, statutory and punitive damages, and attorneys' fees and costs incurred in pursuit of this action in an amount to be determined at trial but no less than $2,000,000 (TWO MILLION DOLLARS).

## JURISDICTION AND VENUE

6.     This Court has subject matter over this action pursuant to 28 U.S.C. § 1331 and 1343 because this action involves federal questions regarding deprivation of Plaintiffs' rights under the FLSA. The Court has supplemental jurisdiction over Plaintiffs' state statutory and common law claims pursuant to 28 U.S.C. § 1367(a).

7.     Venue lies under 28 U.S.C. § 1391(b) because a substantial part of the relevant events giving rise to this action occurred in this district. Furthermore, the agreements at issue provide that New York law applies to this dispute, and that the parties submit to the jurisdiction of New York courts and agree that "the venue shall be in New York state or federal court."

8.     Plaintiffs, through their counsel, have conducted an investigation into the facts supporting the allegations in this Complaint and believe discovery will elicit further evidentiary support for their allegations.

## THE PARTIES

9.     Plaintiff Eugene Morozov is a U.S. citizen currently residing in San Francisco, CA, having moved there from New York, NY in January 2018, and having been splitting his time between New York and California for the purpose of performing his duties as the CEO of Defendant ICOBOX HUB.

10.     Plaintiff Morozov received his Masters' Degree in Accounting from University of Illinois at Urbana-Champaign in 1992 and is a Certified Public Accountant. Prior to joining OMI, Plaintiff Morozov was employed as the Chief Executive Officer of Overseas Media Inc.; Chief Financial Officer of VisaHQ.com Inc.; and managing director of Standard Capital Group. Mr. Morozov also worked as a financial analyst for Deutsche Bank, a senior financial consultant for JP Morgan, and an auditor for Coopers & Lybrand.

11.     Plaintiff Morozov joined Defendant ICOBOX HUB as its Chief Executive Officer pursuant to an employment agreement with the Company dated as of January 1, 2018 (the "Employment Agreement"). A true and correct copy of the Employment Agreement is annexed as Exhibit A hereto.

12.     Defendant ICOBOX HUB purported to terminate Plaintiff's Employment Agreement on February 9, 2018, by a Telegram post sent by Defendant EVDOKIMOV to Plaintiff, offering Plaintiff Morozov an advisory position instead of the CEO position set out in the Employment Agreement. Defendant EVDOKIMOV confirmed on a subsequent conference call on February 15, 2018, that Defendants had indeed changed their minds and were no longer willing to fund Defendant ICOBOX HUB or to honor the Employment Agreement and the Services Agreement.

13.     Plaintiff MEM Consulting Inc. ("MEM") is a Delaware corporation doing business in New York, NY. MEM is a management and financial consulting company owned and operated by Plaintiff Morozov in his professional CPA capacity.

14.     On January 1, 2018, Plaintiff MEM and Defendant ICOBOX HUB entered into a services agreement (the "Services Agreement"), pursuant to which Plaintiff MEM agreed to provide management consulting services to Defendant ICOBOX HUB in the financial and

reporting areas. A true and correct copy of the Services Agreement is annexed as Exhibit B hereto.

15.     Defendant ICOBOX HUB is a Delaware corporation with headquarters at 906 Broadway, San Francisco, CA 94133.

16.     Defendant ICOBOX HUB was initially formed and owned by Defendant EVDOKIMOV. Defendant ICOBOX HUB's Board of Directors is comprised of Artyom Smirnov, Ilya Zibarev, Kirill Golovanov, Pavel Cherkasov, and Gary Baiton.

17.     Defendant ICOBOX HUB was contemplated as a U.S.-based ICO incubator for Defendant ICOBOX and its Russian owners, with locations in New York (Trump Tower) and San Francisco (755 Sansom Street).

18.     Virtually all of Defendant ICOBOX HUB's transactions in the U.S., including wage payments, were conducted in Bitcoins, Ethers, or other cryto-currencies. The one and only time Plaintiff Morozov received his salary, however, was in cash.

19.     Upon information and belief, during the relevant period, Defendant EVDOKIMOV caused Defendant ICOBOX HUB to issue shares to Defendants I280 VENTURES LLC, ICOBOX, and GVA VESTOR.IN PARTNERS FUND, L.P.

20.     Upon information and belief, the corporate Defendants ICOBOX, I280 VENTURES LLC, and GVA VESTOR.IN PARTNERS FUND, L.P., each an offshore shell corporation and an *alter ego* of its shareholders and ultimate beneficial owners Defendants MOSKOVSKY, GENERALOVA, BABAEV, EVDOKIMOV, and RAITSIN.

21.     At all relevant times, Defendant ICOBOX HUB was Plaintiff Morozov's "employer" within the meaning of the applicable statutory provisions of FLSA and NYLL, and

an enterprise engaged in commerce as defined by FLSA § 203, with annual gross volume of business done or anticipated to be done in an amount not less than $500,000.

22.     Defendant EVDOKIMOV is the CEO of Defendant ICOBOX HUB's parent company Defendant ICOBOX and a shareholder of Defendant ICOBOX HUB within the meaning of NYBCL § 630.

23.     Defendant EVDOKIMOV is a resident on both Russia and the U.S. Upon information and belief, in the U.S. he keeps residences at 1240 Benedict Canyon Drive, Beverly Hills, CA 90210-2727 and 725 North Foothill Road, Beverly Hills, CA 90210.

24.     Upon information and belief, in Russia, Defendant EVDOKIMOV resides at Krasnodar Region, Chernomorsky, Neftyannikov 16, Russia 353266. Upon information and belief, Defendant EVDOKIMOV also keeps residence at 29/81-82 Moo 2, Rawai Sub-District, Muang Phuket District, Phuket Province, 83130 Thailand.

25.     According to his Linkedin profile, Defendant EVDOKIMOV is the "founder and investor, blockchain entrepreneur with vast experience founding and developing innovative blockchain projects and automating and scaling up digital marketing processes. For the past year focused on ICO technology, founding ICOBox company which has just successfully completed more than 40 ICOs. Came to blockchain sector in 2014 and immediately got involved with cryptocurrency mining assets, including mining facilities and capacities. . . . Over his 14-year career as an Internet entrepreneur developed numerous digital marketing and blockchain products. Resides in San Francisco, CA."

26.     At all relevant times, Defendant EVDOKIMOV was an "officer" or "agent" of the employer Defendant ICOBOX HUB within the meaning of the applicable statutory provisions of the FLSA and NYLL.

27.     Defendant I280 VENTURES LLC is a Delaware limited liability company, registration number 6638022, and a shareholder of Defendant ICOBOX HUB within the meaning of NYBCL § 630 at all relevant times.

28.     Defendant ICOBOX is a Cayman Islands exempted limited company, registration number 324092, with its registered office at Hermes Corporate Services Ltd., P.O. Box 31493, George Town, Cayman Islands.

29.     Defendant ICOBOX was a shareholder of Defendant ICOBOX HUB within the meaning of NYBCL § 630 at all relevant times.

30.     Defendant GVA VESTOR.IN PARTNERS FUND, L.P., is a Cayman Islands exempted limited partnership, with the registered address at Harbour Place, 103 S Church St, George Town, Cayman Islands.

31.     Defendant GVA VESTOR.IN PARTNERS FUND, L.P., was a shareholder of Defendant ICOBOX HUB within the meaning of NYBCL § 630 at all relevant times.

32.     Defendant MOSKOVSKY was the CEO of Defendant ICOBOX at all relevant times. According to his Linkedin profile, an "Expert Internet entrepreneur with over 7 years experience. Founder, CEO and Chairman of the Board of numerous successful social media platforms and projects. Created SaaS solutions for social media marketing. Specializes in process automation in finance, fintech, and digital marketing. Resides in Moscow, Russia."

33.     Defendant MOSKOVSKY was a shareholder of Defendant ICOBOX HUB within the meaning of NYBCL § 630 at all relevant times.

34.     Defendant GENERALOVA is one of the founders of Defendant ICOBOX; according to her Linkedin profile, she is "a marketing, PR & communications specialist worked as a consultant to Argon Group and helped launch ICO platform Cryptonomos. Speaker at

numerous international conferences in fintech and blockchain, including Money2020, Consensus, CoinAgenda in the US, World Blockchain Forum in London, Blockchain Labo in Tokyo, and others. Resides in Toronto, Canada."

35.     Defendant GENERALOVA was a shareholder of Defendant ICOBOX HUB within the meaning of NYBCL § 630 at all relevant times.

36.     Defendant BABAYEV is a co-founder of Defendant ICOBOX; according to his Linkedin profile, he is a "Digital marketing specialist with 14 years of hands-on experience, co-founded, supported and developed several IT startups and his own advertising network. . . . For the past year has been focusing on blockchain, specifically on cryptocurrencies; for the past 6 months – on product development and cryptocurrency mining. Co-author of several books on digital advertising. Resides in the U.S."

37.     Defendant BABAYEV was a shareholder of Defendant ICOBOX HUB within the meaning of NYBCL § 630 at all relevant times.

38.      Defendant RAITSIN is a co-founder of Defendant ICOBOX; according to his Linkedin profile, he was also an investor in SnowFox Technologies and Petcube, residing in London, U.K.

39.     Defendant RAITSIN was a shareholder of Defendant ICOBOX HUB within the meaning of NYBCL § 630 at all relevant times.

40.     Defendant ICOBOX HUB's Board of Directors was comprised of Defendant EVDOKIMOV as well as Messrs. Artem Smirnov, Ilya Zibarev, Pavel Cherkashin, Gary Baiton, and Kirill Golovanov at all relevant times.

41.     Mr. Smirnov is the son of Vladimir Smirnov, Deputy Chairman of the Board of Novatek, large oil company in Russia and, upon information and belief, an undisclosed beneficial owner of Defendant ICOBOX residing in Moscow, Russia.

42.     Mr. Zibarev is a former Chairman of the Board of Russian Standard bank, belonging to Russian oligarch Rustam Tariko, residing in Moscow, Russia.

43.     Mr. Golovanov is a director of Defendant ICOBOC HOB, residing in Moscow, Russia.

44.     Mr. Cherkashin is a managing partner of Defendant GVA Capital and an investor in AI and blockchain companies, residing in San Francisco, CA.

45.     Mr. Baiton is a Senior Business Advisor at Crypto Lawyers Corp; an expert in blockchain and ICOs, angel and crypto investor, residing in San Francisco, CA.

## FACTS

### A.  Formation of the contractual/employment relationships

46.     In the Fall of 2017, Plaintiff Morozov was residing in New York while exploring various executive-level career opportunities nationwide, and was entertaining an attractive proposal from a California-based cannabis-growing company for an executive position with a compensation package including a $250,000 base annual salary; an annual bonus equal to 5% of the company's EBIDTA; 5% of the company's equity; medical, dental, vision insurance coverage paid by employer; relocation assistance from New York to San Francisco; paid vacation and sick leave, executive secretary; insurance coverage; indemnity; travel and expenses allowance, and other executive perks.

47.     On or about November 30, 2017, Plaintiff Morozov and his spouse and assistant Liana Shushkevich met in New York with Defendant EVDOKIMOV and his personal assistant; Plaintiff Morozov's friend Alexander Garbuzov was also in attendance.

48.     At that November 30, 2017 meeting, Defendant EVDOKIMOV offered Plaintiff a CEO position with Defendant ICOBOX HUB. Plaintiff then told Defendant EVDOKIMOV about the pending cannabis company offer, and Defendant EVDOKIMOV said that he would beat that offer and proposed the following terms: a $325,000 base annual salary, 6% EBIDTA, 6% of the Company's equity; medical, dental, vision insurance coverage paid by employer; $10,000 relocation assistance to defray the costs of moving from New York to San Francisco; paid vacation and sick leave; executive secretary, insurance coverage; indemnity; travel and expenses allowance and other executive perks.

49.     In response, Plaintiff Morozov offered to split the total compensation offered by Defendant EVDOKIMOV between his employment agreement and a services agreement with his financial consulting firm MEM (since MEM was already offering standard management and financial functions to its other customers), and Defendant Evdokimov agreed to that arrangement.

50.     Plaintiff took down the terms orally agreed upon at that November 30, 2017 meeting and memorialized them in his next day's email to Defendant EVDOKIMOV'S assistant as Defendant Evdokimov does not usually reads emails himself, as well as to Defendant ICOBOX HUB's General Counsel Alex Yastremski.

51.     On December 4, 2018, Defendant EVDOKIMOV's assistant confirmed those terms by email, and asked Plaintiff Morozov to have his lawyers prepare the Employment, Services, and Indemnity Agreements, writing: "Also, keeping Alex [Yastremski] in copy and

confirming the terms we are working with: dates changed! Start from 2018 for 3 yrs, base $325K/yr (split: 80 on w2, rest corp to corp) payable bi-weekly, annual bonus 6% of EBITDA, 2% equity per year for 3 years, coverage: med/dent/vision/life, D&O, E&O, indemnity. You can create the contract meanwhile."

52.     Upon receipt of this unequivocal confirmation of his terms of employment, Plaintiff retained employment counsel and, with counsel's assistance, proceeded to draft the three agreements eventually executed by the parties, forwarding the drafts to Defendant EVDOKIMOV's assistant and to Mr. Yastremski on December 11, 2017. In reliance on the agreed-upon terms of employment with Defendant ICOBOX HUB, Plaintiff then rejected the competing full-time offer from the cannabis industry company.

53.     In mid-December, Mr. Yastremski informed Plaintiff that Defendants would have comments on the draft agreement, but their only substantive comment was to revise the commencement date from December 15, 2017 to January 1, 2018.

54.     Plaintiffs agreed, and the Agreements were fully signed by the parties on January 1-2, 2018.

**B.  The relevant contracts**

55.     Effective as of January 1, 2018, Plaintiff entered into the Employment Agreement with Defendant ICOBOX HUB to serve as its CEO.

56.     The Employment Agreement provides in relevant parts:

    1.  EMPLOYMENT DUTIES AND RESPONSIBILITIES

    1.1 Position and Title. Effective **January 1, 2018** ("Employment Date"), Company hereby agrees to employ Employee in the position of Chief Executive Officer and Employee hereby accepts such position and agrees to serve Company in such capacity during his employment, subject to termination as provided hereunder. . . . .

2.  COMPANY DUTIES AND RESPONSIBILITIES

   2.1 Company and Employee shall enter into an Indemnification Agreement, a copy of which is provided as Exhibit "B" to this Agreement.

   2.2 Company shall be responsible for purchase D&O insurance on behalf of CEO as further described in the Indemnification Agreement.

   2.3 Company is responsible for maintaining adequate E&O insurance for the duration of CEO's employment.

   2.4 Company shall be required to fund the Company's annual budget ("Annual Budget") in an appropriate and timely manner.

3.  COMPENSATION

   3.1 Base Salary. Company will pay Employee an annual Base Salary in the amount of **Eighty Thousand Dollars ($80,000)**, subject to applicable withholdings.

   3.2 Bonuses. Employee receive an annual bonus equal to Six Percent (6%) of Company's EBITDA.

   3.3 Equity Compensation. Employee shall receive equity compensation in the amount of Six Percent (6%) vested on a prorated monthly basis over a period of three (3) years and subject to separate agreement attached as an exhibit hereto.

   3.4 Expenses. Company will reimburse Employee for expenses in accordance with Company's Travel and Business Expense Policy attached hereto as Exhibit "C"

   3.5 Benefits. One [sic] formalized by Company, Employee shall in addition receive the following benefits: Social Security, disability, healthcare pension benefits, life insurance and paid time off per calendar year**.** Company shall pay 100% of medical, dental, vision, and life insurance for CEO in accordance with its healthcare policy.

   3.6 Personal Assistant. Employee will be permitted to select, hire and supervise a personal assistant to be employed by Company at a maximum base salary to be approved by the shareholders of the Company and subject to standard Company policies as formalized and updated from time to time by Company.

   3.7 Team Structure and Budget. In connection with execution of this Agreement, CEO shall present a Company budget and team structure proposal for Company's review and approval.

   3.8 Relocation Assistance. Following execution of this Agreement, Company shall pay CEO a one time of Ten Thousand Dollars ($10,000) for purposes of relocation assistance.

4. <u>TERM AND TERMINATION OF EMPLOYMENT</u>

4.1 <u>Initial Employment Term.</u> The initial term of Employee's employment with Company will be from the date of execution of this Agreement through December 31, 2020 (the "Initial Term"). Company and Employee may mutually choose to extend this agreement beyond the Initial Term.

4.2 <u>Termination of Employment in the Initial Term by Company.</u> Notwithstanding the foregoing:

 4.2.1 During the Initial Term, Company may terminate its employment relationship with Employee with thirty (30) days' written notice if the Company determines, in its sole discretion, that Employee is not fully performing his duties. If Company exercises its option to end the employment relationship under this Section, the Company will pay Employee his salary through the termination date and an additional four (4) months of salary payable in a lump sum within thirty (30) days of the termination date. Employee's annual bonus shall be equal to the amount due as of four months following the termination date. Employee shall be entitled to an additional four months of equity compensation following the termination date as described in section 3.3. Employee will not be eligible for any further compensation from Company. . . . .

6.7 <u>Governing Law</u>. This Agreement and the parties' performance hereunder shall be governed by and interpreted under the laws of the State of New York. Employee agrees to submit to the jurisdiction of the courts of the State of New York, and that venue for any action arising out of this Agreement or the parties performance hereunder shall be in the federal or state courts of New York.

6.8 <u>Attorneys' Fees</u>. In the event of a dispute arising out of the interpretation or enforcement of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees and costs.

57.     Also effective as of January 1, 2018, Plaintiff MEM entered into the Services

Agreement with Defendant ICOBOX HUB to provide management consulting services to the

Company in the financial and reporting areas.

58.     The Services Agreement, executed by Defendant EVDOKIMOV on behalf of

Defendant ICOBOX and by Plaintiff Morozov on behalf of Plaintiff MEM, includes the

following relevant provisions:

1.  Services. Company shall perform the following consulting services:
    a.  Building valuable partnerships
    b.  Integration with other Group companies
    c.  People management
    d.  Fundraising (investment, sponsorship, etc.)
    e.  Location expansion and growth strategy

2.  Fee. In consideration of the Services, Client shall pay to Company as follows:
    Monthly payment of $20,417 (Twenty Thousand Four Hundred Seventeen
    Dollars) payable in equal installments twice a month.

3.  Term. This Agreement shall commence on January 1, 2018 and shall remain
    effective through December 31, 2020 (the "Term"). Notwithstanding the
    foregoing this Agreement may be extended by mutual option to cover the need
    for ongoing services.

4.  Termination.
    a.  This Agreement may be terminated by Client upon thirty (30) days' prior
        written notice to Company.
    b.  Company may terminate this Agreement upon thirty (30) days' prior
        written notice to Client.
    c.  This Agreement may be terminated at any time by either party effective
        immediately if any party: (i) becomes insolvent, files a petition in
        bankruptcy, makes an assignment for the benefit of its creditors; or (ii)
        breaches any of its material responsibilities or obligations under this
        Agreement, which breach is not remedied within ten (10) days from
        receipt of written notice of such breach.

5.  Obligations upon Termination.

a. In the event of termination by Client prior to the end of the Term, for any reason whatsoever, Company shall be compensated for the Services performed through the date of termination in the amount of a prorated portion of the fees due and Client shall pay all expenses, fees, out of pocket and any additional costs incurred through and up to the date of cancellation. In addition, Client shall pay Company an additional Eighty One Thousand Six Hundred Sixty Eight Dollars ($81,668) as a cancellation fee ("Cancellation Fee"). It is expressly understood and agreed by the parties that the Cancellation Fee is fair and reasonable under the circumstances as Company is committing significant efforts and resources to Client for the duration of the Term. The parties intend that that the Cancellation Fee would serve to compensate Company for its commitment to Client as well as any damages incurred under this Section 5(a) and do not intend for it serve as a penalty. All payments under this Section 5(a) shall be made within Thirty (30) Days of the termination date. Other than as provided in this section 5 all rights and obligations of each party under this Agreement, exclusive of the Services, shall survive. . . . .

12. Dispute Resolution. Notwithstanding the place of its physical execution, this Agreement shall be governed by and interpreted under the internal substantive laws of the State of New York and the United States, without reference to conflicts of laws provisions.  In the event a dispute arises hereunder, either party may give the other party written notice of the dispute. Prior to commencing any legal action to resolve any dispute arising hereunder, the parties shall meet informally and attempt, for a period of no less than thirty (30) days, to resolve the dispute through good faith negotiation. Only after expiration of such thirty (30) day may either party commence appropriate legal action to resolve the dispute. In the event of legal action arising from or out of this Agreement or the relationship of the parties created hereby, the trier thereof may award to any party any reasonable attorneys' fees and other costs incurred in connection therewith.

59.     In addition to the Employment Agreement and the Services Agreement referenced above, Plaintiff Morozov and Defendant ICOBOX HUB entered into the Indemnification Agreement, whereby Defendant ICOBOX HUB agreed to indemnify Plaintiff Morozov "to the fullest extent permitted by applicable law," and to advance litigation expenses.

60.     Plaintiffs diligently performed their obligations under their respective Agreements and were ready, willing and able to continue to perform their obligations until such time when Defendants' breach prevented and excused their further performance.

### C. Plaintiff Morozov's efforts to correct Defendants' employment and other violations.

61.     During his two-month tenure as the CEO of Defendant ICOBOX HUB, Plaintiff Morozov had discovered, reported to Mr. Evdokimov and other ICOBOX's shareholders, and sought to correct a number of labor law, immigration law, tax law and sanctions violations.

62.     For example, one of the first tasks undertaken by Mr. Morozov shortly after starting his employment was to check that Defendant ICOBOX HUB's employees are legally employed. In response to Mr. Morozov's request, Defendant's Chief Communications Officer Victoria Pirumova, with Defendant EVDOKIMOV's knowledge, responded on January 10, 2018 that "all the employees below are qualified and have right to work in the U.S.," and that "the documents confirming the right to work in the U.S. will follow within next one week or so."

63.     In response, on January 11, Plaintiff Morozov stated that the Company needed to "confirm employment authorizations for all suggested employees" and suggested using E-Verify. The subsequent confirmation showed that four out of five employees were not authorized to work in the U.S.

64.     Plaintiff Morozov also spoke with Alex Yastremsky on or about January 11, 2018, voicing his concern that, according to the documents provided by Defendant EVDOKIMOV, shareholders paid up their contributions in cash, however this was not reflected on the books. Plaintiff Morozov asked where that cash was, to which Mr. Yastremsky had no answer.

65.     On January 10, 2018, Plaintiff Morozov wrote an email to Defendant ICOBOX

HUB's General Counsel Mr. Yastremsky, copying Defendant EVDOKIMOV, and stated as

follows: "Alex, some questions on the existing staff issues. Could you, please, explain the

current employment arrangements with the team in SF? How many are employed? Do all people

have US work permits? Are there any existing contracts? Do you have any thoughts who from

the existing we need to employ at ICOBOX HUB INC? So far I was told that only Nick, Sasha

Lopez and Alexandra Smelianska plan to be on ICOBOX HUB INC payroll, but Mrs Smelianska

does not have employment papers yet."

66.     Defendant EVDOKIMOV responded later that day through his Communication

Director Victoria Pirumova, writing: "Dear Eugene: Please see below the list of our 1099th &

W-2s and the payment for the services. The documents confirming the right to work in the U.S.

will follow within next one week or so. All the employees below are qualified and have right to

work in the U.S. 1) Oleksandra Syniacheva (W-2, $60,000 annual), 2) Nikolay Evdokimov (W-

2, $60,000 annual), 3) Viktoriia Pirumova  (W-2, $60,000 annual), 4) Alex Yastremskiy (W-2

$150,000 annual), 5) Andrey Verbitsky (1099)."

67.     When Plaintiff Morozov attempted to confirm that information, he discovered that

Ms. Syniacheva did not have any work permit to work in the US and advised her to immediately

engage an immigration attorney.

68.     On February 1, 2018, Plaintiff Morozov received an email from Defendant

MOSKOVSKY stating that "*we have a very difficult situation on our hands -- there are several*

*employees, which need to be paid in fiat, and we do not have an account. It is further*

*complicated by the fact that the payment date is February 5.* Please tell us if we can use your

account if it has been already opened?" By "fiat," Defendant MOSKOVSKY meant U.S. dollars rather than Bitcoins and other crypto-currencies that Defendants typically paid their employees.

69.     In his response to Defendant ICOBOX's lawyer Sergei Motov, introduced by Defendant MOSKOVSKY, Plaintiff Morozov wrote on the same day that in order to properly pay, Defendant ICOBOX needed to draft proper agreements with Defendant ICOBOX HUB, ensure proper budgeting, approve with management, provide passports of all contractors or employees, provide the structure and ownership of the company-payee.

70.     Plaintiff Morozov's instructions were ignored, and contractors and employees were paid under the table as has been the practice before Plaintiff Morozov's arrival.

71.     Plaintiff Morozov reported those violations to Defendants in his email on January 25, 2018 to Defendant EVDOKIMOV and the Company's shareholders and directors, including Defendants, and sought to have the violations fixed, writing: "***conducted examination of the employment status of the employees; found violations; immigration counsel retained for the employees***."

72.     Plaintiff Morozov again complained about these violations to Defendants in his email on February 1, 2018. Plaintiff Morozov also spoke to General Counsel Mr. Yastremsky and Defendant ICOBOX HUB's Communications Director Victoria Pirumova on or about January 31, 2018, and voiced his concerns. Mr. Yastremsky shared those concerns and agreed that immediate actions need to be taken to rectify the violations.

73.     Specifically, they talked about Ms. Alexandra Syniacheva, Ms. Nataliya Shiryaeva and Mr. Vlad Schetinin, who was stopped at the border upon entering the U.S. and questioned by an immigration officer. The officer reduced the permitted continuous stay for Mr.

Schetinin to 30 days. Mr. Schetinin came to Plaintiff Morozov for advice, who told him to leave the U.S. before the expiration of his visa and to re-apply.

74.     Plaintiff Morozov provided Mr. Schetinin and several other employees of Defendant ICOBOX HUB with an immigration attorney contact. Plaintiff Morozov also met with Igor Shoifot, a director of ICOBOX Fund, another entity within Defendant ICOBOX's group of companies, on or about February 8, 2018, raised the issue, and further on or around February 10, 2018 wrote an email to Defendant EVDOKIMOV and Mr. Shoifot requesting urgent attention to this matter, which request was ignored. ICOBOX Fund was another company of Defendant ICOBOX

75.     On January 30, 2018, Congress released a sweeping list of prominent Russian business and political figures, intending to sanction them for Russia's election meddling. The Trump administration was required to publish the list by the Countering America's Adversaries Through Sanctions Act (CAASTA), which was meant to punish Russia for its interference in the 2016 US election, as well as human rights violations, the annexation of Crimea and ongoing military operations in eastern Ukraine

76.     Upon learning of this list, Plaintiff Morozov checked if any of the Russian shareholders or Directors were on that list or directly associated with anyone who was, and found a direct association of Defendant ICOBOX HUB's director Mr. Smirnov with the Russian oligarch Leonid Mikhelson's Novatek, where Mr. Smirnov and his father used to work at top manager positions.

77.     Plaintiff Morozov also discovered Defendant ICOBOX HUB's director Mr. Zibarev's association with another Russian Oligarch Rustam Tariko, who owned the bank Russian Standard where Mr. Zibaref served as Chairman of the Board.

78.     Plaintiff Morozov repeatedly raised that issue with Defendant EVDOKIMOV. On February 22, 2018, when the parties were still in discussions regarding Plaintiff Morozov's position at Defendant ICOBOX HUB, Plaintiff Morozov wrote to Defendant EVDOKIMOV: "***I ask the current ICOBOX HUB INC shareholders to consider alternative funding sources which would allow for successful launch of our wonderful project without taking money from individuals on the US Congress sanctions list***."

79.     Plaintiff Morozov's warning and advice were ignored, and Defendant EVDOKIMOV continued to negotiate with associates of individuals on the sanctions list, while terminating Plaintiff Morozov.

80.     Finally, Plaintiff Morozov complained about Defendant ICOBOX HUB's delaying or not paying wages throughout his brief stay at the company. There were 4 instances in 2018 when Defendants did not pay timely wages to Defendant ICOBOX HUB's employees, of which there was only Plaintiff Morozov during the relevant period.

81.     Defendants failed to pay wages on time on the following occasions:

       f.   The January 15 wages were not paid until February 3 (18-days delay)

       g.   The January 31 wages were not paid until February 3 (3-days delay)

       h.   The February 15 wages have not paid as of the date of this complaint;

       i.   The February 28 wages have not paid as of the date of this complaint.

82.     According, Plaintiff Morozov is entitled to recover his unpaid/delayed wages and additional statutory damages in the amount of those unpaid/delayed wages.

83.     Plaintiff Morozov was terminated immediately following his reports of those violations and the corrective actions which had to be taken and paid for – which the shareholders did not want to do, particularly following the bitcoin crash.

84.     Upon information and belief, Plaintiff Morozov was terminated in retaliation for his reporting of the violations and his insistence that Defendants should conduct their business legally, even if that meant having to spend more money, because shareholders quickly lost any appetite for spending money on legal compliance in the wake of the bitcoin crash.

85.     Finally, According to US Treasury's OFAC, IRS, and other regulators, crypto-currencies other crypto-assets are subject to reporting in the U.S. While working for Defendant ICOBOX HUB, Plaintiff Morozov learned that Defendants own significant number of assets on blockchain, raised more than $1 billion USD in 2015-2017 for various projects, some of which can be seen on Defendants' website  https://icos.icobox.io/projects/finished, but failed to report their assets and revenues to IRS.

### D.   Defendants' Termination of the Agreements Entitles Plaintiffs to Their Respective Measures of Contract Damages.

86.     Between December 18, 2017, and February 6, 2018, the value of Bitcoin crashed 70% from $19,994 to $6,048, and the Defendants contracted a severe case of buyers' remorse and lost any appetite for meeting their commitments to the Plaintiffs (or to Defendant ICOBOX HUB for that matter).

87.     Thus, when the parties entered into the relevant agreements in early January 2018, Defendant EVDOKIMOV represented to Plaintiffs that Defendant ICOBOX HUB had already been funded with $3,000,000. That representation was false as Defendant ICOBOX HUB had only $100 on its bank account at the time.

88.     By end of January 2018, Defendant EVDOKIMOV reneged on the $3 million funding promise and undertook instead to send $300,000 to Defendant ICOBOX HUB to fund its operations and ongoing commitments to third parties. However, the promised $300,000 never materialized either.

89.     Defendants' failure to fund the Company cause it to be in breach of Section 2.4 of the Employment Agreement, which states that "Company shall be required to fund the Company's annual budget ("Annual Budget") in an appropriate and timely manner."

90.     On February 1, 2018, in a Telegram post Defendant EVDOKIMOV responding to Plaintiff Morozov inquiring where the promised money was, wrote "to start sales no protocols are needed, and very little money, I will talk to contractors and pay them. This is a startup, it has its own laws."

91.     Plaintiff Morozov responded on the same day: "Nik, you and I do not want to go to jail. Without proper back office we cannot start sales. If my 25 years of experience are not enough, ask any attorney in the U.S. The laws in the U.S. apply to everyone."

92.     A week later, on February 9, 2018, Defendant EVDOKIMOV informed Plaintiffs that Defendant ICOBOX HUB's shareholders decided to scale back dramatically their investment in the planned expansion of the Company, and eliminated Plaintiff's position as the CEO, offering him a consulting role instead.

93.     Defendant EVDOKIMOV explained the shareholders' decision by alleging that Plaintiff Morozov was trying to do too much too fast, purportedly trying to build a "Google" while the shareholders intended to be a small-scale startup (having quickly forgotten all their financial commitments and promises made just a few weeks earlier). Defendants also terminated Plaintiff MEM's Services Agreement.

94.     Defendants further stated that they would not make any payments pursuant to the contracts with various vendors and service providers that Plaintiff Morozov had already executed as the CEO of the Company.

95.     Accordingly, Defendants breached the Employment Agreement because they improperly terminated Plaintiff Morozov during the initial 3-year term of the Agreement.

### 1.   **Plaintiff Morozov's Damages Under the Employment Agreement**

96.     The Employment Agreement provides that during that initial term, the Company can terminate Plaintiff Morozov only "if the Company determines, in its sole discretion, that Employee is not fully performing his duties." There was never – nor could there have ever been – any such determination:  if anything, as shown above, Plaintiff was trying to carry out the shareholders' initial ambitious vision for the Company, which the shareholder themselves had lost an appetite for after the bitcoin crash.

97.     Accordingly, the Company's termination of Plaintiff Morozov's employment during the initial three-year term of the Agreement constitutes a material breach of that Agreement, excusing Plaintiff Morozov's further performance under the Agreement and entitling him to his benefits-of-the-bargain damages, *i.e.*, his compensation due under the Agreement in the amount of his salary and benefits for the three-year initial term.

98.     In addition, Plaintiff Morozov relocated to San Francisco from New York with his spouse and assistant Liana Shushkevich to work for Defendant ICOBOX HUB, and incurred well in excess of the $10,000 relocation expenses provided for by Section 3.8 of the Employment Agreement. Defendants did not offer to compensate him for any of those expenses, and in fact refused to do so in the post-termination discussions.

99.     Further, the Employment Agreement Section 3.6 permitted Plaintiff Morozov "to select, hire and supervise a personal assistant to be employed by Company at a maximum base salary to be approved by the shareholders of the Company and subject to standard Company policies."

100.    In the course of his employment with Defendant ICOBOX HUB, Plaintiff

Morozov, with Defendant EVDOKIMOV's knowledge and consent, employed his spouse and

assistant Liana Shushkevich as a personal assistant contemplated by the Agreement. Moreover,

also with Defendants' knowledge and consent, Ms. Shushkevich acted as Defendant ICOBOX

HUB's corporate secretary during the relevant period. Accordingly, Plaintiff Morozov is entitled

to be reimbursed by Defendant ICOBOX HUB for Ms. Shushkevich's assistance pursuant to

Section 3.6 of the Employment Agreement.

101.    Plaintiff Morozov also incurred significant consequential damages from

Defendants' breach of the Employment Agreement in the form of a reputational injury as a result

of Defendants' breach. During his employment as the CEO of Defendant ICOBOX HUB,

Plaintiff negotiated significant transactions with various counterparties using, *inter alia*, his

personal and business connections. Such counterparties included the Trump Organization, the

Durst Organization, Protax Inc., Standard Capital Group, and others.

102.    Plaintiff Morozov also reached out to his many other contacts seeking to enlist

their cooperation with Defendant ICOBOX HUB, made written and oral presentations to and

entered into agreements with some of them. Defendants' subsequent termination of Plaintiff's

position forced Plaintiff to renege on his own promises and commitments made to his

counterparts, severely damaging his business standing and professional reputation.

103.    Plaintiff Morozov is also entitled to his attorneys' fees incurred in pursuit of this

action under Section 6.8 of the Employment Agreement.

### 2.  Plaintiff MEM's Damages Under the Services Agreement

104.    Plaintiff MEM's Services Agreement, also terminated by Defendants, provides

that "[i]n the event of termination by Client prior to the end of the Term, for any reason

whatsoever, Company shall be compensated for the Services performed through the date of termination in the amount of a prorated portion of the fees due and Client shall pay all expenses, fees, out of pocket and any additional costs incurred through and up to the date of cancellation."

105.    The Services Agreement further provides that "[i] in addition, Client shall pay Company an additional Eighty One Thousand Six Hundred Sixty Eight Dollars ($81,668) as a cancellation fee ("Cancellation Fee"). It is expressly understood and agreed by the parties that the Cancellation Fee is fair and reasonable under the circumstances as Company is committing significant efforts and resources to Client for the duration of the Term. The parties intend that that the Cancellation Fee would serve to compensate Company for its commitment to Client as well as any damages incurred under this Section 5(a) and do not intend for it serve as a penalty."

106.    Accordingly, Plaintiff MEM is entitled to the pro-rata portion of its fees through the termination date, plus the Cancellation Fee of $81,668.

107.    In addition, Plaintiff MEM is also entitled to its attorneys' fees incurred in pursuit of this action under Section 5 of the Services Agreement.

## CAUSES OF ACTION

### COUNT I
### Breach of Contract (the Employment Agreement)
### (By Plaintiff Morozov)

108.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

109.    Plaintiff Morozov and Defendant ICOBOX HUB are parties to a valid contract -- the Employment Agreement dated as of January 1, 2018. Plaintiff Morozov has acted in full compliance with his contractual duties under the Employment Agreement and in good faith, and is not in breach thereof.

110.    Defendant ICOBOX HUB did not fulfil its contractual obligations and is in material breach of numerous provisions of the Employment Agreement arising out of its termination of Plaintiff Morozov and otherwise, as set out above.

111.    Accordingly, Defendant ICOBOX HUB is liable to Plaintiff Morozov for his benefits-of-the-bargain damages, which includes his compensation and benefits for the 3-year term of the Agreement, as well as his out-of-pocket relocation expenses and the "personal assistant" allowance, in the amount of not less than $550,000.

112.    Plaintiff Morozov is also entitled to his reputational damages caused directly and proximately by Defendants' breach of contract, in an amount to be determined at trial.

113.    Plaintiff Morozov is also entitled to his attorneys' fees and costs pursuant to Section 6.8 of the Employment Agreement.

## COUNT II
### Breach of Contract (the Services Agreement)
### (By Plaintiff MEM)

114.    Plaintiffs reallege and incorporate by reference all paragraphs of this Comlpaint as though fully set forth herein.

115.    Plaintiff MEM and Defendant ICOBOX HUB are parties to a valid contract -- the Services Agreement executed as of January 1, 2018.

116.    Plaintiff MEM has acted in full compliance with its contractual duties under the Services Agreement and in good faith, and is not in breach thereof.

117.    Defendant ICOBOX HUB terminated the Services Agreement on February 9, 2018.

118.    Accordingly, Plaintiff MEM is entitled to a pro-rata portion of its fees and the Cancellation Fee, for the total amount of $143,000.

119.    Plaintiff MEM is also entitled to its attorneys' fees incurred in pursuit of this action under Section 5 of the Services Agreement.

### COUNT III
**Failure to pay timely wages in violation of the FLSA**
**(By Plaintiff Morozov)**

120.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

121.    Plaintiff Morozov is a covered non-exempt employee within the meaning of FLSA. Plaintiff was not paid his wages on time on at least 4 separate occasions in the course of his short employment with Defendant ICOBOX HUB.

122.    While the FLSA contains no explicit deadline for paying the required wages, the U.S. Supreme Court and other authorities concluded that an employer violates the FLSA when it does not pay its workers the necessary FLSA wages on the regular paydays for the work performed. *See also* 29 C.F.R. § 790.21(b) ("The courts have held that a cause of action under the Fair Labor Standards Act for unpaid minimum wages or unpaid overtime compensation and for liquidated damages 'accrues' when the employer fails to pay the required compensation for any workweek at the regular pay day for the period in which the workweek ends.")

123.    Defendants' failure to pay Plaintiff's wages on time was therefore unlawful under the FLSA and entitles Plaintiff to an additional amount equal to the untimely paid wages as "liquidated damages" under the FLSA's Section 16(b), 29 U.S.C. § 216(b).

124.    Defendants violated the FLSA knowingly and willfully, as they knew that the failure to pay wages on time was illegal.

125.     These violations make the Defendants jointly and severally liable to Plaintiff

Morozov for damages, including liquidated damages pursuant to FLSA § 16(b), in the amount to

be determined at trial.

**COUNT IV**
**Failure to pay timely wages in violation of NYLL § 191 and NYBCL § 630**
**(By Plaintiff Morozov)**

126.     Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint

as though fully set forth herein.

127.     The NYLL requires covered "employers" such as Defendant ICOBOX to pay

employees the wages with the requisite frequency in accordance with the agreed terms of

employment "but not less frequently than semi-monthly, on regular pay days designated in

advance by the employer" for employees such as Plaintiff Morozov.

128.     Defendants did not pay Plaintiff Morozov his wages timely on at least 4 separate

occasions in the course of his employment with Defendant ICOBOX HUB.

129.     New York Business Corporation Law § 630 further provides that "[t]he ten largest

shareholders, as determined by the fair value of their beneficial interest as of the beginning of the

period during which the unpaid services referred to in this section are performed, of every

domestic corporation or of any foreign corporation, when the unpaid services were performed in

the state, no shares of which are listed on a national securities exchange or regularly quoted in an

over-the-counter market by one or more members of a national or an affiliated securities

association, shall jointly and severally be personally liable for all debts, wages or salaries due

and owing to any of its laborers, servants or employees other than contractors, for services

performed by them for such corporation."

130.    Defendant ICOBOX HUB and its largest shareholders Defendants  ICOBOX,

MOSKOVSKY, GENERALOVA, BABAYEV, EVDOKIMOV., RAITSIN, 1280 VENTURES

LLC, and GVA VESTOR.IN PARTNERS FUND, L.P., committed these labor law violations

knowingly and willfully, and are jointly and severally liable to Plaintiff Morozov for damages,

including liquidated damages, and attorneys' fees and costs.

**COUNT V**
**Retaliatory discharge in violation of FLSA § 15(a)(3)**
**(By Plaintiffs Morozov)**

131.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint

as though fully set forth herein.

132.    Section 15(a)(3) of the FLSA, 29 U.S.C. § 215(a)(3), makes it unlawful for "any

person . . . to discharge or in any other manner discriminate against any employee because such

employee has filed any complaint or instituted or caused to be instituted any proceeding under or

related to this chapter, or has testified or is about to testify in any such proceeding, or has served

or is about to serve on an industry committee."

133.    Defendants ICOBOX HUB and EVDOKIMOV terminated Plaintiff Morozov

following and in retaliation for his reports of Defendants' violations of labor, immigration, tax

and other laws. Plaintiff Morozov made his reports in January 2018 and was abruptly terminated

in early February.

134.    As a direct and proximate result of Defendants' unlawful retaliatory conduct,

Plaintiff Morozov has suffered and continues to suffer monetary and other economic harm

entitling him to an award of monetary damages.

135.    Section 16(b) of the FLSA, 29 U.S.C. § 216(b), provides that "[a]ny employer

who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or

equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title,

including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages. . . . The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

136.     Defendants are all "persons" within the meaning of the FLSA § 215(a)(3) and are jointly and severally liable to Plaintiff for his injuries, including reasonable attorney's fees and costs of this action.

**COUNT IV**
**Retaliatory discharge in violation of NYLL § 215**
**(By Plaintiff Morozov)**

137.     Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as though fully set forth herein.

138.     Section 215 of the NYLL makes it illegal for employers to discharge, penalize, or in any manner discriminate or retaliate against an employee for making a complaint about a possible labor law violation to the employer.

139.     Defendants ICOBOX and EVDOKIMOV terminated both Plaintiff following and in retaliation for Plaintiff Morozov's reports concerning Defendants' labor, immigration, tax and sanctions laws violations, Plaintiff Morozov having made those reports in January and terminated in early February 2018.

140.     Section 215 also provides for criminal sanctions for such retaliation, including personal criminal liability of the company's officers or agents, and requires that that "[a]t or before the commencement of any action under this section, notice thereof shall be served upon the attorney general by the employee." Plaintiff Morozov intends to provide the required statutory notice to the New York Attorney General at or before the filing of this complaint.

141.     Defendants retaliated against Plaintiff Morozov for his numerous complaints about labor law and other violations that he had made to his employer Defendants ICOBOX HUB and EVDOKIMOV and terminated him shortly after those complaints.

142.     This abrupt and wholly undeserved firing of Plaintiff Morozov left the family without any income; severely damaged Plaintiff's business reputations and career prospects; and left Plaintiff and his spouse in veritable shock after they had just moved the house across the country from New York to San Francisco for this job, having forgone other opportunities.

143.     As a direct and proximate result of Defendants' unlawful retaliatory conduct, Plaintiff Morozov has suffered and continues to suffer monetary and other economic harm entitling them to an award of monetary damages.

144.     The foregoing conduct of the Defendants constitutes willful violations of the NYLL, making them jointly and severally liable to Plaintiff Morozov for punitive and/or liquidated damages.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court enter a judgment against Defendants, including the following:

(a)   Actual damages in an amount according to proof at trial;

(b)   Liquidated, punitive, and statutory damages;

(c)   Pre-judgment interest at the maximum rate permitted by applicable law;

(d)   An order awarding Plaintiffs their attorney's fees and costs and expenses in connection with this action; and

(e)   Such other and further relief as the Court deems just and appropriate.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, of all issues so triable.

DATED:  April 18, 2018                                Respectfully Submitted,

_____
Dimitry Joffe

JOFFE LAW P.C.
The Helmsley Building
230 Park Avenue, 10 Fl.
New York, NY 10169
(212) 309-8711
dimitry@joffe.law

*Counsel for the Plaintiffs*