ICC9MORA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   EUGENE MOROZOV, ET AL.,

4                 Plaintiffs,

5            v.                              18 CV 3421 (GBD)

6   ICOBOX HUB INC., ET AL. ,

7                 Defendants.

8   ------------------------------x
                                            New York, N.Y.
9                                           December 12, 2018
                                            10:28 a.m.
10
    Before:
11
                     HON. GEORGE B. DANIELS
12
                                            District Judge
13
                          APPEARANCES
14
    JOFFE LAW P.C.
15       Attorney for Plaintiffs
    BY:  DIMITRY JOFFE
16
    LUST & LEONOV, P.C.
17       Attorney for Defendants
    BY:  ROMAN LEONOV
18

19

20

21

22

23

24

25

ICC9MORA

```
 1            (Case called)
 2            MR. JOFFE:  Dimitry Joffe, Joffe Law P.C., appearing
 3    for plaintiffs.
 4            THE COURT:  Good morning, Mr. Joffe.
 5            MR. LEONOV:  Good morning, your Honor.  Roman Leonov
 6    from Lust & Leonov, P.C. for all the defendants.
 7            THE COURT:  Good morning.
 8            Before Mr. Joffe I hear you with regard to your motion
 9    for an order of attachment let me just deal with some other
10    issues that the parties have raised.
11            MR. JOFFE:  Sure.
12            THE COURT:  Mr. Leonov, you moved to withdraw as
13    counsel for one of the defendants.
14            MR. LEONOV:  That's correct, your Honor.  For
15    Alexander Moskovsky.  That's correct.
16            THE COURT:  What is his intention?  Because,
17    obviously, he exposes himself to a default judgment against him
18    if he doesn't obtain another attorney or represent himself.  So
19    I want to make sure that he understands what the consequences
20    are of not having an attorney here and how he wants to proceed.
21            MR. LEONOV:  He does, your Honor.  And I explained it
22    to him.  And his intentions were that I still make that motion.
23    What his other intentions are, I do not know, so.
24            THE COURT:  Does he intend to get another lawyer?
25    Does he intend to represent himself?  Does he intend to abandon
```

ICC9MORA

1    the defense of this case?

2              MR. LEONOV:  I explained all options to him.  He gave

3    me no information further than withdrawing.

4              THE COURT:  This is what I want.  I want a letter to

5    him indicating that I intend to grant your motion, if that's

6    his intent to proceed without counsel, without you as counsel.

7    But I want it in writing clear to him that he still has a

8    responsibility to defend this case.  And if he doesn't get a

9    new lawyer or indicate that he intends to defend himself

10   personally by participating in this case and coming to court,

11   then he may expose himself to a default judgment.

12             MR. LEONOV:  Certainly, your Honor.

13             THE COURT:  So make that clear to him.  Once I see

14   that letter, it's provided to him -- is he in the United

15   States?

16             MR. LEONOV:  I believe he's not, your Honor.

17             THE COURT:  Not?

18             MR. LEONOV:  I believe he's not.

19             THE COURT:  So when I see that letter I'll so order it

20   and relieve you with regard to that.

21             MR. LEONOV:  Yes.

22             THE COURT:  Was he served?

23             MR. LEONOV:  He made an appearance, yes.

24             THE COURT:  So we'll proceed that way with regard to

25   that.

ICC9MORA

1              MR. LEONOV:  Thank you.

2              THE COURT:  Just remind me.  What is his -- other than

3      being a shareholder in the original company, the ICOBOX Hub,

4      what is his other relationship to this?

5              MR. LEONOV:  That is the issue.  He was never a

6      shareholder of ICOBOX Hub.  He had a relationship with ICOBOX

7      which ended, according to him, before the plaintiff was

8      involved.

9              THE COURT:  So ICOBOX --

10             MR. LEONOV:  It's a separate entity.

11             THE COURT:  -- Hub, Inc.

12             MR. LEONOV:  No.  ICOBOX, he was involved with ICOBOX,

13     which is a Cayman entity.

14             THE COURT:  And ICOBOX Hub, Inc. is a different entity

15     than ICOBOX?

16             MR. LEONOV:  That is correct.

17             THE COURT:  And he was a principal or shareholder of

18     ICOBOX?

19             MR. LEONOV:  He was involved with ICOBOX but he was

20     never involved --

21             THE COURT:  I know, but what was the nature of his --

22             MR. LEONOV:  I believe he was involved there as an

23     investor or as one of the managers.

24             THE COURT:  And ICOBOX, the difference between ICOBOX

25     and ICOBOX Hub is what?

ICC9MORA

1          MR. LEONOV:  ICOBOX is an entity in the Cayman Islands

2     and ICOBOX Hub, Inc. is an entity that tried to organize a

3     business in the United States.

4          THE COURT:  What is the nature of the business?

5          MR. LEONOV:  ICOBOX Hub, Inc. tried to engage into

6     making cryptocurrency tokens and ICOBOX is already in the

7     business of a similar business and nature but has its own

8     tokens different from ICOBOX Hub, Inc.

9          THE COURT:  And ICOBOX -- my recollection is that the

10    employment contract between the plaintiff and -- the employment

11    contract with the plaintiff was to be the CEO of ICOBOX Hub?

12         MR. LEONOV:  Correct.

13         THE COURT:  All right.  So let me put that aside for

14    now.

15          I also received some letters with regard to discovery.

16    Is there a genuine dispute about discovery?

17          I guess I should turn that to you, Mr. Joffe.  Is

18    there something that you know exists that you asked for that

19    they are refusing to give you?

20         MR. JOFFE:  Your Honor, yes.  The produced few

21    documents and among them only a handful, one or two, internal

22    correspondence.

23         THE COURT:  So what do you think exists that you think

24    that you are entitled?

25         MR. JOFFE:  Even the pieces, one or two pieces that

ICC9MORA

1    they produced, showed that there is a number of discussions

2    among the principals of ICOBOX Hub related to my client.

3              THE COURT:  Well what do you think -- are you looking

4    for a particular document that you think exists?

5              MR. JOFFE:  I'm looking for internal discussions on

6    how my client --

7              THE COURT:  I know.  But they say it doesn't exist.

8    So I'm trying to identify -- they say they gave you all the

9    correspondence.

10             MR. JOFFE:  They produced one e-mail, internal e-mail,

11   and they said nothing else exists internally.

12             THE COURT:  So do you have some reason to believe that

13   something else does exist?

14             MR. JOFFE:  I have reason to believe that there will

15   be correspondence were involved, correspondence through all

16   that period.  They were using e-mails.  They were using --

17             THE COURT:  Well do you have any correspondence that

18   reflect additional documents that you don't -- that you

19   requested that you didn't receive?

20             MR. JOFFE:  Yes.  We produced our correspondence from

21   my client that was going to the other side, to defendants.  And

22   we produced a lot of pieces of that correspondence.  It is just

23   impossible that they've not communicated amongst themselves

24   other than one e-mail that they've produced.

25             THE COURT:  Well you say that it's impossible, but I

ICC9MORA

1    don't know what's impossible.  Either they say it exists or

2    they say it doesn't exist.  At this point in time the letter

3    that I have basically says that they produced everything and

4    they don't have anything.  And I'm not the Wizard of Oz.  I

5    can't tell them to produce something that doesn't exist.

6            So I'm trying to get from you, you say you know

7    something exists and they're hiding it or refusing to give it

8    to you, then I'll order them to give it to you.  But I'm not

9    sure what the two of you are fighting about.

10           Is there some particular set of documents that you're

11   fighting about or you just think that there must be something

12   more than what you got?

13           MR. JOFFE:  They didn't produce anything that related

14   to my client's hiring, his termination, his complaint --

15           THE COURT:  So what do you think exists?

16           MR. JOFFE:  I think there are internal e-mails or

17   texts among defendants who decided to terminate my client in

18   retaliation.  And I asked for them several times.  And what I

19   got back from defendants is that well if they are lost or

20   missing or destroyed then tough luck we cannot recreate them.

21           THE COURT:  But the letter that I received said that

22   they didn't represent that they were destroyed.  They

23   represented that they don't exist.

24           MR. JOFFE:  Well the e-mail that I quote in the letter

25   from Mr. Leonov said either they're missing or destroyed or

ICC9MORA

1    lost we cannot create them.

2           THE COURT:  Do you have a document, an example of a

3    document that you know exists that they should have produced

4    that you didn't get so I can get some idea what you think is

5    out there.

6           MR. JOFFE:  The one document that they produced, one

7    internal e-mail refers to that they had week-long discussions

8    about this matter amongst themselves and they are thinking what

9    to do and they decided that they will restructure and

10   terminate, all that.  Nothing -- none of those discussions

11   produced in any text or e-mail form.  And they communicated

12   amongst themselves by text and e-mails.  We know that because

13   at least one --

14          THE COURT:  So what do you want me to do?  I'm not

15   sure what you want me to do.

16          MR. JOFFE:  Your Honor --

17          THE COURT:  If such e-mails and texts exist, surely I

18   can order them to turn them over.  But if they say that they

19   don't exist the only thing I could do is sanction them if later

20   on you find or show me that they do exist and that they are

21   hiding them or something.

22          MR. JOFFE:  In our subsequent correspondence with

23   Mr. Leonov he kept referring to:  Oh, I can ask for my clients

24   to look for internal e-mails, or I can ask them to look for

25   internal texts and documents and see what they can produce.  So

ICC9MORA

1    even I think Mr. Leonov understands that there ought to be

2    communications on the subject.

3           Your Honor, the lawsuit was filed shortly after the

4    termination and retaliation and they knew that the litigation

5    was coming right there when he was terminated.  So it wasn't

6    like there was a delay when such e-mails could have been --

7           THE COURT:  I understand all that.  But my question

8    still is:  What do you want me to do?  I'm trying to assist

9    you.  What do you want me to do?  What do you want me to order

10   them to do?

11          MR. JOFFE:  To compel them to produce those documents

12   or to say that they were missing or destroyed and then I will

13   have spoliation --

14          THE COURT:  But I thought that the letter said that

15   those documents don't exist.

16          MR. JOFFE:  I will pull the letter.  I think I have

17   it.  And I will quote Mr. Leonov's e-mail saying that if the

18   documents -- well, the initial production from them was I think

19   14 documents and just one e-mail.  And when I raised the

20   issue -- and we produced thousand or something or more

21   correspondence in support.  And when I asked what other --

22   where are all the e-mails, where are the discussions, I got

23   back the response that they -- either lost or missing or

24   destroyed.  And if they were, we cannot produce them.

25          THE COURT:  So what do you --

ICC9MORA

1          MR. JOFFE:  So I kept insisting that we need some

2    documents.

3          THE COURT:  Well you don't need some documents if they

4    don't exist.

5          MR. JOFFE:  If they don't exist, they were destroyed

6    in anticipation of litigation because --

7          THE COURT:  Well, I don't know that.  That's a

8    different issue.

9          The issue I have right now is you want me to tell them

10    to produce documents.  They say that they produced all the

11    documents they have, that you're asking for documents that

12    don't exist.

13          MR. JOFFE:  I'm not sure they don't exist, your Honor.

14          THE COURT:  Well I'm not sure either.  But I can only

15    go by what they say.  If you can prove that they do exist, then

16    I can sanction them.  But if their representation is they

17    produced all the documents and they produced all the

18    correspondence that you've requested, obviously, minimally they

19    will be precluded from using it in their defense and they may

20    be sanctioned even further if it turns out that they do have

21    these documents and they misrepresented to the Court that they

22    don't exist.

23          As I say, I'm very happy to tell them that it's my

24    order that they produce those documents if they exist, but I

25    don't know what else I can do beyond that at this point unless

ICC9MORA

1   you can demonstrate to me that you know that there's a

2   particular document that you should have gotten in response and

3   that document should be among other documents that they didn't

4   produce.  But I don't see you -- I mean I don't know if there's

5   a particular document that you can identify that they have that

6   they're refusing to give you.

7          MR. JOFFE:  I'm unable to identify which document they

8   didn't produce because their production was such meager, I

9   can't point out that there was some piece of correspondence

10  missing.  There's nothing to go on.

11         However, your Honor, then after I take deposition, in

12  the absence of documents, I'll be able to, hopefully, to

13  pinpoint the documents.

14         THE COURT:  Obviously, whatever discussions they had

15  they were not in writing you have the opportunity to depose

16  those witnesses with regard to those discussions and they have

17  the responsibility to produce those relevant documents if those

18  documents exist and make a good faith effort to locate those

19  documents or at least to be able to affirmatively say whether

20  those documents exist or not.

21         Mr. Leonov, were there documents that the two of you

22  are fighting about?

23         MR. LEONOV:  Your Honor, that's the thing.  We are not

24  fighting about those.

25         I also made that point of what Mr. Joffe is referring

ICC9MORA

1    to.  I explained that if there were handwritten notes, I don't

2    know what they are.

3            As far as the e-mails, he's correct.  I went to my

4    clients and I told them:  If you have something that you can

5    give me, go to your e-mails and make a search for Morozov, and

6    whatever it is, give to me, and I will give to Mr. Joffe.  We

7    did that as well.

8            As far as the documents we produced, we did not

9    produce just one e-mail.  And that e-mail, along with others,

10   show communications.  But there is nothing else that I can give

11   you which doesn't exist.  We don't have any other e-mails and

12   that's about it.

13           THE COURT:  So you've produced all documents

14   responsive to this request?

15           MR. LEONOV:  Even documents that just mention

16   Mr. Morozov.  We have nothing else to produce regarding his

17   request.  As far as communication.

18           As far as destroying documents before litigation.  We

19   did not.  We even produced documents which were way before.  So

20   we did not do that.  My client did not do that.  We don't have

21   anything else -- we're not hiding anything.  It's not in our

22   interests to do that.

23           THE COURT:  Well, the only thing I can do is accept

24   your representations with regard to that.  If it turns out that

25   your clients do have other information and they either

ICC9MORA

1  misstated it --

2          MR. LEONOV:  And they're aware of it.

3          THE COURT:  -- and they come across something that

4  they didn't think they had, then they should produce it right

5  away.

6          MR. LEONOV:  We are well aware of that.  We are aware

7  of the consequences and so am I.

8          I've spoken to them numerous times and I can represent

9  to you that we produced all the documents that we have.  They

10  are looking for a particular document which states we

11  terminated Mr. Morozov because of retaliation; if we have it,

12  we would produce it, but we do not.

13          THE COURT:  Then I'm going to assume at this point

14  that you produced all the documents in your client's possession

15  that were responsive to the request.

16          MR. LEONOV:  To the best of my knowledge, that's

17  correct.

18          THE COURT:  And if it turns out that that's not the

19  case, then we can address it again.

20          MR. LEONOV:  Yes, your Honor.

21          THE COURT:  But your clients have made sure that

22  they've made a thorough search for all the documents and there

23  are no further documents that they have in their possession

24  that are responsive to the request for communications.

25          MR. LEONOV:  Certainly.

ICC9MORA

1          THE COURT:  Mr. Joffe, you can raise this issue again

2     if you can give me some evidence that there's some other

3     documents out there.

4          MR. JOFFE:  Thank you, your Honor.

5          THE COURT:  My point is always that it's only a

6     genuine discovery dispute if you can say to me I've asked the

7     other side for X and they have refused.  So I don't hear them

8     saying that.  I don't hear you saying that they've refused to

9     give me something.  I hear them saying that they gave you

10    whatever they have and they don't have anything more.

11    Sometimes that makes sense.  Sometimes it doesn't make sense.

12    But if that's the reality, then there's not much else I can do

13    at this stage unless you can demonstrate that there is evidence

14    that they have additional documents that they should have

15    produced to you; and if you do, the first thing you should do

16    is show that to Mr. Leonov.  If you have some correspondence in

17    your file that you say should have been produced and you can

18    show him what it is that you have and he can go back and

19    confront his client with it, then we can make some more

20    progress.  But otherwise, as long as the representation is that

21    this is all the documents that exist and they're not refusing

22    to give you anything and they produced all the documents in

23    their possession, I can only rely on that until and unless

24    there's evidence to the contrary.

25          MR. JOFFE:  Understand.  Thank you, your Honor.

ICC9MORA

1          MR. LEONOV:  Thank you, Judge.

2          THE COURT:  Mr. Joffe, let me hear you with regard to

3   your motion for an order of attachment.

4          I guess the way I want to start the focus is that you

5   have a number of defendants, and I'm not quite sure exactly

6   what property of whom -- whose property that you want to

7   attach.  So why don't you give me some idea of what you think

8   exists and where you think these things are located and why you

9   think that there's a basis to attach any one or more of these

10  defendants' contents in a court proceeding.

11         MR. JOFFE:  Federal Rule 64(a) allows for revenue

12  attachment if it's available under state law.  And New York law

13  provides for attachment under CPLR Section 6201.

14         And there are two bases for attachment that are

15  relevant for our case.  One is 6201 subsection (1) that

16  provides for attachment could be ordered against defendant who

17  is a nondomiciliary outside of the state or foreign corporation

18  outside of the state.  And another Section 6201 subsection (3)

19  provides for attachment where there is -- where a defendant

20  dissipates or removes the property with an intent either to

21  defraud his creditors or to frustrate the enforcement of the

22  eventual judgment.  And we are looking for attachment under

23  either of these sections.  Both grounds apply to our case.

24         As far as the conditions for granting the attachment,

25  we believe we've satisfied them.  And they are, briefly, there

ICC9MORA

1    are four conditions.  First, a plaintiff seeking an attachment

2    should have a cause of action for a money judgment; second,

3    there ought to be likelihood of success on the merits; third,

4    one of the grounds for attachment, which I just mentioned two

5    of them under CPLR, should apply; and fourth, that the amount

6    of the attachment exceeds all the known counterclaims.  And we

7    in our briefs, your Honor, we show that we satisfy all of those

8    elements and grounds for attachment.

9           The thing is last year about this time defendants

10   hired my clients to work for a three-year commitment to work as

11   the CEO of this ICOBOX Hub, Inc. which defendants decided to

12   open in the United States and to develop into an incubator of

13   initial coin offering, coin offerings.  It was quite an

14   ambitious project.  They had a business model that projected

15   hundreds of millions of dollars that the ICOBOX Hub will be

16   making.  And the financial model and the budget contemplated $3

17   million investment from shareholders of ICOBOX Hub, Inc.

18          So my client was retained by defendants.  He signed a

19   three-year deal with them.  And the basic deal was $325,000 a

20   year, plus there was 6 percent of EBITDA, stock, and two

21   percent per year of equity in the company, plus all the perks,

22   executive perks and so forth.

23          THE COURT:  Who do you say that he signed the contract

24   with, because you have a number of defendants here and the -- I

25   see the employment agreement and the service agreement are with

ICC9MORA

1    ICOBOX Hub, Inc. not with regard to the other individual

2    defendants.

3            MR. JOFFE:  Right.  They were signed by ICOBOX Hub and

4    its CEO Nickolay Evdokimov.  These are direct contracting

5    parties.

6            The other defendants either -- the other defendants

7    are shareholders of ICOBOX Hub, Inc.

8            ICOBOX Hub, Inc. was -- the U.S. entity was

9    incorporated by defendants in Delaware and had an address in

10   New York.  It was the only U.S. entity that the other

11   defendants used to start this U.S. operation.  It was a wholly

12   owned subsidiary of ICOBOX LLC which was a Cayman Island

13   entity.

14           THE COURT:  The agreement, as I see it, is between

15   Mr. Morozov and ICOBOX Hub, Inc.

16           MR. JOFFE:  Correct, your Honor.

17           THE COURT:  Give me a better idea of why MEM

18   Consulting, Inc. is a plaintiff and why the other individuals

19   are defendants.

20           MR. JOFFE:  MEM Consulting, Inc. is the plaintiff

21   because MEM Consulting, Inc. is Mr. Morozov's financial

22   consulting company.

23           THE COURT:  So what does that have to do with an

24   employment agreement?

25           MR. JOFFE:  The way they structured -- the deal that

ICC9MORA

1    they made is that they had an employment agreement with

2    Mr. Morozov and then a services agreement with his company MEM

3    Consulting, Inc.

4              THE COURT:  So you say that the employment agreement

5    was with him individually and the service agreement was with

6    MEM Consulting, Inc.

7              MR. JOFFE:  Correct, your Honor.

8              And on the other hand there was ICOBOX Hub, Inc. its

9    CEO Evodokimov and the other defendants are shareholders of

10   ICOBOX Hub, Inc. and they're partners by virtue of New York

11   business corporation or Section 630 that says that the ten

12   largest shareholders of a New York corporation that is a

13   foreign corporation and –– sorry, I misspoke.  Ten largest

14   shareholders of a foreign corporation are liable for all the

15   debts and wages and salaries.

16             THE COURT:  I know.  Two things I have concern about.

17   One, doesn't –– that doesn't apply to exempt employees.  That

18   doesn't apply to the CEO of the company.  That applies to

19   nonexempt employees, those rules.

20             And also that –– under those statutes they're liable

21   for the services already rendered.  They're not liable for

22   future contractual obligations.

23             MR. JOFFE:  Well the statute said they are liable for

24   all the debts.

25             THE COURT:  Right.  So that's the other thing.  Your

ICC9MORA

1    client was -- well, it doesn't say they're liable for the debt.

2    It says they're liable for the services that have been rendered

3    by those employees.

4              MR. JOFFE:  I have the exact language of the statute.

5    I can --

6              THE COURT:  Sure.  I have it too.  Where are you

7    looking?

8              MR. JOFFE:  I'm looking at my reply brief.

9              THE COURT:  And you're citing which statute?

10             MR. JOFFE:  I'm citing New York Business Corporation

11   Law 630 which provides that the ten largest shareholders of

12   every domestic corporation.

13             THE COURT:  OK.  But it says when --

14             MR. JOFFE:  Shall jointly and severally be personally

15   liable for all debts, wages or salaries due and owing --

16             THE COURT:  Right.  I'm not quite sure what you

17   claim -- there aren't -- it says when the unpaid services were

18   performed in the state.

19             What services do you say one of the plaintiffs

20   provided that was not paid for?

21             MR. JOFFE:  Well, your Honor, the only payment that he

22   received for everything was onetime cash payment of $25,000, I

23   believe, which he received.

24             THE COURT:  OK.

25             MR. JOFFE:  Which didn't even -- well.

ICC9MORA

1          THE COURT:  But he only worked a month.

2          MR. JOFFE:  He worked for --

3          THE COURT:  You said he was terminated on February 9.

4          MR. JOFFE:  What happened, your Honor -- right.  He

5    worked for -- he was terminated on February 9.  There was still

6    some back and forth with them.

7          THE COURT:  But wasn't he paid for all of the time

8    between January 1 or whatever the date was that they signed the

9    agreement and February 9?  He was paid for that month period,

10   wasn't he?

11         MR. JOFFE:  Your Honor at that time --

12         THE COURT:  For any services he provided during that

13   month --

14         MR. JOFFE:  He was paid -- well, I'm not sure.  He was

15   paid in cash at that time.  He worked for a month.  He had

16   relocation expenses.  He to move the family from New York to --

17         THE COURT:  I know but that's different -- that's not

18   defined as paid -- unpaid services.  If you say that they're

19   obligated to pay his living expenses or moving expenses.

20   That's not what's defined as unpaid services under the statute.

21         Unpaid services means if I am an employee of the

22   company and I worked on Monday and then nobody paid me for the

23   work that I did, then I could go to the shareholders and say:

24   Wait a minute.  You guys owe me the money for the work that I

25   did.

ICC9MORA

1          I don't see here where you say that he performed

2    services that he wasn't paid for.

3          You say that he had a contract that obligated them or

4    whoever signed the contract to make certain payments.  But

5    those weren't services provided.

6          The services -- the services that were provided were

7    services provided between -- when was -- remind me, January --

8          MR. JOFFE:  January 1.

9          THE COURT:  -- first was the signing of the contract,

10   right?

11         MR. JOFFE:  Yes, your Honor.

12         THE COURT:  And you allege in the complaint that

13   February 9 was his last day of employment.

14         MR. JOFFE:  It was when the termination happened, your

15   Honor.

16         THE COURT:  So it was the last day of employment,

17   right?

18         MR. JOFFE:  Yes.

19         THE COURT:  I'm not going to debate that with the two

20   of you whether he was fired or whether he wasn't fired.  But as

21   of February 9 he was no longer working for the company, right?

22         MR. JOFFE:  Correct.

23         THE COURT:  He was paid -- I'm not even sure what work

24   he was paid for for the first month.

25         You don't claim they owe him money for services he

ICC9MORA

1    rendered prior to February 9?

2            MR. JOFFE:  Well, your Honor, just -- the payment he

3    received was just cash.

4            THE COURT:  I know but that was payment for his

5    services as the CEO.

6            MR. JOFFE:  Well I don't know -- at that time -- your

7    Honor he --

8            THE COURT:  What are you alleging?  That's what I'm

9    trying to ask you.

10           MR. JOFFE:  At that time whenever he got paid that

11   money he already had relocated to San Francisco from New York

12   and under the contract the company owed him to pay for

13   relocation expenses.

14           THE COURT:  But that's a contractual obligation.

15   That's not -- under the business law that doesn't in and of

16   itself constitute unpaid services.

17           MR. JOFFE:  My point was only that when they give them

18   the packet of cash.

19           THE COURT:  Right.

20           MR. JOFFE:  They owed him his salary for that month.

21   They owed him relocation expenses.

22           THE COURT:  But you do not claim that he was not paid

23   his salary for that month.

24           MR. JOFFE:  All he got is that packet of money.

25           THE COURT:  But he was paid his salary for that month.

ICC9MORA

1    You don't allege that he wasn't paid his salary for that month.

2         MR. JOFFE:  Well he certainly wasn't issued any check

3    that says it's a payroll and whatever.  He just got from a

4    secretary, he got a pack of money for the months in which he

5    already spent ten thousand of his own.

6         THE COURT:  What did he receive that money for?  Are

7    you claiming that they owe him --

8         MR. JOFFE:  They owe him both for his salary -- they

9    owed him business expenses that he incurred.  They owed him

10   relocation.  So when they gave him one set of cash, you know,

11   it's not --

12        THE COURT:  What I'm trying to understand is the only

13   theory that you have against the other defendants is that they

14   were shareholders.  That's the only theory that you have

15   against those other defendants.

16        MR. JOFFE:  No.

17        THE COURT:  They are the largest shareholders so they

18   should be liable for the services that he rendered for which he

19   was not paid.  That's your argument.

20        And I'm trying to understand from your complaint what

21   services you claim that he rendered for what period of time

22   that you claim that he was not paid.

23        MR. JOFFE:  Well that month and month-and-a-half or

24   month and the week.

25        THE COURT:  Which month?

ICC9MORA

1          MR. JOFFE:  January and part of February.  He worked

2     constantly.

3          THE COURT:  Wasn't he paid?  He was paid.

4          Because you even allege that he -- part of your claim

5     that he was paid but he wasn't paid timely.  That's part of

6     your claim.  You claim that he was paid.

7          MR. JOFFE:  He was paid onetime cash payment.  That's

8     it.

9          THE COURT:  I know.  That's what I'm asking.  That's

10    what I haven't got from you.

11         He worked from January 2018 to February -- January 1,

12    2018 when he signed the contract to be the CEO you claim that

13    he worked until February 9 when he was terminated.

14         MR. JOFFE:  Correct, your Honor.

15         THE COURT:  I don't see anywhere in this complaint

16    where you say he was not paid those wages.

17         As a matter of fact, paragraph 83 says defendant

18    failed to pay the wages on time on the following occasions.

19         You say that the January 15 wages were paid on

20    February 3.  And you say the January 31 wages were paid on

21    February 3.

22         And then you say the February 15 and the February 25,

23    2018 wages were not paid at all.  But that's after he no longer

24    worked there.  Right.

25         MR. JOFFE:  Right.  Well he worked there --

ICC9MORA

1          THE COURT:  So what wages did he earn after

2     February 9?

3          MR. JOFFE:  After February 9 he -- well, the agreement

4     provided that there was a 30-day notice.

5          THE COURT:  I know but wages.  We're talking about

6     wages.  You're trying to assert a statutory claim against a

7     shareholder.  That's what I want to focus on first.

8          I understand more clearly your claims, contractual

9     claims against the company.  And we can discuss whether or not

10    Evdokimov, whether or not he has any personal liability as a

11    signatory to the contract.

12         But at this point when I'm looking at the complaint

13    and the papers, it seems that your client signed an agreement

14    with the company; didn't sign a personal agreement with any of

15    the individuals.  His contract was with the company.  The

16    company, whatever you say -- whoever you say owes him money

17    pursuant to a contract, the company owes him money pursuant to

18    the contract.

19         If you want to extend that to shareholders, you have

20    to do two things.  You have to convince me:  One, that he's not

21    an exempt employee because he's the CEO of the company.  My

22    understanding is the law that you want to apply doesn't apply

23    to the CEO of the company.  It applies to the employees and

24    nonexempt employees of the company if they provide services.

25    He's not -- he's not one of those kinds of employees.  And

ICC9MORA

 1    two --

 2          MR. JOFFE:  Under New York Labor Law I think.

 3          THE COURT:  Again, as I said, even if I were to accept

 4    that, in this complaint I don't see which wages you say that he

 5    earned that he was not paid for as an employee when he was

 6    employee of the company.

 7          You say in paragraph 83, you say he was paid his

 8    January 15 wages and his January 31 wages.  So which wages do

 9    you say he wasn't paid?

10          MR. JOFFE:  Well even on this one he wasn't -- until

11    February 9, the first week or two weeks of February he wasn't

12    paid.  That's not paid wages.

13          THE COURT:  He was not paid.

14          MR. JOFFE:  He was not paid for February -- even if he

15    was -- even if the termination was on February 9, he was not

16    paid for February.

17          THE COURT:  So what period of time do you claim that

18    he was paid for?

19          MR. JOFFE:  Well he was paid one sum, one lump sum

20    and -- that was January.  So for January he was paid.

21          THE COURT:  OK.

22          MR. JOFFE:  But again -- well, right.  He was paid --

23          THE COURT:  So you say he was paid for January.

24          MR. JOFFE:  He was paid for January.  He wasn't paid

25    for February, at least for the first biweekly wages, he wasn't

ICC9MORA

1    paid many of them.

2              THE COURT:  That's what I'm trying to understand.

3              MR. JOFFE:  Well February, please, my concern with

4    January, yes, we say he was paid, but there was not just salary

5    payments that were due to him in January.  And when he got that

6    cash payment, you can call it wage or salary, but you could

7    also call it business expense.

8              THE COURT:  But the statute does not cover business

9    expense.

10             MR. JOFFE:  For the purposes of the statute his salary

11   for first part of February were not paid.  And even for the

12   purposes of the statute that's sufficient, your Honor, I

13   believe, to bring Section 630 into play and have shareholders

14   of the company liable for that.

15             THE COURT:  But isn't the amount of money he was paid

16   the amount of money that would have covered the February -- to

17   February 9.

18             MR. JOFFE:  To February 9 that would have --

19             THE COURT:  I mean the amount of his salary was

20   prorated through the date that --

21             MR. JOFFE:  Right.  He was prorated.  I think it would

22   have been probably twelve, thirteen thousand dollars.  I have

23   to calculate that.  But yes.  So -- yes.

24             THE COURT:  And also I'm not quite sure what is --

25   give me a little bit more of the facts of what he did.  My

ICC9MORA

1    understanding is he was signed up to be the CEO.

2              MR. JOFFE:  Yep.

3              THE COURT:  That they were supposed to start this

4    company.  They never did the financing to get the company off

5    the ground.  So what is it -- what kind of work was he doing?

6              MR. JOFFE:  He immediately -- well, the first thing he

7    started to do, because that was the first thing they want him

8    to do, is to find good office space.  And he was in

9    negotiations with Trump Tower, Trump Organization in New York.

10   They wanted to rent Trump Tower suite.

11             THE COURT:  I thought he was going to work in

12   California.

13             MR. JOFFE:  And at the same time they wanted to open

14   an office in San Francisco and Sansome, 755 Sansome Street.

15   Big, high end, you know, real estate offices.  So he was

16   shuttling between New York and San Francisco trying to rent

17   both offices.  He was in negotiations with Trump Organization

18   including Trump CFO.

19             THE COURT:  Up until when?

20             MR. JOFFE:  That was in January.

21             THE COURT:  Right.  But he was paid for January.  See,

22   again that's where I keep coming back.  He was paid his salary

23   in January.  So did he do any other work in February?

24             MR. JOFFE:  He was, your Honor.  I'm sure.  We

25   produced tons of documents on that and discovery will show he

ICC9MORA

1    was working.  He was working in January and February.  He had

2    financial people, he had lawyers he was working with.  He had a

3    lot of computer programmers who work on -- technical people.

4              THE COURT:  When?

5              MR. JOFFE:  In February.  All in February.  He was

6    working as the CEO.  He moved from New York to San Francisco

7    and continued working out of San Francisco offices when they

8    told them that his plan.  And the idea was, your Honor, there

9    are financial models we'll put in as exhibits, the idea was to

10   grow this U.S. side corporation quickly and dramatically.  It

11   was projected to make a hundred million dollars or so by 2020.

12   So they wanted to build that big corporation and he was working

13   on that, obtaining people, getting documentation, contracts.

14             THE COURT:  So are these other individual defendants,

15   are they shareholders of ICO Hub -- BOX Hub or shareholders of

16   ICOBOX?

17             MR. JOFFE:  They are -- some of them are

18   shareholders -- direct shareholders of ICO Hub and some of them

19   are shareholders --

20             THE COURT:  Where do you allege that?  Because you say

21   the shareholder defendant, but it's unclear to me, because in

22   the first paragraph you say that defendant ICOBOX Hub, Inc. and

23   then its parent company, the Cayman Island entity is ICOBOX,

24   their main shareholders, the shareholder defendants.  So whose

25   main shareholders, ICOBOX or ICOBOX Hub?

ICC9MORA

1          MR. JOFFE:  They are shareholders of ICOBOX.

2          THE COURT:  The parent company.

3          MR. JOFFE:  ICOBOX, the parent company.

4          THE COURT:  But your theory is that they should be

5    held responsible for his salary because they are shareholders.

6    But they're not shareholders of the company that hired him.  I

7    mean I don't know if they are.  You don't allege that.  You're

8    not claiming that they're shareholders of the company ICOBOX

9    Hub.  That's who you say in Count One the employment agreement

10   is with.

11         MR. JOFFE:  We also allege that Mr. -- defendant

12   Evdokimov was a shareholder of ICOBOX Hub.

13         THE COURT:  Where do you allege that?

14         MR. JOFFE:  That's paragraph 22 of our first amended

15   complaint, your Honor.

16         THE COURT:  22?

17         MR. JOFFE:  22.

18         THE COURT:  I see that.  So you allege in 22 that he

19   is the CEO of ICOBOX Hub's parent company, defendant ICOBOX and

20   a shareholder of defendant ICOBOX Hub within the meaning of the

21   business law.  So I see that.  But you don't make that

22   allegation with regard to any of these other defendants.

23         MR. JOFFE:  With respect to others, your Honor, in

24   paragraph 20.

25         THE COURT:  20.

ICC9MORA

1      MR. JOFFE:  Yes.  Paragraph 20 of the amended

2  complaint.

3      THE COURT:  OK.  Twenty does not say that any of these

4  defendants are shareholders of ICOBOX Hub.

5      MR. JOFFE:  Right.  But we do claim that they are

6  offshore shell company ICOBOX was the alter ego of those

7  shareholders and ultimate beneficial owners because they all

8  used ICOBOX as an entity to actually control and do business in

9  the United States --

10      THE COURT:  I know but you don't say --

11      MR. JOFFE:  ICOBOX Hub.

12      THE COURT:  No, you don't say ICOBOX Hub.  You don't

13  say that anybody is an alter ego of ICOBOX Hub.

14      MR. JOFFE:  Of ICOBOX the Cayman Island.

15      THE COURT:  That's a different company.

16      MR. JOFFE:  Which ICOBOX --

17      THE COURT:  Is the parent company.

18      MR. JOFFE:  -- is the owner of --

19      THE COURT:  Yeah, but that doesn't make them liable

20  for the subsidiary as shareholders, because they're

21  shareholders of the parent company.  You can't advance that

22  theory, can you?

23      And you're not saying that they're alter egos of

24  ICOBOX Hub.

25      MR. JOFFE:  They are alter egos of ICOBOX Hub

ICC9MORA

1    shareholder ICOBOX Cayman Island.

2              THE COURT:  No.  ICOBOX Cayman Island.  You say

3    they're shareholders of ICOBOX Cayman Island?

4              MR. JOFFE:  Right.

5              THE COURT:  But you don't have any contract with

6    ICOBOX Cayman Island.

7              MR. JOFFE:  We don't.  But ICOBOX Cayman Island is a

8    shareholder of ICOBOX Hub.

9              If ICOBOX Hub is liable for wages or salaries, so

10   that's for the unperformed service, Section 630 of New York

11   Business Law makes ICOBOX Cayman Island liable for those unpaid

12   services.

13             THE COURT:  I know but that doesn't -- under the

14   statute that doesn't make the shareholders of the parent

15   company liable for the debts of its subsidiary.  That's not

16   what the statute says.

17             MR. JOFFE:  No, your Honor.  The individual

18   shareholders of ICOBOX Cayman Island company -- ICOBOX Cayman

19   company is alter ego of those Russian investors.  So the Cayman

20   Island company --

21             THE COURT:  I know but the Cayman Island company, you

22   don't have a contract with the Cayman Island company.

23             MR. JOFFE:  We don't have a contract with Cayman

24   Island company.  We have a contract with U.S. company.

25             THE COURT:  Right.

ICC9MORA

1          MR. JOFFE:  Which was -- your Honor, it was created

2     for -- existed for several months and then it was abandoned.

3          THE COURT:  I understand that.

4          MR. JOFFE:  And who created it was this group of

5     shareholders.

6          THE COURT:  Right.

7          MR. JOFFE:  Who were acting through their Cayman

8     offshore --

9          THE COURT:  I know.  But you don't say other than, the

10     one I keep mispronouncing his name, Nickolay, I'll call him

11     Nickolay.  You don't claim that anybody else other than

12     Nickolay is a shareholder of ICOBOX Hub.  You say that Nickolay

13     is a shareholder of ICOBOX Hub and you say that -- I'm not even

14     sure you say that ICOBOX is a shareholder of ICOBOX Hub.

15          MR. JOFFE:  I believe I do, your Honor.

16          THE COURT:  That would make sense.

17          MR. JOFFE:  It would make sense.

18          THE COURT:  Is that here in the complaint?

19          MR. JOFFE:  I'm sure I allege that ICOBOX Cayman

20     Island is the parent company.

21          THE COURT:  Right.  You say the parent company.  But

22     you don't say specifically that they are shareholders.

23          MR. JOFFE:  I'm trying to find it.

24          THE COURT:  What theory do you have against ICOBOX as

25     defendant?  Why does ICOBOX owe your client money?  Under which

ICC9MORA

theory?

          MR. JOFFE:  ICOBOX is the immediate parent of ICOBOX

Hub and its shareholder and --

          THE COURT:  But I don't see any subsidiary parent

liability.  That's not the basis.

          MR. JOFFE:  OK.  I found paragraph 29.

          THE COURT:  29.

          MR. JOFFE:  ICOBOX Hub was a shareholder of defendant

ICOBOX Hub -- sorry.  Defendant ICOBOX was a shareholder of

defendant ICOBOX Hub.

          THE COURT:  OK.  I see.

          MR. JOFFE:  So.  I'm sorry.  I have it there.

          THE COURT:  All right.

          MR. JOFFE:  So the theory is, the liability, how to

get to the shareholders is that if -- well certain shareholders

ICOBOX and Evdokimov are alleged to be shareholders of ICOBOX,

Inc.  That would bring them within the ambit of a New York

Section 630.  Others, once they removed the shareholders of

Cayman Island company, and we allege that there is an alter ego

theory, that the shareholders of ICOBOX Cayman Island company

are alter ego of that company and vice versa.  So they would be

liable by virtue of the alter ego liability.

          THE COURT:  Except I'm not sure which count that is.

Which claim is that?

          MR. JOFFE:  This is the claim for unpaid wages and for

ICC9MORA

1   retaliation under New York labor law and fair standards.

2          THE COURT:  Count Four?

3          MR. JOFFE:  It's Count Four, your Honor.  And it's

4   also retaliatory discharge as well, your Honor.  But that's

5   something -- we're talking about wages only, so.

6          THE COURT:  All right.  I understand your first

7   contract theory is the employment agreement against ICOBOX Hub.

8   That's a claim simply against ICOBOX Hub.

9          MR. JOFFE:  Yes.  Contract breach, yes.

10         THE COURT:  And then the second breach of contract is.

11         MR. JOFFE:  Is services.

12         THE COURT:  The service agreement between MEM.

13         MR. JOFFE:  The contractual party of ICOBOX Hub, Inc.

14         THE COURT:  So that's MEM and ICOBOX, Hub.

15         MR. JOFFE:  Yes, your Honor.  Those are Counts One and

16   Two.

17         THE COURT:  And Count Three is your failure to pay

18   timely wages.  And it's unclear to me in what way these wages

19   were untimely.

20         MR. JOFFE:  Well, the wage is considered untimely when

21   it's not paid.

22         THE COURT:  When?

23         MR. JOFFE:  Biweekly under the New York labor law.

24         THE COURT:  So what wages --

25         MR. JOFFE:  So if you delay, under New York law -- and

ICC9MORA

1    under FLSA, let's say if you have to pay biweekly and there is

2    a delay in payment of wages that's considered to be delayed.

3              THE COURT:  Where does it say that he was supposed to

4    be paid biweekly?

5              MR. JOFFE:  Your Honor, in the -- first of all, under

6    FLSA it's as a matter of contractual -- sorry, as a matter of

7    law.  I can cite -- I can bring cases.

8              THE COURT:  But that doesn't apply to the CEO of the

9    company.  He's the CEO of the company.  These rules don't apply

10   to him.  If he was simply an employee of the company --

11             MR. JOFFE:  I believe New York labor law applies.

12             THE COURT:  As the CEO of the company?  He's the

13   managerial -- I mean he's head of the company.

14             MR. JOFFE:  Well, he still gets paid.

15             THE COURT:  Right.  But he doesn't get paid pursuant

16   to the New York business law.

17             MR. JOFFE:  No.

18             THE COURT:  He's an exempt employee.  He gets paid as

19   a managerial employee.

20             MR. JOFFE:  Right.  But under New York labor law there

21   is no such exemption for -- I don't believe there is an

22   exemption for CEOs.  There is -- I grant there is an exemption

23   for minimum wage and overtime pay.

24             THE COURT:  But he's not that kind of employee.  He's

25   not an hourly employee.  He's not entitled to minimum wage.

ICC9MORA

1    He's not -- he's a salaried, exempt employee.

2              So that's what I'm trying to understand, under what

3    theory does he have to say, well, I was entitled to get paid

4    every two weeks?

5              And doesn't your complaint say he got paid?

6              Where is he entitled to get paid every two weeks?

7              That's not in his employment contract.

8              MR. JOFFE:  No, your Honor.

9              THE COURT:  Because you say the January 15 wages.  I'm

10   not sure what you mean by the January 15 wages.

11             He signed the contract on January 1.  You're saying

12   because he signed the contract on January 1 he had the right to

13   be paid.

14             MR. JOFFE:  Biweekly.

15             THE COURT:  Where do you get that?  In either law or

16   in contract?  Where does it say that -- I don't get paid

17   biweekly.  I get paid every month.  I can't say I'm entitled to

18   be paid biweekly.  Where do you get that entitlement from?

19             And as a matter of fact many employees don't get paid

20   until the week after the two weeks that they've earned.  They

21   don't get paid before they earn it.  A lot of employees who

22   have a week lag in terms of their payments.

23             MR. JOFFE:  That's right.  We're not alleging that he

24   should have gotten paid on January 1.

25             THE COURT:  When are you alleging he should have

ICC9MORA

1   gotten paid?  That's what I'm trying to understand.

2          MR. JOFFE:  We say biweekly.

3          THE COURT:  But you say he should have gotten paid on

4   January 15 for working on January 14.

5          MR. JOFFE:  For the first biweekly period.

6          THE COURT:  Where do you get that from?  That's what

7   I'm trying to figure out.

8          That's not in his contract, is it?  And that's not in

9   the statute that if he works -- if he works for a two-week

10  period that the day after the two-week period he's supposed to

11  get a paycheck.

12         Where do you get that?

13         MR. JOFFE:  Your Honor --

14         THE COURT:  Is that the way you get your paycheck?

15         MR. JOFFE:  No.  I don't get paychecks.

16         THE COURT:  Right.  That's what I'm saying.

17         He's the CEO of the company.  You're saying to me that

18  he was entitled to be paid for the first two weeks that he

19  worked the day after the first two weeks passed.  I don't know

20  where you get that from.  What contract or statutory language

21  entitles him to that payment on that date?

22         MR. JOFFE:  Your Honor I cannot find the authority to

23  give you right now but there is an authority under both

24  New York law and under FLSA that says that -- FLSA itself does

25  not define what is the timely wages.  I will have to say both

ICC9MORA

1     New York labor law and FLSA refer to timely or untimely wages.

2                THE COURT:  Right.

3                MR. JOFFE:  FLSA does not specifically define what

4     timely wages is.  But there is case law and I just -- I can't,

5     unfortunately, give you reference right now.  And there is CFR

6     provision that says that wages are considered timely when they

7     are paid biweekly.

8                I believe in New York labor law it is also specified

9     what timely wages is.

10               THE COURT:  So what do you claim --

11               MR. JOFFE:  Must statutes turn on timely wages.

12               THE COURT:  So what do you claim the timely wages

13    would be?  What would be untimely?

14               MR. JOFFE:  Biweekly.  Every two weeks, your Honor.

15               THE COURT:  So are you saying that if he worked for

16    two weeks from January 1 to January 14 he was entitled by

17    statute to be paid on January 15?

18               MR. JOFFE:  That would be a timely wage, your Honor.

19               THE COURT:  Why wouldn't January 15 be a timely wage?

20               MR. JOFFE:  Well because --

21               THE COURT:  Or January 16?

22               Or February 1?

23               Where do you get --

24               MR. JOFFE:  I'm getting that --

25               THE COURT:  Where do you draw the line?

ICC9MORA

1              MR. JOFFE:  I'm getting at the fact that both

2      statutes, New York State, and federal, refer to timely payment

3      of wages.

4              THE COURT:  Right.

5              MR. JOFFE:  And there ought to be an understanding

6      what is timely.

7              THE COURT:  And what is your understanding?

8              MR. JOFFE:  My understanding is it's two weeks,

9      biweekly payments.  And I'll be happy to follow up with --

10             THE COURT:  I know, but if I worked on January 14, if

11     you're arguing that I should have been paid on January 15 for

12     the work I did on January 14.  That's not two weeks.  That's

13     one day.

14             MR. JOFFE:  Correct.

15             THE COURT:  How is that not timely?  If I get paid on

16     January 15 for the work I did on January 14?

17             MR. JOFFE:  Yes, your Honor.

18             THE COURT:  So -- but that's not two weeks.  So you're

19     saying -- that's two weeks from January 1.  But that's not two

20     weeks from February 14.  So how is it that you're alleging that

21     he wasn't paid timely for the work he did on February 14 if --

22             MR. JOFFE:  Sorry.  January probably.

23             THE COURT:  January.

24             MR. JOFFE:  For February he wasn't paid at all.

25             THE COURT:  But doesn't -- let me go back to another

ICC9MORA

1    issue.  The statute lays out definitions.  And it lays out the

2    definition of employees who are covered by these statutes.  The

3    definition of employee excludes executive, administrative, or

4    professional capacity.  Right.  Executive -- work in a bona

5    fide executive capacity means work by an individual whose

6    primary duty consists of the management of the enterprise in

7    which such individual is employed or of a customary recognized

8    department or subdivision.

9            He's not defined as an employee under the statute.

10           MR. JOFFE:  Your Honor are you quoting from FLSA?

11           THE COURT:  I'm quoting from the New York State Labor

12    Law.  The New York State Labor Law says that the labor law

13    covers employees.  And Section 142-2.14 defines employee as

14    someone other than an executive, administrator -- who works as

15    an executive, administrator or in a professional capacity.

16           That's the capacity your guy worked for.  He's not a

17    low level employee.  He's the CEO.  As the CEO he doesn't fall

18    under the definition of employee under the statute.

19           And there's similar language under -- I think there's

20    similar language under the Fair Labor Standards Act.

21           But let me just refocus one second and then I can hear

22    from the other side.

23           Tell me what you want me to seize.  My understanding

24    is, first of all, that the company that he was employed by

25    ICOBOX Hub, Inc. has no assets; is that correct?

ICC9MORA

1          MR. JOFFE:  They put it in dissolution, your Honor.

2          THE COURT:  They put it in what?

3          MR. JOFFE:  In dissolution.  They say they dissolved

4    it.

5          THE COURT:  I know but did it have any assets?

6          MR. JOFFE:  It has no assets.

7          THE COURT:  That's not my point.  My point is you want

8    me to seize the defendants' assets.  The defendant ICOBOX Hub

9    has no assets.

10         MR. JOFFE:  That's right, your Honor.

11         THE COURT:  So there is no assets that they are in

12   possession of that you've identified that you want me to seize.

13         MR. JOFFE:  Not from ICOBOX Hub which has none.  But

14   its CEO, Evdokimov, its CEO shareholder, has sets.  We listed

15   them --

16         THE COURT:  He has a home and bank accounts in the

17   United States.

18         MR. JOFFE:  He has a home in California and he has

19   some assets in California and he has shares --

20         THE COURT:  So what evidence is there that he intends

21   to either defraud recovery of assets from him if there's a

22   judgment against him or to frustrate the recovery by the

23   plaintiff if the plaintiff were to get a personal judgment

24   against him?

25         MR. JOFFE:  Well, the evidence --

ICC9MORA

1            THE COURT:  As you said -- or that he intends -- he's

2     taken some action to dissipate his assets to make them

3     unavailable to satisfy a judgment.  Because, as you

4     articulated, that's part of the requirement.

5            What evidence is there that he or any of these

6     individuals are taking such things?

7            MR. JOFFE:  Well, your Honor, as soon as we've

8     commenced the lawsuit they've abandoned the offices they worked

9     for -- they worked at in San Francisco.  They moved personnel

10    and they moved business elsewhere.

11           THE COURT:  When you say "they moved personnel," I'm

12    not sure what you mean because I'm not sure I know that this

13    company ever had any personnel.

14           Did the company ever have any employees?

15           MR. JOFFE:  Well it had my client.

16           THE COURT:  Right.

17           MR. JOFFE:  It had people, programmers and others.

18           THE COURT:  That's what I'm asking.  Were there

19    people --

20           MR. JOFFE:  There were people who were working there

21    in that office.

22           THE COURT:  Which office?

23           MR. JOFFE:  There was an office in San Francisco.

24           THE COURT:  And there were employees?

25           MR. JOFFE:  And there were employees there.

ICC9MORA

1          THE COURT:  And so what happened?

2          MR. JOFFE:  Actually, the defendants themselves,

3     Generalova and Evdokimov and others, they worked out of that

4     office in San Francisco.  What happened is as soon as we filed

5     that complaint and attempted to serve them the office was

6     abandoned.

7          THE COURT:  Didn't they indicate that the office would

8     be abandoned even before the lawsuit?

9          MR. JOFFE:  It could have been, but the time

10    difference was -- I mean when he was fired he said that he will

11    litigate this issue with them.  So they knew.  We couldn't find

12    them.  We couldn't find it.  Now they tell us the company is in

13    dissolution and it has no assets.

14         THE COURT:  Did the company ever have assets?

15         MR. JOFFE:  The company, I presume, was renting

16    something.

17         THE COURT:  I can't presume.

18         MR. JOFFE:  And there was -- the whole idea for this

19    company and office was that the shareholders of the defendants

20    will contribute $3 million.  We have it in the financial models

21    and the term sheet.  The idea -- and the contractual obligation

22    of the company was to fund its own budget.

23         THE COURT:  Where was that?  I didn't see that.

24         I thought there was a provision that specifically said

25    that if they didn't -- if the company didn't get the funding

ICC9MORA

1    that the contract was void.

2              MR. JOFFE:  Well, it wasn't -- it was just a breach

3    because in -- I have employment agreement here.  I can hand

4    up --

5              THE COURT:  I think I have it or I saw it.

6              MR. JOFFE:  It's paragraph 2.4 -- paragraph 2.4 says

7    company shall be required to fund the company's annual budget.

8              THE COURT:  Which company should be required?

9              MR. JOFFE:  ICOBOX Hub.  ICOBOX Hub, Inc.

10             THE COURT:  So it's required to fund itself.

11             MR. JOFFE:  It was required to fund the company with

12   the annual budget.  It was not my client --

13             THE COURT:  So where was it everybody else's

14   responsibility?

15             Whose responsibility was it?

16             MR. JOFFE:  The owners of the company.

17             THE COURT:  Well where does it say that?

18             MR. JOFFE:  We have --

19             THE COURT:  Who is the owner of the company?

20             MR. JOFFE:  The shareholders of the company.

21             THE COURT:  I'm still not sure who the shareholders of

22   the company are supposed to be.

23             MR. JOFFE:  Those are those Russian guys.

24             THE COURT:  All of these guys you still say you

25   believe are the shareholders of ICOBOX Hub.

ICC9MORA

1          MR. JOFFE:  Not all -- well, ICOBOX itself.

2    Moskovsky, Generalova, Babayev, Evdokimov and Raitsin.

3          So they were posed to fund the company.  He was

4    supposed to do the work.  And that was the whole plan.

5          It wasn't his responsibility to raise money for the

6    budget.

7          It was going on from the get-go.  The shareholders

8    said we'll fund it with $3 million and we have it in writing.

9          THE COURT:  So whose property am I supposed to seize?

10         MR. JOFFE:  Well ICOBOX.

11         THE COURT:  Which property?

12         MR. JOFFE:  We are asking for attachment of Evdokimov.

13   Evdokimov is the main guy there.  Evdokimov --

14         THE COURT:  What assets do you want me to seize?

15         MR. JOFFE:  We have a list of assets, your Honor.

16         THE COURT:  Tell me.

17         MR. JOFFE:  Some real estate in California, and there

18   is some shares in various companies that he owns.

19         THE COURT:  Shares in what -- U.S. companies?

20         MR. JOFFE:  No.  Not U.S. companies.

21         THE COURT:  So how am I supposed to seize shares in a

22   company out of the United States?

23         MR. JOFFE:  He owns them here in the United States.

24         THE COURT:  He owns them here?

25         MR. JOFFE:  I would believe they are -- not the

ICC9MORA

1    companies itself.  But you can have, you know, stock --

2              THE COURT:  That's what I'm asking.

3              MR. JOFFE:  -- stock in a foreign company but you can

4    have it here.  If we arrest a stock --

5              THE COURT:  So what evidence is there that he's taken

6    any steps to dissipate any of his assets?

7              MR. JOFFE:  Well he's taken steps to dissipate all the

8    assets -- not dissipate but to discontinue any operations of

9    ICOBOX in the United States, to move everything from the United

10   States, not contribute money.

11             THE COURT:  What did he move from the United States?

12   I don't see that in your papers.  What evidence is there that

13   he moved something from the United States to put it out of

14   reach of a judgment?

15             MR. JOFFE:  Well they've already refused to fund the

16   company.

17             THE COURT:  Right.  That I understand.

18             MR. JOFFE:  They made the company enter into

19   contracts, your Honor, and they fund zero money for the

20   company.  They didn't provide any support for the company to

21   honor its obligations.  So that's what they did in the

22   beginning.  You don't have to move much if there was not much

23   to begin with.  They told my client they will put $3 million --

24   I mean there's agreements that he signed with them.

25             THE COURT:  I understand that.  And I understand the

ICC9MORA

1    nature of your contractual claim.  But that is not evidence

2    that they are moving assets to avoid a judgment.

3              MR. JOFFE:  They didn't put in any assets --

4              THE COURT:  Right.  That's not hiding assets from you

5    so you would have a judgment.  It's not like they had a million

6    dollars in the bank and then you sued them and they took the

7    million dollars and they took it out of the bank and they sent

8    it overseas.  That's not what you're claiming.  You're claiming

9    they never had the million dollars in the bank at all in ICO

10   Hub.  They never invested the money.

11             MR. JOFFE:  They never did, your Honor.

12             THE COURT:  So how is that evidence that they had

13   taken some action to --

14             MR. JOFFE:  OK.  Right before we filed the litigation

15   they had an office, they had people working in the United

16   States.

17             THE COURT:  Well if they're not going to do

18   business -- right.  They closed the office.  But how is that a

19   dissipation of assets to frustrate the judgment?  Because

20   that's the second requirement.

21             The first requirement, you know -- the first

22   requirement is a likelihood of success on the merits.  But the

23   second requirement is that there's some evidence that they're

24   trying to dissipate assets in order to defraud or frustrate

25   recovery.

ICC9MORA

1          MR. JOFFE:  That's one of the grounds.

2          THE COURT:  Right.

3          MR. JOFFE:  There is another and it's an alternative

4    ground.  You don't have to show dissipation if you show the

5    defendant is a nondomiciliary residing out of state or foreign

6    corporation out of state.  That's independent under 6201

7    subsection (1) under CPLR.  We don't have to show, if we

8    qualify under 6201, that all the defendants are out of state

9    and foreign corporations, then we don't need separately to show

10   that there is a dissipation of assets with intent to frustrate

11   enforcement of judgment.  Those are two separate grounds.  It

12   doesn't necessarily turn on intent to frustrate enforcement of

13   judgment.  That's one point I want to make.

14         And we do show that under both CPLR Section 6201(1) as

15   a nondomiciliary foreign corporation.  They all are, except for

16   one, which is now in dissolution, has no assets and never had

17   any assets; yet, that's the one that entered into contractual

18   obligations in the United States.

19         THE COURT:  So which defendant is a nondomiciliary?

20         MR. JOFFE:  Well out of six defendants, other than

21   ICOBOX Hub, Inc., which is incorporated in Delaware.

22         THE COURT:  OK.

23         MR. JOFFE:  It doesn't --

24         THE COURT:  Doesn't make it a foreign --

25         MR. JOFFE:  It never had an office in New York and it

ICC9MORA

1    was in San Francisco.

2              THE COURT:  I know but --

3              MR. JOFFE:  All the rest are nondomiciliaries.

4              THE COURT:  Except that's not the issue that we're

5    talking about.  There are no assets of ICO Hub that you want me

6    to seize.  There are no assets.

7              MR. JOFFE:  I'm not aware of any, your Honor.  We

8    believe there aren't.

9              THE COURT:  That's not who we're talking about.  We're

10   talking about the other defendants.

11             MR. JOFFE:  Yes.

12             THE COURT:  The question is:  Do you have a likelihood

13   of success against the other defendants and are you entitled to

14   seize their property?  Right?

15             MR. JOFFE:  Right.

16             THE COURT:  So your only argument that you're entitled

17   to seize the property of the other individuals other than

18   Nickolay is that they are shareholders of ICOBOX.

19             MR. JOFFE:  Correct, your Honor.

20             And ICOBOX is the parent company.  They are alter ego

21   of ICOBOX Hub.  ICOBOX Hub is a shareholder and parent of

22   ICOBOX Hub, Inc.  ICOBOX, Inc. is gone.  We can only -- if it's

23   dissolved, it has no assets, then obviously whatever judgment,

24   if it's rendered in our favor, we won't be able to recover

25   against them.

ICC9MORA

1          THE COURT:  Then you recover against -- if you have a

2     basis to recover against the other defendants, you recover

3     against the other defendants.

4          MR. JOFFE:  Yes.  And the other defendants, your

5     Honor, all of them are under CPLR 6201(1) nondomiciliaries, all

6     of them.

7          THE COURT:  But I'm not convinced that you have a

8     likelihood of success against all of these other defendants.

9     Because the only theory that I hear is that they are

10    shareholders of the parent company.  They didn't sign an

11    agreement with your client.  They didn't -- they're not bound

12    by the contract or the service agreement.  Your only theory is

13    that I would have to accept the fact that somehow because

14    they're shareholders, that your client, even though he's an

15    executive, the CEO of the company, that they are liable under

16    the business law to pay his expenses.

17         MR. JOFFE:  We have three theories of liability in

18    general, your Honor.  One of them is unpaid wages or whatever

19    under New York -- that's one.  We have two other theories of

20    liability, your Honor.  The other theory is the contract breach

21    and the third one is retaliation.

22         THE COURT:  So tell me how -- tell me specifically

23    what your client -- what protected activity your client was

24    engaged in and what happened that one could say that these

25    facts demonstrate retaliation, because you're very vague with

ICC9MORA

1    regard to that.

2           First of all, you say -- let me just find the
3    paragraph in the complaint.

4           You say paragraph 136.  You said defendants ICOBOX Hub
5    and Nickolay terminated plaintiff following and in retaliation
6    for his reports of defendants' violations of labor,
7    immigration, tax and other laws.

8           First of all, I don't see anything that protects him
9    with regard to immigration, tax or other laws and I'm not even
10   sure what you're talking about.

11          MR. JOFFE:  Well, it's all in connection with
12   employment.  There were people who worked for ICOBOX Hub
13   without immigration status and he was complaining to defendants
14   that it's a violation when you have --

15          THE COURT:  I'm not sure that that's what the statute
16   protects.

17          MR. JOFFE:  Well --

18          THE COURT:  It doesn't address immigration complaints.
19   It addresses labor complaints.

20          MR. JOFFE:  It's employment-related immigration.

21          THE COURT:  Again, I don't even know what this means.
22   What do you say he complained of that he was protected and you
23   say that they fired him.  What evidence is there that they
24   fired him because he complained about something?

25          MR. JOFFE:  Well, one, it's not necessarily evidence

ICC9MORA

1    but, first of all, there was a clear temporal proximity between

2    his complaints and his being terminated.

3              THE COURT:  So you think really just based on these

4    facts you have a basis to believe that the reason they fired

5    him was because he complained about immigration and tax laws.

6              MR. JOFFE:  Well it's not that -- not because of

7    immigration complaints, your Honor.  They hired him to build

8    the infrastructure and to build and run the company.  And the

9    common theme was that -- and we can show, if we have documents

10   we produced at least, that every step he was trying to do

11   things in a legal way, legally.

12             THE COURT:  Right.

13             MR. JOFFE:  So if you have employees, they have to be

14   paid correctly.

15             THE COURT:  That's not what this complaint says.  It

16   doesn't say anything about that.

17             MR. JOFFE:  The complaint says that he was -- the

18   complaint alleges that he was complaining --

19             THE COURT:  About violations of labor, immigration,

20   tax and other laws.  That doesn't tell me anything.

21             What do you say he complained about specifically that

22   was protected by the statute?

23             MR. JOFFE:  The employees' immigration, paragraphs 64,

24   65.

25             THE COURT:  64 and 65.

ICC9MORA

1          MR. JOFFE:  Describe his complaints in subsection (c)

2     of the amended complaint.  It starts with paragraph 63.  It

3     goes on.

4          THE COURT:  Where does this say he's complaining about

5     something?

6          MR. JOFFE:  He is complaining saying that you need to

7     fix this.

8          THE COURT:  Fix what?

9          MR. JOFFE:  There are several employees which needs to

10    be paid in cash.  We don't have an account.  Please, can we use

11    your account.  He's saying you cannot do it.

12         THE COURT:  So you are really alleging in good faith

13    that the reason that they fired him, terminated him, was

14    because of the complaint he made on January 10?

15         MR. JOFFE:  There were many complaints, your Honor.

16    It goes on not just in January.

17         THE COURT:  You really think that that's why they

18    fired him?

19         MR. JOFFE:  What we allege, your Honor, is -- well,

20    one point is it doesn't have to be exclusive cause of --

21         THE COURT:  What evidence is there that they fired him

22    because of that?

23         It seems to me that they fired him because they didn't

24    want to invest the money.  That's what you really allege.  They

25    didn't fire him because he came and complained.

ICC9MORA

1        MR. JOFFE:  Bitcoin, the main currency, crashed

2   70 percent during the period between his hiring and his firing.

3   And at the same time, yes -- well, he was complaining, what he

4   was saying is you have to do it in a legal way; you cannot do

5   it illegally.  You cannot take money from, you know, people who

6   are under sanctions here.

7        THE COURT:  So what evidence is there that their

8   response was that because he complained that's why they fired

9   him.

10        MR. JOFFE:  There would never be such a --

11        THE COURT:  Well, there could be.

12        MR. JOFFE:  Could be.  We didn't get any of the

13   documents from the defendants to bring you.  When you asking me

14   that, your Honor, you would agree it would not be in

15   correspondence with my client that they will say we are firing

16   you in retaliation.  It would be something internally amongst

17   themselves.  That was my point when we started this morning.

18        THE COURT:  But there would be some circumstantial

19   evidence.  The only evidence that you want to rely upon is that

20   you say that it was close in time.

21        MR. JOFFE:  Your Honor, we cite cases that say that

22   temporal proximity is a good circumstantial --

23        THE COURT:  That's all you're relying on.  There is no

24   other evidence that that's what motivated them.  It's just the

25   temporal proximity of the fact that he happened to work.

ICC9MORA

1          MR. JOFFE:  The temporal proximity of that and the

2     whole flow of communication because -- yes, your Honor.  Yes.

3          THE COURT:  But there's nothing about the

4     communication --

5          MR. JOFFE:  If I complain to my boss about something,

6     serious violation and I get terminated next day, I would

7     assume, in the absence of other reasons, that --

8          THE COURT:  But he didn't get terminated the next day.

9          MR. JOFFE:  It was very close.  It was almost the same

10    week when he made his last complaint.  Yes, it was.  And the

11    temporal proximity is an important factor.  It's hardly

12    expected to --

13         THE COURT:  So what else did he complain about other

14    than the -- about the ability for these people to work in the

15    United States?

16         MR. JOFFE:  The ability of people to work, that they

17    have to get paid in a normal, you know, they have to have a

18    payroll.

19         THE COURT:  Where does it say that?

20         MR. JOFFE:  Well they were trying to get --

21         THE COURT:  Where do you allege that?

22         MR. JOFFE:  Paragraph 70.  For example, February 1 he

23    received an e-mail saying that why don't you pay the employees

24    in cash from your own account.

25         THE COURT:  Right.

ICC9MORA

1          So what was he complaining about?  What violations was

2    he complaining about?

3          MR. JOFFE:  He says that you need to do it properly.

4    You need to verify that your employees are proper employees.

5    You need to provide -- I have an e-mail from him saying we

6    don't want to go to jail if we do it like this.

7          THE COURT:  Is that in the complaint?

8          MR. JOFFE:  Yes, it is.

9          THE COURT:  About going to jail?

10         MR. JOFFE:  Yes.

11         THE COURT:  What paragraph?

12         MR. JOFFE:  Yes, your Honor.  He says he sent an

13   e-mail saying I don't want us to go to jail and we don't want

14   to go to jail and immediately -- I have example of that --

15         THE COURT:  There's a paragraph that says that?

16         MR. JOFFE:  Yes.  93.  Paragraph 93.  "Nik, you and I

17   don't want to go to jail.  Without proper back office we cannot

18   start sales," and so forth.

19         And the week later he got terminated, your Honor.

20         And the excuse, your Honor, that his budget was too

21   high and he proposed to do too much was a ridiculous excuse,

22   provided they said we will fund the company with $3 million and

23   they want to grow the company to make hundreds of millions in

24   three years.

25         THE COURT:  All right.

ICC9MORA

1           MR. JOFFE:  Then we don't get any documents from them

2      internal that would have showed -- substantiated more.  So

3      we'll just have to go to deposition and they will ask them

4      because that's what we see.  We're telling them you're doing

5      things wrong.  You need to spend money.  You promised $3

6      million.  Then you promised three hundred thousand.  And

7      nothing came.  Nothing.

8           THE COURT:  So other than -- and then I'll hear from

9      the other side.

10          Other than Mr. Nickolay's personal assets, what else

11     do you want to seize?  Other than Nickolay's personal assets?

12          MR. JOFFE:  Well, we don't really -- we don't have

13     information about others.

14          THE COURT:  That's what I'm asking.  I want to make

15     sure I understand what you're asking.

16          MR. JOFFE:  Nickolay's assets are the ones we know.

17          THE COURT:  You don't want to seize his house, do you?

18          MR. JOFFE:  He has property --

19          THE COURT:  Does he live in that house?

20          MR. JOFFE:  We are not sure.  It's his family house,

21     but he might have gotten divorced or separation.  We're not

22     sure.

23          THE COURT:  What are you asking me?

24          MR. JOFFE:  To lien, to put a lien on the house, on

25     the assets.

ICC9MORA

1              THE COURT:  On his personal house and his stocks?

2              MR. JOFFE:  And the stock that he owns, yes, your

3    Honor, in the United States.

4              THE COURT:  Any other assets of any other defendant

5    that you have identified that you want seized?

6              MR. JOFFE:  We haven't been able to identify other

7    defendants.  They're not in the United States.

8              THE COURT:  So your request at this point is to attach

9    his home and his stock?

10             MR. JOFFE:  Stock.

11             THE COURT:  All right.  Let me hear from the other

12   side.

13             MR. LEONOV:  Thank you, your Honor.

14             THE COURT:  Yes.

15             MR. LEONOV:  What would you like to hear?

16             THE COURT:  Well I want to know why I shouldn't do

17   that.

18             MR. LEONOV:  I believe you shouldn't do that for the

19   reasons, as stated.  I believe the likelihood of success here

20   is at best questionable.  I don't have much to add other than

21   the BCL also doesn't apply to contractors.  And definitely

22   there is a contract here.  It's in the statute, your Honor.

23             THE COURT:  Well contractors and contract are not the

24   same.

25             MR. LEONOV:  I don't mean a contractor like a

ICC9MORA

1    contractor who builds a home.

2          THE COURT:  You mean an independent contractor?

3          MR. LEONOV:  Yes.

4          THE COURT:  Except I'm not quite sure where you get

5    that -- he's hired as the CEO of the company, how does that

6    make him an independent contractor?

7          MR. LEONOV:  It's not that.  It's because he has a

8    contract.

9          That aside, the reason I think you shouldn't attach it

10   is because the office was there before.  That office was not

11   for discovery.  It was an office for multiple venues.  That

12   office was closed when Mr. Morozov was there.  The company --

13   nobody is moving anything anywhere.  No one is selling their

14   house.  It belongs to him and his wife.  They are definitely

15   not going to move the house.  There's a mortgage on the house.

16         THE COURT:  Are they residents of the United States?

17         MR. LEONOV:  They are residents of the United States.

18   That's correct.  They are residents of the State of California.

19   So they are not removing anything.  They did not move -- that's

20   ridiculous.  There were no employees of ICOBOX Hub.

21   Mr. Morozov was the only one.  And he tried to higher in-house

22   counsel.

23         I don't think the assets should be attached.  That's a

24   harsh remedy.  They would be left without the ability to -- I

25   believe it's too much of a hassle to my client and it would be

ICC9MORA

```
 1    damaging to my clients for that reason.  If they would be
 2    selling the home, but they are not.  There were no transfers of
 3    it.  They didn't try to refinance it.  Nothing.  And they are
 4    absolutely defending the lawsuit.  So I believe that this
 5    attachment would be improper for those reasons.
 6              THE COURT:  Is anybody else of these defendants that's
 7    in the United States other than --
 8              MR. LEONOV:  Sometimes Daria would come in here.  I
 9    believe Anar was never here.  Nickolay is here.  And that's the
10    reason I believe not.
11              THE COURT:  So other than Nickolay who else is here?
12              MR. LEONOV:  I believe Daria Generalova is sometimes
13    in the United States.
14              THE COURT:  But he's a resident of --
15              MR. LEONOV:  She's primarily a resident, I believe, of
16    Russia.
17              THE COURT:  And Nickolay?
18              MR. LEONOV:  Nickolay is primarily a resident of
19    California.
20              THE COURT:  OK.  And the -- what is the nature of the
21    service contract with MEM?
22              MR. LEONOV:  That is actually one of our questions.
23    We are not sure, which we believe is duplicative, so we're not
24    sure what that is; whichever way that the parties wanted to
25    struck the deal, that is fine.  So maybe they wanted to split
```

ICC9MORA

1    the funds.  So I don't know exactly.

2              THE COURT:  But there is a separate -- the service

3    contract is not with Mr. Morozov --

4              MR. LEONOV:  Correct.

5              THE COURT:  -- personally?

6              The employment contract is with him?

7              MR. LEONOV:  Correct.

8              THE COURT:  He can enforce the employment contract?

9              MR. LEONOV:  Correct.

10             THE COURT:  Only MEM is the signatory to the service

11   contract?

12             MR. LEONOV:  Correct.

13             THE COURT:  What services were they supposed to

14   provide?

15             MR. LEONOV:  Well, as discussed, Mr. Morozov did try

16   to negotiate the leases.  That is absolutely correct.  He did

17   try to negotiate them.  What MEM did separately, we are not

18   sure.

19             The duties that I described in our opposition were

20   taken from the contracts.  They are extremely similar to what I

21   believe, there are differences, but what MEM did, I am not

22   sure.  So I cannot -- I cannot represent to the Court what MEM

23   did.

24             Both Mr. Morozov did, he did try to hire individuals;

25   he did try to negotiate the leases.  And, unfortunately, no

ICC9MORA

1    lease was signed.  But he really did do that.  Yes.  What MEM

2    did, I don't know.

3            THE COURT:  Give me a good reason or some idea why

4    this whole deal went south.

5            MR. LEONOV:  The reason this deal went south, your

6    Honor, is because the budget proposal -- we're not necessarily

7    blaming Mr. Morozov for that, but the budget proposal for the

8    startup was close to two hundred thousand dollars a month.  And

9    our clients believed that that's a little bit too high for that

10   startup.

11           THE COURT:  And they weren't aware of this prior to

12   signing all these agreements?

13           MR. LEONOV:  I'm sorry?

14           THE COURT:  They weren't aware of this prior to

15   signing all these agreements?

16           MR. LEONOV:  No.  Because nobody was proposed to that.

17   So two hundred thousand dollars a month, your Honor, is

18   slightly high.  That was discussed with Mr. Morozov.

19           I can discuss the entire termination issue but, as you

20   mentioned, that goes to the likelihood of success.  Nowhere in

21   the conversations, which are attached with slight translations

22   as Exhibit C to my position, nowhere does it mention anything

23   that he was terminated.  As a matter of fact, within the same

24   conversation, as soon as something was mentioned regarding the

25   displeasure with that proposal, immediately Mr. Morozov stated:

ICC9MORA

 1    Get an attorney.  Let us discuss something.  My client was in

 2    shock.  So why this deal went south is because people who were

 3    supposed to fund it, who were working with Nickolay, did not

 4    want to fund two hundred thousand dollars.

 5              THE COURT:  But I can't resolve the issue of whether

 6    he quit or whether he's fired at this point.  I mean it sounds

 7    to me that he has at least a colorable claim that you guys

 8    weren't going to pay him any further beyond the 9th.  And there

 9    is no indication in writing or otherwise that he said he was no

10    longer working for the company.

11              MR. LEONOV:  Exactly.  And I would not be able to make

12    that argument.  So I'm not sure what happened with that

13    termination at this point.  Exactly.

14              THE COURT:  Because you don't -- neither one of you

15    argue that he was employed by the company beyond February 9.

16              MR. LEONOV:  There is no way that could be argued.

17              THE COURT:  How that happened.

18              MR. LEONOV:  How that happened is something that I

19    don't think we can address today, or least I cannot.  I'm not

20    prepared to do so.

21              As far as payment goes, your Honor, if you'd like me

22    to discuss that, I will.  But I believe there was sufficient

23    discussion.  But if you want, I can explain.

24              THE COURT:  Which part?  I'm sorry.

25              MR. LEONOV:  I can respond regarding the $27,000 if

ICC9MORA

 1    you would like.  I believe everything was discussed here.  I

 2    listened carefully.

 3              THE COURT:  I mean I'm just not sure what he was paid

 4    for.

 5              MR. LEONOV:  Your Honor he was paid -- MEM was paid

 6    according to the contracts.  I'm not sure what MEM was paid for

 7    exactly.  But the $27,000 translates into exactly a month of

 8    work for him.

 9              THE COURT:  That's what I thought.

10              MR. LEONOV:  And for MEM.

11              THE COURT:  And I read that.

12              MR. LEONOV:  And my calculations are in my papers.

13    Conveniently translates to exactly that amount plus, minus a

14    few dollars.

15              And as far as the expenses go, I can address that too

16    but I believe it's not necessary unless the Court directs me to

17    do so.

18              THE COURT:  How do you respond to his claim that he

19    wasn't paying timely?

20              MR. LEONOV:  Very easily.  Because he was paid $27,000

21    in advance of his employment.

22              THE COURT:  When he was he paid the 27,000?

23              MR. LEONOV:  He was paid 27,000 -- I'm not sure of the

24    date, but there's an e-mail, which is Exhibit E to my

25    opposition.  And he had claimed that Mr. Morozov was making,

ICC9MORA

1    when he is actually trying to sue, he says less cash advance

2    received.  I'm not sure of the exact date.  And, yes, it was

3    cash.  I'm not sure why counsel is making a big deal out of it.

4    But, yes, it was cash.  Cash advance received.  Cash advance

5    prior.  I do not have the exact date.  So it's impossible to be

6    untimely if it was given as a cash advance.

7              THE COURT:  And the cash advance was what amount?

8              MR. LEONOV:  $27,000.

9              THE COURT:  That was the amount for --

10             MR. LEONOV:  Correct.

11             THE COURT:  -- that prorated the salary?

12             MR. LEONOV:  Correct.  And it translates perfectly

13   into --

14             THE COURT:  So what was he paid for after -- and that

15   was --

16             MR. LEONOV:  He was not paid anything afterwards.

17             THE COURT:  Well he says that he got some other

18   payments in February.

19             MR. LEONOV:  I'm not -- I'm unaware of that.

20             MR. JOFFE:  Your Honor, that's the payment we are

21   discussing.  That's the only payment he got paid in February.

22             THE COURT:  The February 3rd.

23             MR. JOFFE:  February 3rd.

24             MR. LEONOV:  Your Honor, that's -- I'm not sure how

25   it's February 3rd when Mr. Morozov states in his e-mail, dated

ICC9MORA

1    22nd that this payment was in advance.

2              But let's assume that it was.  He still received the

3    $27,000.  I think it was an advance, according to Mr. Morozov's

4    e-mail.  I'm not sure advance of what.  But that was that.  So

5    that's my explanation.

6              THE COURT:  How do you respond to his claim of

7    retaliatory termination?  I'm not even sure the two of you

8    agree that there was a termination.

9              MR. LEONOV:  I'm not sure if there was a termination

10   but let us, for the sake of argument, retaliation.  The

11   response is as follows.  There could be no violation because

12   the company had no employees.  Clearly, there were complaints.

13   And that the e-mail you're referring to regarding the jail,

14   that's Exhibit E.  That is the only close proximity to any

15   complaints.

16             Yes.  There were complaints.  Something is improper.

17   Yes.  I understand that.

18             But that is not the reason which -- that there is no

19   reason in any communications between the parties and which was

20   produced regarding that.  The only communications are about

21   money, hiring people, regarding the proper documents for the

22   leases of the offices, about proper corporate structures.

23   Those -- that is pretty much it.  Whatever plaintiff is

24   alleging, frankly, is just throwing everything and the kitchen

25   sink at my clients.

ICC9MORA

1          THE COURT:  What was the communication that reflected

2     the breakdown in the employment relationship?

3          MR. LEONOV:  That would be, your Honor, the terminal

4     communication would be Exhibit B to my opposition.

5          THE COURT:  B would be what?

6          MR. LEONOV:  B is the terminal communication between

7     Mr. Evdokimov -- lots of it is in Russian.  It is.  But if you

8     take a look at it, it mentions the numbers.  It mentions the

9     numbers in English.

10          THE COURT:  So what does this communication --

11          MR. LEONOV:  It is basically the people --

12     Mr. Evdokimov, which is a defendant, speaking to other

13     individuals regarding this budget and then explaining that

14     that's why it's not going to work.

15          Exhibit C is the communications which we tried our

16     best to translate, and I can represent that most of it is

17     translated fine.  Exhibit C is the communications on

18     February 9, on February 9, regarding this particular issue and

19     it ends with -- and it ends with, "I'm grateful to listen," and

20     it ends with, "get an attorney" and that's about it.  So on the

21     same date.  And that is a communication that led down to the

22     breakup of this relationship, call it a termination or call it

23     whatever -- be it as it may at this point, your Honor.  And

24     that's it.

25          THE COURT:  And this was a communication between?

ICC9MORA

1              MR. LEONOV:  Nickolay and plaintiff.

2              THE COURT:  And the essence of the -- how was this

3      left?  You say the end says what.

4              MR. LEONOV:  At the end -- let me try to find it.

5              At the end, the page next to last, your Honor, the box

6      second from the bottom.  Nik, I tried to resolve the conflict.

7      I suggest you talk on the zoom on Monday 9, 3 p.m.  Today we're

8      flying to New York.  We'll talk with my lawyer Dimitry Joffe.

9      I introduced you.  It is desirable you also have a lawyer.

10             This is pretty much how it ends.  And this entire

11     conversation is regarding the funding and the plan.

12             THE COURT:  I'm sorry.  Where are you?

13             MR. LEONOV:  You can't see it?  Page second to last.

14             THE COURT:  Second to last.  And the box starts?

15             MR. LEONOV:  Second box from the bottom.

16             THE COURT:  From Nik to Eugene?

17             MR. LEONOV:  Yes.

18             THE COURT:  "Hey, I will certainly participate"?

19             MR. LEONOV:  No, your Honor.  I probably misguided

20     you.

21             Third from last.  Excuse me.

22             THE COURT:  The one before that or after that?

23             MR. LEONOV:  The one before that.  Third from last.

24     Second box -- second box from the bottom.

25             THE COURT:  "Nik, to try to resolve the conflict."

ICC9MORA

1          MR. LEONOV:  Correct.

2          THE COURT:  Which conflict is being referred to?

3          MR. LEONOV:  That would be too long for me to put on

4    the record but unless your Honor directs me.

5          THE COURT:  Just in general.

6          MR. LEONOV:  This is regarding the funding.

7          THE COURT:  The funding?

8          MR. LEONOV:  Yes.

9          THE COURT:  So at what point did the parties part

10   ways?

11         MR. LEONOV:  After that point, after that

12   communication, we believe that a notice of lawsuit was sent to

13   internal counsel in California.  I'm not sure of that date.  So

14   immediately thereafter, shortly thereafter.

15         THE COURT:  And this was on February 9.

16         MR. LEONOV:  This was on February 9.  I'm not aware of

17   when the notice was sent to counsel in California.  And then he

18   contacted the clients.  And then we stepped in.

19         THE COURT:  So there is no -- this communication --

20   there is no communication that indicates one that basically

21   says you're fired?

22         MR. LEONOV:  No.

23         THE COURT:  Or basically says I quit?

24         MR. LEONOV:  Exactly.

25         THE COURT:  You say this is --

ICC9MORA

1          MR. LEONOV:  This is it.

2          THE COURT:  -- the final communication between the two

3    parties over the financing issues?

4          MR. LEONOV:  Correct.

5          THE COURT:  And the next thing that you heard --

6          MR. LEONOV:  Well not the next day but shortly

7    thereafter.

8          THE COURT:  The next communication was the filing of

9    the lawsuit.

10          MR. LEONOV:  I believe it was a demand letter that was

11    sent to general counsel in California.

12          THE COURT:  OK.

13          MR. LEONOV:  And then they couldn't reach a

14    settlement.

15          THE COURT:  And then what did the demand letter --

16          MR. LEONOV:  I do not have it with me.  I believe it

17    was written by plaintiff's counsel to general counsel.

18          THE COURT:  But did that demand letter reference a

19    demand for what?

20          MR. LEONOV:  For money.

21          THE COURT:  For money for him personally or funding

22    for the company?

23          MR. LEONOV:  No, no.  That letter really came from

24    Mr. Morozov, from Mr. Morozov, to plaintiff's attorney, stating

25    that I'm owed money on the contracts and pay so much money; not

ICC9MORA

1    the money to the company.

2              THE COURT:  The money he said he was owed.

3              MR. LEONOV:  Yes.

4              THE COURT:  The demand for those monies.

5              MR. LEONOV:  For this lawsuit.

6              THE COURT:  And did it say one way or the other

7    whether he was fired or quit?

8              MR. LEONOV:  I believe it was because he was

9    terminated.  I believe so, but I do not have the letter.

10             THE COURT:  That's fine.  I accept that.  All right.

11   OK.  All right.  That's fine.  That's sufficient for my

12   purposes.  Thank you.

13             Mr. Joffe, did you want to add anything further at

14   this point.

15             MR. JOFFE:  Just on the termination point.  I just

16   wanted to -- I'm not sure what Mr. Leonov quoted that box of

17   the February 9 text from Mr. Evdokimov where at the end,

18   February 9, he says to my client:  Let's agree on something

19   comfortable for both of us.  I would gladly offer you the

20   position of an adviser or a consultant with a subsequent return

21   at the moment when we are making, sustain a profit.  That was

22   on February 9.  Evdokimov says that we can maybe bring you as

23   an adviser or consultant, which is not paid position, instead

24   of the CEO.  That was the termination.

25             MR. LEONOV:  With all due respect, that is there, but

1    it doesn't say instead.

2              MR. JOFFE:  That's an issue of whether he was

3    terminated or not.  This is something I'm not prepared to

4    discuss at this point.

5              THE COURT:  This is not a motion to dismiss.  So I'm

6    not trying to judge the merits of this only to the extent of

7    the likelihood of the success on the merits.

8              Quite frankly with regard to this case I'm not

9    convinced that for an attachment that the plaintiff has

10   demonstrated both the likelihood of success on the merits or

11   that it is appropriate under the statute, either statute, to

12   seize any property of Nickolay at this stage of the

13   proceedings.  There is no indication that if he is found to be

14   personally liable, and I think there is some question as to

15   whether or not he is personally liable, but there is no

16   indication that any steps have been taken to make any assets

17   unavailable for a judgment or to dissipate or to hide any

18   assets.  There is no indication that he believed that he would

19   personally be somehow judgment proof if there was a judgment

20   against him.  I don't find a compelling reason to seize either

21   his -- or to attach either his home or any of his personal

22   assets at this stage of the proceedings given the numerous

23   issues and legal issues and legal hurdles that I think the

24   plaintiff needs to overcome to not only prevail on one or more

25   of his claims but to prevail against Mr. -- against Nickolay

ICC9MORA

1    personally given that it doesn't even appear that there's any

2    allegation against him that he somehow put his personal assets

3    or his personal liability at stake with regard to either the

4    MEM contract or the employment contract.  Those contracts were

5    with the company.  The plaintiff would have to either pierce

6    the corporate veil somehow or demonstrate that he has exposed

7    himself to this personal liability under the contract or under

8    the -- the service contract or other employment contract.

9             Also, I think the allegations with -- I think that the

10   plaintiff has a significant hurdle to demonstrate that he is

11   covered by the statute in order to enforce his rights as a CEO

12   of a company.  I think the definition of employee that the

13   plaintiff is relying upon I think that that definition for the

14   most part excludes the kind of employment agreement that he

15   had.  And whether he can demonstrate that the company and/or

16   Mr. -- or Nickolay or any of these other defendants are liable

17   for a breach of contract or are liable for some retaliatory

18   act, quite frankly, the only retaliatory act is really an

19   accusation against Nickolay.  It's not really an accusation

20   against any other defendant.  It's an accusation that Nickolay

21   was the one who made that decision and did so in retaliation

22   and did so on behalf of ICOBOX Hub, the signatory to the

23   contract.

24            So, I'm not going to further assess other than the

25   likelihood of success, of which I don't think has been

ICC9MORA

1    demonstrated at this point, I'm not going to further assess the

2    merits of the claims here.

3              I think the parties should go ahead and proceed.  But

4    I think that this is not an appropriate case, and the plaintiff

5    has not made out a claim for attaching the personal property of

6    the principal and/or/shareholder of ICOBOX Hub, the company

7    with which he had an employment contract, or MEM, the company

8    that is the plaintiff based on the service contract.

9              So I'm going to deny the motion for an order of

10   attachment.

11             If it turns out that during discovery it appears that

12   assets are being transferred or being moved in such a way that

13   it raises issues as to whether or not the defendant is either

14   trying to dissipate or put assets out of the reach of the

15   recovery if there's a judgment against them, then I will

16   reconsider whether or not there is such evidence to support an

17   attachment of some property.  But on this record I think it's

18   insufficient to order an attachment at the beginning of this

19   litigation given the particular hurdles that the plaintiff must

20   overcome in order to get a personal judgment against Nickolay

21   and a judgment for which he will be responsible to satisfy out

22   of his own personal assets.  So I am going to deny the motion

23   for an attachment.

24             I probably should agree upon a case management plan to

25   complete discovery and I will -- if there are any other issues

ICC9MORA

1    that arise with regard to discovery, bring them to my

2    attention.  I think I will schedule a conference -- do we have

3    another conference?

4              THE DEPUTY CLERK:  No.

5              THE COURT:  I think I will schedule a conference

6    for -- I think we do have a proposed date in February.

7              THE DEPUTY CLERK:  The 13th.

8              THE COURT:  February 13 at 9:45.  Let's see where we

9    are at that point in time and, as I said, if any other issues

10   arise or any further information with regard to the individual

11   defendants and their assets or transfer or suspicious transfer

12   of assets, then bring it to my attention and I'll revisit this.

13   But I'm going to deny it without prejudice to renew it if

14   there's some specific evidence that would warrant protecting a

15   potential likely judgment by plaintiff.

16             So we'll set it down for February 13 at 9:45 and we'll

17   see we're where we are at that point in time.

18             And if you want the assistance of the magistrate judge

19   or mediation for possible settlement discussion in the meantime

20   just let me know and I'll refer you there in the first

21   instance.  But, otherwise, move forward with discovery.  If

22   there are any other disputes with regard to discovery, bring

23   them to my attention by letter and a quick response as you did

24   recently and then I'll resolve those right away so you can move

25   forward efficiently.

ICC9MORA

1              MR. JOFFE:  Thank you, your Honor.

2              MR. LEONOV:  Thank you, your Honor.

3              One more thing, since we're here.  I apologize and

4     thank you for your time.

5              I believe we have a January date to complete discovery

6     at this point.  We'll do our best.

7              THE COURT:  How much time do you think reasonably?

8              MR. LEONOV:  I think we need slightly longer, just

9     because we will produce Victoria.  We need a couple depositions

10    and people in different countries.  I just, frankly, don't

11    think we will have the time.  Plaintiff's counsel depose

12    Victoria and me depose plaintiff by that time.

13             THE COURT:  Do you think you can do it before the end

14    of February?

15             MR. LEONOV:  Definitely.

16             THE COURT:  So I'll anticipate that hopefully you can

17    finish discovery by the time I see you next, by February 13; if

18    not, then you can tell me, hopefully you'll tell me you're just

19    about finished up and what it is.

20             MR. LEONOV:  Thank you so much, Judge.

21             MR. JOFFE:  Thank you, your Honor.

22             (Adjourned)

23

24

25


SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300