## THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EUGENE MOROZOV and MEM CONSULTING INC., | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ICOBOX HUB INC., ICOBOX, ALEX MOSKOVSKY, DARIA GENERALOVA, ANAR BABAYEV, NICKOLAY EVDOKIMOV, MICHAEL RAITSIN, 1280 VENTURES LLC, GVA VESTOR.IN PARTNERS FUND, L.P. | ) NO. <u>1:18-cv-03421-GBD</u> |
| Defendants. | ) |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

August 30, 2019

Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Avenue, 2C
New York, New York 10025
Tel: (917) 929-1964
Email: dimitry@joffe.law
*Counsel to Plaintiffs*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ...................................................................................................... 2

    1.    The contracts .................................................................................................. 2

    2.    Plaintiffs' performance and Defendants' breach ........................................ 4

    3.    Contractual damages .................................................................................... 6

    4.    Alter ego ........................................................................................................ 8

ARGUMENT ............................................................................................................................. 11

    1.    Legal standards ........................................................................................... 11

    2.    Plaintiffs are entitled to summary judgment
        on their breach of contract claims ............................................................. 12

    3.    The undisputed facts demonstrate Defendant Evdokimov's
        alter ego liability for ICOBOX HUB's breach of contract .................... 15

CONCLUSION ......................................................................................................................... 18

## **TABLE OF AUTHORITIES**

**Cases**

Anderson v. Liberty Lobby, Inc., 4 77 U.S. 242 (1986) ........................................................ 11, 12

Caldarola v. Calabrese, 298 F.3d 156 (2d Cir. 2002) ................................................................ 11

Continental Ins. Co. v Atl. Cas. Ins. Co., 603 F.3d 169 (2d Cir. 2010) ...................................... 12

Cornell v T.V. Dev. Corp., 17 N.Y.2d 69 (1966) ...................................................................... 15

David v. Mast, No. 1369-K, 1999 WL 135244 (Del. Ch. Mar. 2, 1999) ...................................... 16

First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162 (2d Cir. 1998) .............................. 12

First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253 (1968) ............................................. 12

Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423 (2d Cir. 2001) ................................................ 12

Gayle v. Gonyea, 313 F.3d 677 (2d Cir. 2002) ........................................................................ 11

Geyer v. Ingersoll Publications Co., 621 A.2d 784 (Del. Ch. 1992) ........................................... 15

Harper v. Delaware Valley Broadcasters, Inc., 743 F. Supp. 1076 (D. Del. 1990) ...................... 16

Irwin Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983 (Del. Ch. 1987) ............................... 16

Kumiva Group, LLC v. Garda USA Inc., 2017 NY Slip Op. 00235 (1st Dep't Jan. 2, 2017) ..... 14

Martin v. D.B. Martin Co., 10 Del.Ch. 211, 88 A. 612 (1913) ................................................... 15

Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260 (D. Del. 1989) .................................... 16

Morse v. Fusto, 804 F.3d 538 (2d Cir. 2015) ........................................................................... 12

MSF Holding Ltd. v. Fiduciary Trust Co. Int'l, 435 F. Supp. 2d 285 (S.D.N.Y. 2006) .............. 14

NetJets Aviation, Inc. v. LHC Communications, LLC, 537 F.3d 168 (2d Cir. 2008) ................. 15

Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171 (2d Cir. 2003) .................... 12

Pauley Petroleum Inc. v. Continental Oil Co., 239 A.2d 629 (Del. 1968) .................................. 15

Rebh v Lake George Ventures, 241 A.D.2d 801 (1997) ............................................................. 15

Siegel v. Laric Entertainment Corp., 307 A.D.2d 861 (1st Dep't 2003) ..................................... 14

Tendler v. Bais Knesses of New Hempstead, Inc., 112 AD 3d 911 (2d Dep't 2013) ................... 14

Terwilliger v. Terwilliger, 206 F.3d 240 (2d Cir. 2000)................................................... 12

U.S. Underwriters Ins. Co. v. Zeugma Corp., No. 97-Civ-8031, 1998 WL 633679
  (S.D.N.Y. Sept. 15, 1998)............................................................................................ 14

United States v. Golden Acres, Inc., 702 F. Supp. 1097 (D. Del. 1988) ...................... 16

Plaintiffs, through their undersigned counsel, respectfully move the Court pursuant to Rule 56(a) of the Federal Rules of Civil Procedure for a partial summary judgment on their breach of contract claims alleged as Counts I and II of their First Amended Complaint (Dkt. 24), seeking to hold Defendant Evdokimov liable for the breach as an alter ego of Defendant ICOBOX HUB Inc. ("ICOBOX HUB" or the "Company").

## PRELIMINARY STATEMENT

On November 30, 2017, Defendant Evdokimov hired Plaintiff Morozov to serve as a CEO of ICOBOX HUB, one of Defendant Evdokimov's serial business ventures dealing in cryptocurrencies and initial token offerings, incorporated in Delaware the day before, on November 29, 2017. Evdokimov and Morozov made a deal for a 3-year term, and signed the contracts dated January 1, 2018 implementing it.

However, Defendant Evdokimov's plan to have potential investors fund the Company with a $3 million investment quickly floundered, the Company did not get any funding, and did not get off the ground. On February 9, 2018, Defendant Evdokimov terminated Plaintiff Morozov from his CEO position, abandoned ICOBOX HUB, and moved on to his next venture, claiming that "the only company which had dealings with Mr. Morozov, ICOBOX Hub Inc., should protect me from personal liability."

As the parties' discovery has demonstrated, ICOBOX HUB was nothing more but a sham company and an alter ego of its owner Defendant Evdokimov: the Company was never capitalized and did not have more than $100 in its account; the Company did not have any offices or any employees (except for a brief period of less than two months when Plaintiff Morozov served as its only employee). The Company never took off, as Defendants readily admit, and effectively seized to exist less than three months after its formation, as soon as

Defendant Evdokimov lost his investors and his appetite for spending his own money, and unceremoniously terminated Plaintiff Morozov in breach of his 3-year employment agreement. Based on the undisputed facts stated below, Plaintiffs are entitled to a summary judgment awarding them damages for breach of their contracts with Defendant ICOBOX HUB and holding Defendant Evdokimov personally liable for those damages.

## FACTUAL BACKGROUND

### 1.     The contracts

ICOBOX HUB was incorporated in Delaware on November 29, 2017. See Plaintiffs' Statement of Undisputed Material Facts ("SUMF") ¶ 1. On November 30, 2017, Defendant Evdokimov offered Plaintiff Morozov a CEO position at the Company. In response, Plaintiff Morozov proposed to split the total compensation of $325,000 offered by Defendant Evdokimov between Plaintiff Morozov's employment agreement and a services agreement with his financial consulting firm Plaintiff MEM, and Defendant Evdokimov agreed to that arrangement. SUMF ¶ 2. The terms and conditions of the deal were then memorialized in the December 4, 2018 email to Plaintiff Morozov from Defendant Evdokimov's personal assistant Alexa Lopez, stating: "confirming the terms we are working with: dates changed! Start from 2018 for 3 yrs, base $325K/yr (split: 80 on w2, rest corp to corp) payable bi-weekly, annual bonus 6% of EBITDA, 2% equity per year for 3 years, coverage: med/dent/vision/life, D&O, E&O, indemnity. You can create the contract meanwhile." SUMF ¶ 3.

Plaintiff Morozov then retained counsel to draft the contracts incorporating these agreed terms. The contracts were executed by Defendant Evdokimov on behalf of the Company on or about January 1, 2018. SUMF ¶ 4.

The Employment Agreement provides that "the initial term of Employee's employment with Company will be from the date of execution of this Agreement [January 1, 2018] through December 31, 2020." Employment Agreement ¶ 4.1 (SUMF ¶ 5).

The Employment Agreement provided for the following compensation to Plaintiff Morozov: (i) annual base salary of $80,000.00 (¶ 3.1); (ii) an annual bonus equal to 6% of Company's EBITDA (¶ 3.2); (iii) equity compensation in the amount of 6% vested on a prorated monthly basis over a period of three years (¶ 3.3); (iv) reimbursement of T&E expenses (¶ 3.4); (v) "Social Security, disability, healthcare pension benefits, life insurance and paid time off per calendar year," as well as "100% of medical, dental, vision, and life insurance" (¶ 3.6); and (vi) a one-time payment of $10,000 in relocation assistance (¶ 3.8). SUMF ¶ 6.

The Employment Agreement further provided in paragraph 4.2 that "[d]uring the Initial Term, Company may terminate its employment relationship with Employee with thirty (30) days' written notice if the Company determines, in its sole discretion, that Employee is not fully performing his duties. If Company exercises its option to end the employment relationship under this Section, the Company will pay Employee his salary through the termination date and an additional four (4) months of salary payable in a lump sum within thirty (30) days of the termination date. Employee's annual bonus shall be equal to the amount due as of four months following the termination date. Employee shall be entitled to an additional four months of equity compensation." There is no limitation of damages provision in the Employment Agreement. SUMF ¶ 7.

The Services Agreement with Plaintiff MEM was also for the period of three years (¶ 3) and provided for "[m]onthly payment of $20,417 (Twenty Thousand Four Hundred Seventeen Dollars) payable in equal installments twice a month." (¶ 2). SUMF ¶¶ 9-10.

"The [Services] Agreement may be terminated by Client [ICOBOX HUB] upon thirty (30) days' prior written notice to Company [MEM]" (¶ 4). "In the event of termination by [ICOBOX HUB] prior to the end of the Term, for any reason whatsoever, [MEM] shall be compensated for the Services performed through the date of termination in the amount of a prorated portion of the fees due and [ICOBOX HUB] shall pay all expenses, fees, out of pocket and any additional costs incurred through and up to the date of cancellation. In addition, [ICOBOX HUB] shall pay [MEM] an additional Eighty One Thousand Six Hundred Sixty Eight Dollars ($81,668) as a cancellation fee ('Cancellation Fee'). . . . All payments under this Section 5(a) shall be made within Thirty (30) Days of the termination date." ¶ 5 (SUMF ¶ 11).

### 2.   <u>Plaintiffs' performance and Defendants' breach</u>

Following the execution of the Agreements, Plaintiff Morozov commenced working in his position as the Company CEO, and Plaintiff MEM, providing services to the Company. On February 3, 2018, Plaintiffs received a cash payment of $27,000, which equaled Plaintiffs' monthly compensation due under the two Agreements for January 2018. SUMF ¶ 20.

In the course of his employment, Plaintiff Morozov had insisted that the Company should abide by US laws in its employment and business practices, raising concerns over potential violations and trying to correct them. SUMF ¶ 14. For example, on January 25, 2018, Plaintiff Morozov reported to Defendants, including Defendant Evdokimov: "conducted examination of the employment status of the employees; found violations; immigration counsel retained for the employees." Id.

On February 1, 2018, in a Telegram post Defendant Evdokimov in response to Plaintiff Morozov's complaint that the Company had no money to pay its outside counsel and other counterparties, wrote "to start sales no protocols are needed, and very little money, I will talk to

4

contractors and pay them. This is a startup, it has its own laws." Plaintiff Morozov responded on the same day: "Nik, you and I do not want to go to jail. Without proper back office we cannot start sales. If my 25 years of experience are not enough, ask any attorney in the U.S. The laws in the U.S. apply to everyone." SUMF ¶ 15. Plaintiff Morozov made the same point in his February 2, 2018 email to Defendant Evdokimov and his investors. SUMF ¶ 16.

A week later, on February 9, 2018, Defendant EVDOKIMOV informed Plaintiffs that Defendant ICOBOX HUB's shareholders decided to scale back their contemplated investment in the Company, and eliminated Plaintiff's position as the CEO, offering him an advisory role instead. SUMF ¶ 17.

In a long Telegram post sent to Plaintiff Morozov that day, Defendant Evdokimov stated: "Let's agree on something comfortable for both of us. I would be pleased to offer you the position of an adviser, a consultant with a subsequent return at a time when we are already going to a sustainable profit. . . . We just need to understand how we can continue to cooperate – to transfer you to the post of adviser, to let you stay in the Board of Directors, to connect after we have profit and continue the interaction. . . . Therefore, I would consider the option of your participation in the future. Now as an advisor, and after the release of a plus already in the operating system." SUMF ¶ 17.[1]

On his deposition, Defendant Evdokimov testified that he wanted to remove Plaintiff Morozov from the CEO position to allow Defendant Evdokimov himself close the deal with his investors, but claimed that such "trading places" was "temporarily" until the closing of the

---

[1] Defendant Evdokimov explained the investors' decision by claiming that Plaintiff Morozov was trying to do too much too fast, purportedly trying to build a "Google" while the investors intended to be a small-scale startup. Defendants never alleged that Plaintiff Morozov was terminated because he was "not fully performing his duties" as provided for by the Employment Agreement. In fact, Defendant Evdokimov's position is that Plaintiff Morozov was not terminated at all rather than terminated for cause. SUMF ¶ 18.

investment, and denied that his Telegram post meant termination. SUMF ¶ 19 ("I needed simply to conclude the deal, that's why I needed to -- to trade places, so to speak. I did not say to him you are leaving, I simply needed to do this to complete the deal and then we would continue to be working."; "Q: Mr. Evdokimov, were you offering him the position of an advisor instead of the CEO position?  The answer is yes? A: Temporarily.  Temporarily.  Temporarily offered for the time being that the deal needs to close.")

Whether intended by Defendant Evdokimov as temporary or not, Plaintiff Morozov was indisputably terminated from his position as the CEO of ICOBOX HUB by the February 9 Telegram.[2]

Defendants have also breached the Services Agreement by effectively terminating it at the time of Plaintiff Morozov's firing without the required 30-day written notice and without paying Plaintiff MEM its severance due under the Services Agreement in the event of termination, *i.e.*, its prorated fees for February 2018 and the Cancellation Fee.

### 3.   **Contractual damages**

*First*, Plaintiff Morozov's "benefit of the bargain" or expectation damages under the Employment Agreement include the amounts he would have been paid in salary and benefits during the remainder of the 3-year contract term (less any wages that he has earned or could earn with reasonable diligence during the unexpired term). Plaintiff Morozov was entitled to $240,000 as his base salary for three years, less $6,666 he was paid for January 2018, *i.e.*, $233,334. SUMF ¶ 21.

---

[2] Defendant Evdokimov also contradicted his own February 9th post by stating that he meant Plaintiff Morozov's removal from the CEO position to last until the close of the investment rather than until "we are already going to a sustainable profit" as he wrote in the post. SUMF ¶ 19. Moreover, Defendant Evdokimov had failed to close the deal with the investors after Plaintiff Morozov had been gone from the Company, nor had the Company ever turned any profit, proving Plaintiff Morozov's termination permanent in any event. Id.

*Second*, Plaintiff Morozov is also contractually entitled to the $10,000 reallocation assistance. Plaintiff Morozov did reallocate from New York to San Francisco in mid-January 2018 but Defendants never paid him the promised reallocation assistance. SUMF ¶ 22.

*Third*, Plaintiff Morozov is entitled to his business travel expenses accrued in the amount of $12,400 that were never paid. SUMF ¶ 23.

*Fourth*, Plaintiff Morozov is entitled to recover benefits under the Agreement, *i.e.*, "Social Security, disability, healthcare pension benefits, life insurance and paid time off per calendar year," as well as "100% of medical, dental, vision, and life insurance" (¶ 3.6). Plaintiff conservatively estimated these benefits at $2,000 per month, for the total amount of $72,000 for the 3-year term. SUMF ¶ 24.

*Fifth*, The Employment Agreement further provides that "[i]n the event of a dispute arising out of the interpretation or enforcement of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees and costs." SUMF ¶ 25. Accordingly, Plaintiff Morozov is entitled to his reasonable attorney's fees and costs incurred in pursuit of this action.

Likewise, Plaintiff MEM is entitled to damages under the Services Agreement. In particular, Plaintiff MEM is entitled to its monthly fee for February 2018 in the amount of $20,417 and the Cancellation Fee in the amount of $81,668, *i.e.*, $102,085. SUMF ¶ 26.

Finally, following termination, Plaintiff Morozov undertook diligent efforts to find another employment, sending out hundreds of resumes and going to dozens of interviews. Despite his efforts, he was only able to find a variety of temporary or part-time position, earning approximately $75,000 since termination until now. SUMF ¶ 27. Accordingly, Plaintiffs are entitled to $429,819 less $75,000 earned, for the total of $354, 819 in contract damages; they are also entitled to their attorneys' fees and costs provided for by the Agreements. SUMF ¶ 28.

4.    **Alter ego**

ICOBOX HUB "was opened on January 1, 2018 for operations and did not take off after the budgeting issues were not resolved." SUMF ¶ 29. According to Defendant Evdokimov, "[w]e certainly contemplated [dissolution] this as well as bankruptcy . . . but since ICOBOX Hub Inc. has no assets and now in a lawsuit, that made no sense to pursue." Id.

Indeed, as discovery in this case further revealed, ICOBOX HUB never had any assets, was not capitalized, and was nothing but Defendant Evdokimov's "concept" that did not work: "The principle is as follows. I created a concept and I promoted it, developed it into a project. And then I developed a business model of that project, I attracted investors, and when I saw their full interest and preparedness for the project then I attracted Morozov." SUMF ¶ 30. When the investors did not invest, Defendant Evdokimov quickly moved on his next "concept," leaving ICOBOX HUB behind with no funds but with contractual commitments it never had any resources to meet. As Defendant Evdokimov testified: "I develop an idea, then I search for the person in charge, then for investors. And that's it. And I am leaving, I am gone." SUMF ¶ 31.

When the Company signed a three-year deal with Plaintiffs, it had no money to pay even their first-month compensation. The Company was never capitalized; did not have more than $100 in its account; did not have any employees except Plaintiff Morozov. SUMF ¶ 32 ("Q: How was the Hub capitalized? A: Well, other than minute initial capital we did not put down. We were preparing after all it for the deal, for a deal with investors. Q: So you personally did not contribute any money to the Hub? A: No.").

ICOBOX HUB used Defendant Evdokimov's personal offices at Four Embarcadero Center in San Francisco for its address and did not have its own office. SUMF ¶ 33 ("Q: And where was the Hub's office in 2018? A: It did not have an office.  Everybody was seated in

Embarcadero but we did not organize any separate office. . . . It wasn't ICOBox's office.  It wasn't ICOBox's office, it was my personal office in which I was seated and several people who were assisting me in handling the project.").

Defendant Evdokimov paid the Company's expenses using his personal cash. The single payment that Plaintiff Morozov received was made in cash by Defendant Evdokimov's personal assistant using Defendant Evdokimov's personal funds. The Company did not honor any of its contracts with the outside vendors and consultants retained by Plaintiff Morozov, and did not pay any of their invoices. SUMF ¶¶ 34-35.

ICOBOX HUB's parent, a Cayman Islands company Defendant ICOBOX, too, was owned by Defendant Evdokimov, who admitted that its corporate owners "CryptoLab and Blockchain [Empire] belong to me by 100%." SUMF ¶ 36. Moreover, Defendant conceded that the organizational charts purporting to show a chain of corporate ownership of the Company and ICOBOX were somebody's "*inventions*." SUMF ¶ 37.[3]

ICOBOX's officers with such titles as the "Head of Strategy," "Chief Communications Officer," "Chief People's Officer" turned out to be Defendant Evdokimov's personal assistants, while their hefty titles turned out to be all fictitious and "*entirely absurd*," in Defendant Evdokimov's own words, assumed by them just to put on airs and impress potential investors, with Defendant Evdokimov's knowledge and consent. SUMF ¶¶ 38-39.[4] They too, were paid in cash (or bitcoins) from Defendant Evdokimov's personal funds. SUMF ¶__.[5]

---

[3] See also id. (Defendant Evdokimov's testifying that he owns "[m]ore than 50% of ICOBox Hub and then a hundred percent -- well, more than 95% of ICOBox," the parent company of ICOBOX HUB).

[4] See, e.g., Victoria Pirumova's Deposition at pp. 150-51: "Q: When you called yourself Chief Communications Officer, or Chief People's Officer at ICOBox, you just testified that in reality you were just a personal assistant to Mr. Evdokimov; did you not? A: Yes." SUMF ¶ 38.

[5] They were all members of Defendant Evdokimov's personal team handling his various projects: "Q: Do you know about the offices at Four Embarcadero Center in San Francisco? A: Of course.  They were my team that were

These ICOBOX officers were in fact all part of Defendant Evdokimov's personal team working on his private projects, and paid in cash or bitcoins from Defendant Evdokimov's personal funds. SUMF ¶ 40 ("Q: Do you know about the offices at Four Embarcadero Center in San Francisco? A: Of course.  They were my team that were handling my projects." "Q: When you say the team, do you mean ICOBox or do you mean your personal team?  Where is the distinction? A: My personal team consisted of several people. They developed my private directions and projects. I, correspondingly I worked through the concept and then we would file the paperwork, we would present presentations, communicated with potential partners, respectfully possibly with investors too. And out of this -- out of this -- out of this conveyor, out of this factory or better say out of this incubator when the project would come out, and then at that time that project would then become an official registered business, its base team, that is what -- what -- that is in regards to my team.").

Defendant ICOBOX had no bank account. SUMF ¶ 41 ("Q: And does ICOBOX have a bank account in the United States? A: ICOBOX does not have a bank account at all.").

Defendant Evdokimov also commingled or attempted to commingle the funds of his companies ICOBOX and ICOBOX HUB. For example, on February 1, 2018, Plaintiff Morozov received an email from Defendant Moskovsky, then CEO of Defendant Evdokimov's Cayman Island company ICOBOX, stating that "we have a very difficult situation on our hands -- there are several employees, which need to be paid in fiat, and we do not have an account. It is further

---

handling my projects." "Q: When you say the team, do you mean ICOBox or do you mean your personal team? Where is the distinction? A: My personal team consisted of several people. They developed my private directions and projects. I, correspondingly I worked through the concept and then we would file the paperwork, we would present presentations, communicated with potential partners, respectfully possibly with investors too.  And out of this -- out of this -- out of this conveyor, out of this factory or better say out of this incubator when the project would come out, and then at that time that project would then become an official registered business, its base team, that is what -- what -- that is in regards to my team." SUMF ¶ 40.

complicated by the fact that the payment date is February 5. Please tell us if we can use your account if it has been already opened?" SUMF ¶ 42. Defendant Evdokimov testified in this regard that "[i]t is simply a method of exchange and that's all. One company is arranging with another company for help so, after all, we are friends and the large company, the ICOBox, the ICOBox does not have a bank account and so he needs to pay the employees via Fiat in dollars. And the ICOBox Hub does have an account. Therefore, Alex is asking Eugene for help." SUMF ¶ 43.

In sum, the stillborn ICOBOX HUB was a fiction and merely an alter ego of its founder and majority owner Defendant Evdokimov, who had personally managed the affairs of his company ICOBOX (and the non-functioning ICOBOX HUB), with his personal team of assistants using "entirely absurd" titles and an "invent[ed]" corporate structure in their dealings with Plaintiffs. Yet, Defendant Evdokimov claims that "the only company which had dealings with Mr. Morozov, ICOBOX Hub Inc., should protect me from personal liability." SUMF ¶ 44.

## ARGUMENT

### I.   Legal standards

Summary judgment is appropriate where "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002). A fact is "material" when "it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 4 77 U.S. 242, 248 (1986)).

To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact and "do more than simply show that there is some metaphysical doubt as to the material facts," Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002), and "may not rely

on conclusory allegations or unsubstantiated speculation," Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 428 (2d Cir. 2001), but must produce admissible evidence that supports its pleadings. See First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289-90 (1968). "The 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Anderson, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the evidence is construed in the light most favorable to the non-moving party and all inferences are drawn in that party's favor. See Morse v. Fusto, 804 F.3d 538, 546 (2d Cir. 2015).

## II.    Plaintiffs are entitled to summary judgment on their breach of contract claims.

Plaintiffs are entitled to summary judgment on their breach of contract claims as a matter of law because there is no genuine dispute as to any factual elements of their claims. Thus, to prevail on a breach of contract claim under New York law, plaintiff must prove "'(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.'" Terwilliger v. Terwilliger, 206 F.3d 240, 246 (2d Cir. 2000) (quoting First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998)). Summary judgment may be granted in a contract dispute where the language of the contract is "unambiguous." Continental Ins. Co. v Atl. Cas. Ins. Co., 603 F3d 169, 180 (2d Cir. 2010).

*First*, no genuine issue of material fact exists as to the existence of their contracts. Defendants admitted in their answer to the First Amended Complaint that "effective as of January 1, 2018, Plaintiff entered into the Employment Agreement with Defendant ICOBOX HUB to serve as its CEO." Dkt. 29 (Answer) ¶ 57; see also SUMF ¶ 4. Defendants also admitted that "an agreement was entered into with Plaintiff MEM." Dkt. 29 (Answer) ¶¶ 14, 59.

*Second*, Plaintiffs proved their performance of the contracts; indeed, Defendants do not allege any breach of contract by Plaintiffs in their answer or affirmative defenses. SUMF ¶ 13. Indeed, Defendant Evdokimov insisted on his deposition that Plaintiff Morozov was terminated only temporary to allow Defendant Evdokimov to close deal with the investors (which never happened). SUMF ¶ 19.

*Third*, Plaintiffs proved that the contracts were wrongfully terminated by Defendants in breach of their respective provisions. Defendant Evdokimov admitted his statements to Plaintiff Morozov made in the February 9, 2018 Telegram post: "Let's agree on something comfortable for both of us. I would be pleased to offer you the position of an adviser, a consultant with a subsequent return at a time when we are already going to a sustainable profit. . . . We just need to understand how we can continue to cooperate – to transfer you to the post of adviser, to let you stay in the Board of Directors, to connect after we have profit and continue the interaction. . . . Therefore, I would consider the option of your participation in the future. Now as an advisor, and after the release of a plus already in the operating system." SUMF ¶ 18.

In deposition, Defendant Evdokimov disputed that the February 9 letter amounted to termination, claiming that Plaintiff Morozov's removal from the CEO position was meant to be "temporary," to give Defendant Evdokimov an opportunity to close the deal with potential investors without Plaintiff Morozov as the CEO. [6]  SUMF ¶ 19.

Temporary or not, it is undisputed that Defendant Evdokimov in his February 9, 2018 post did remove Plaintiff Morozov from his CEO position in breach of the Employment Agreement. The language of the letter is clear in that respect and cannot be reasonably disputed.

---

[6] The letter itself referred to the Company's turning profitable as an ephemeral time of Plaintiff Morozov's potential "subsequent return" as the CEO. Regardless, neither the profitability nor the closing of the investment proved attainable after Plaintiff Morozov was terminated as the CEO.

The fact that Defendant Evdokimov now self-servingly disputes the plain meaning and legal consequences of that termination letter is not an obstacle to summary judgment. "Where parties on a summary judgment motion do not dispute a dispositive material fact, and merely disagree as to the consequence of that undisputed fact under the law, a question of law is presented for the court's interpretation and the court could not be on firmer ground in granting summary judgment as a matter of law." MSF Holding Ltd. v. Fiduciary Trust Co. Int'l, 435 F. Supp. 2d 285, 305 (S.D.N.Y. 2006). See also U.S. Underwriters Ins. Co. v. Zeugma Corp., No. 97-Civ-8031, 1998 WL 633679, at *2 (S.D.N.Y. Sept. 15, 1998) ("Summary judgment is appropriate where all facts are undisputed and only questions of law remain to be decided.").

*Fourth*, Plaintiffs proved that they had suffered damages as a result of Defendants' wrongful termination. Pursuant to New York law governing the Agreements, "a plaintiff alleging breach of contract is entitled to damages restoring the full benefit of the bargain." Kumiva Group, LLC v. Garda USA Inc., 2017 NY Slip Op. 00235 (1st Dep't Jan. 2, 2017).

"The damages an employee is entitled to recover for breach of an employment agreement is the amount of wages and other benefits he/she would have received under the contract (see Wiener v. Lawrence-Picaso, Inc., 295 A.D.2d 273, 274, lv denied 99 N.Y.2d 504; Rebh v. Lake George Ventures, Inc., 241 A.D.2d 801, 803; see also 52 N.Y. Jur2d, Employment Relations, § 249, pp 442-443)." Siegel v. Laric Entertainment Corp., 307 A.D.2d 861, 862 (1st Dep't 2003) (reversing damages award where the jury "only awarded plaintiff compensation for wages owed him for the period prior to his termination, but neglected to include damages for the unexpired part of the minimum one-year term of the contract"); see also Tendler v. Bais Knesses of New Hempstead, Inc., 112 AD 3d 911, 911 (2d Dep't 2013) ("The damages payable for breach of an employment contract are measured, prima facie, by the wages that would have been paid during

14

the remainder of the contract term (see Cornell v T.V. Dev. Corp., 17 N.Y.2d 69, 74

[1966]; Rebh v Lake George Ventures, 241 A.D.2d 801, 803 [1997])"). The actual damages are

reduced by the income which the discharged employee has earned, will earn, or could with

reasonable diligence earn during the unexpired term. Id. "[T]he burden of proving a lack of

diligent effort to mitigate damages is upon the defendant." Cornell, 17 N.Y.2d at 74.

As shown above, Plaintiffs' damages include compensation and benefits that Plaintiff

Morozov would have been paid during the remainder of the Employment Agreement's term of

three years (less his income earned during the unexpired term); and Plaintiff MEM's prorated

service fee and the Cancellation fee due upon termination of the Services Agreement, totaling

$349,819. Plaintiffs are also entitled to their attorney's fees and costs incurred in pursuit of this

action. SUMF ¶28.[7]

### III.   The undisputed facts demonstrate Defendant Evdokimov's alter ego liability for ICOBOX HUB's breach of contract.

The Second Circuit in NetJets Aviation, Inc. v. LHC Communications, LLC, 537 F.3d

168, 176-77 (2d Cir. 2008), applied the alter ego law of Delaware as defendant's state of

incorporation and summarized it as follows:

> The distinction between the entity and its owner "may be disregarded" to require
> an owner to answer for the entity's debts. Pauley Petroleum Inc. v. Continental
> Oil Co., 239 A.2d 629, 633 (Del. 1968). In general, with respect to the limited
> liability of owners of a corporation, Delaware law permits a court to pierce the
> corporate veil "where there is fraud or where [the corporation] is in fact a mere
> instrumentality or alter ego of its owner." Geyer v. Ingersoll Publications Co., 621
> A.2d 784, 793 (Del.Ch. 1992); see, e.g., Martin v. D.B. Martin Co., 10 Del.Ch.
> 211, 217, 88 A. 612, 615 (1913) ("Martin") . . ., 88 A. at 615 ("It must be in the
> power of the court to look through these legal fictions to the equitable realities
> and see by whom and through what agencies the wrong is done and on whom the
> loss ultimately falls.").

---

[7] The Employment Agreement also entitles Plaintiff Morozov to annual bonuses in the amount of 6% of ICOBOX
HUB' EBITDA, and equity compensation in the amount of 2% equity per year. However, since ICOBOX HUB
never took off, never made any earnings and has no capital, assets or any value, Plaintiff Morozov does not claim
the unpaid bonuses or equity compensation as part of his damages.

To prevail under the alter-ego theory of piercing the veil, a plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an "overall element of injustice or unfairness." Harco, 1989 WL 110537, at *4. "[A]n alter ego analysis must start with an examination of factors which reveal how the corporation operates and the particular defendant's relationship to that operation. These factors include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder." Id. at *4 (quoting United States v. Golden Acres, Inc., 702 F. Supp. 1097, 1104 (D. Del. 1988) ("Golden Acres"), aff''d, 879 F.2d 857 879 F.2d 860 (3d Cir. 1989)).

"[N]o single factor c[an] justify a decision to disregard the corporate entity, but . . . some combination of them [i]s required, and . . . an overall element of injustice or unfairness must always be present, as well." Harco, [ 1989 WL 110537, at *5] (quoting Golden Acres, 702 F.Supp. at 1104). Harper v. Delaware Valley Broadcasters, Inc., 743 F. Supp. 1076, 1085 (D. Del. 1990) ("Harper") (emphasis added), aff 'd, 932 F.2d 959 (3d Cir. 1991).

As the above discussion indicates, "[n]umerous factors come into play when discussing whether separate legal entities should be regarded as alter egos," id., and "[t]he legal test for determining when a corporate form should be ignored in equity cannot be reduced to a single formula that is neither over-nor under-inclusive," Irwin Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 989 (Del. Ch. 1987). The inquiry initially focuses on whether "those in control of a corporation" did not "treat[] the corporation as a distinct entity"; and, if they did not, the court then seeks "to evaluate the specific facts with a standard of 'fraud' or 'misuse' or some other general term of reproach in mind," id., such as whether the corporation was used to engage in conduct that was "inequitable," Mobil Oil Corp. v. Linear Films, Inc., 718 F.Supp. 260, 269 (D. Del. 1989) ("Mobil Oil") (internal quotation marks omitted), or "prohibited," David v. Mast, No. 1369-K, 1999 WL 135244, at *2 (Del. Ch. Mar. 2, 1999), or an "unfair trade practice," id., or "illegal," Martin, 10 Del.Ch. at 219, 88 A. at 615.

Here, the relevant factors overwhelmingly point to Defendant Evdokimov's *alter ego*

liability for the Company's debts. As shown above, Defendant ICOBOX HUB was not a real

entity but a temporary façade for its founder Defendant Evdokimov: the Company never took

off; it was not capitalized and never had more than $100 in its account; it had no assets, no

offices, and no employees except Plaintiff Morozov. Defendant Evdokimov attempted to commingle the assets of Defendants ICOBOX and ICOBOX HUB by seeking to use ICOBOX HUB's bank account to pay wages to ICOBOX's employees. Defendant Evdokimov also caused the Company to renege on its contracts signed with its outside vendors (counsel, accountants, financial advisors) and to refuse payments for services provided.

The Company's bills, to the small extent they were paid, were paid by Defendant Evdokimov's personal cash for the first month of its short existence -- but soon enough, not finding any investors, Defendant Evdokimov simply moved on to his new ventures, abandoning his 3-month-old shell Company and leaving Plaintiffs in ruin.[8]

Plaintiffs have also demonstrated the "overall element of injustice or unfairness" in Defendant Evdokimov's use of his alter ego Company "to protect [him] from personal liability." Hiding behind the corporate veil, Defendant Evdokimov caused the Company to engage in unfair or wrongful business and labor practices, including attempts to (a) employ Russian and Ukrainian citizens not authorized to work in the U.S.; (b) attract Russian investors on the U.S. sanctions list; (c) solicit U.S. investors without obtaining proper registrations or implementing any internal controls or compliance checks, or any proper back office.

Defendant Evdokimov engaged in these unfair practices with impunity, hoping that his shell company "ICOBOX Hub Inc. should protect me from personal liability." SUMF ¶ 14. The

---

[8] Defendant Evdokimov's next venture, started in May 2018, called Decenturion, and marketed as the first blockchain state, was uniformly derided in the media as a Ponzi scheme. "In May, new Russian and Ukrainian blockchain startup Decenturion was on display at the Consensus forum in New York. They issued passports. It didn't take long for the Reddit community and other Bitcoin forum participants to call it out for being a Ponzi scheme. The coin now trades at around $3, according to CoinGecko, a loss of 98% from its launch last spring." Kenneth Rapoza, *Will Russia Make Any Waves In Crypto This Year?*, Forbes (Jan. 2, 2019). SUMP ¶ 45. Defendant Evdokimov serves as Decenturion's Minister of Information; his personal assistant Victoria Pirumova, the fake "Chief Communications Officer" and "Chief People's Officer" at ICOBOX, served as Decenturion's Minister of Foreign Affairs. As Defendant Evdokimov stated in his declaration, "I am simply continuing my other ventures as I have been doing before. . . . business operations and my life continue as normal." SUMF ¶ 46.

17

Delaware alter ego law says otherwise, making Defendant Evdokimov personally liable for his shell company's debts, including for damages to Plaintiffs on their breach of contract claims.

## <u>CONCLUSION</u>

The facts indisputably point to Defendant Evdokimov's alter ego liability for contract breach by his shell non-functioning company ICOBOX HUB. Plaintiffs' evidence on the record demonstrates the contracts, their breach by Defendants, the amount of the resulting damages, the facts that the Company was merely an alter ego of its owner Defendant Evdokimov, and an overall element of injustice or unfairness. Plaintiffs respectfully submit that they are entitled to summary judgment against Defendant Evdokimov as a matter of law in the amount of $354,819 plus their attorneys' fees and costs.

August 30, 2019                                   JOFFE LAW P.C.

_____
Dimitry Joffe
765 Amsterdam Ave, 2C
New York, NY 10025
(917)-929-1964
Dimitry@joffe.law
*Plaintiffs' counsel*

**CERTIFICATE OF SERVICE**

I, Dimitry Joffe, hereby certify that on this 30th day of August, 2019, I caused a true and correct copy of Plaintiffs' memorandum of law in support of their summary judgment motion accompanied by the Statement of Undisputed Material Facts and Plaintiff Morozov's Affidavit with exhibits thereto to be served upon counsel for Defendants by ECF and upon unrepresented Defendant Evdokimov by electronic mail to Neo@icobox.io and Nick@Evdokimov.com.

/s/ Dimitry Joffe
Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Ave, 2C
New York, NY 10025
*Plaintiffs' counsel*