UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EUGENE MOROZOV AND MEM CONSULTING
INC.,

                              Plaintiffs,

        v.                                                    CIVIL ACTION NO.: 18 Civ. 3421 (GBD) (SLC)

ICOBOX HUB INC., ICOBOX, ALEX MOSKOVSKY,           **REPORT AND RECOMMENDATION**
AND NICKOLAY EVDOKIMOV,

                              Defendants.


**SARAH L. CAVE,** United States Magistrate Judge.

**TO THE HONORABLE GEORGE B. DANIELS**, United States District Judge:

## I.        INTRODUCTION

On April 18, 2018, Plaintiff Eugene Morozov ("Morozov") and MEM Consulting Inc.

("MEM") (Morozov and MEM together, "Plaintiffs") filed a complaint alleging that Defendants

ICOBOX HUB Inc., ICOBOX, Alex Moskovsky, Daria Generalova, Anar Babayev, Nickolay

Evdokimov, Michael Raitsin, 1280 Ventures LLC, and GVA Vestor.In Partners Fund, L.P.

("Defendants") failed to compensate them pursuant to written agreements, wrongfully

terminated Morozov's employment, and failed to pay Morozov sufficient wages.  (ECF No. 1).  In

2019, Plaintiffs entered into a settlement with Defendants Generalova, Babayev, and Raitsin (the

"Settling Defendants"), which the Honorable George B. Daniels approved.  (ECF Nos. 51, 53).

After Judge Daniels granted the motions of Defendants' counsel to withdraw his appearance for

Defendants Evdokimov, ICOBOX, ICOBOX Hub, and Moskovsky (the "Defaulting Defendants"), no

substitute counsel appeared on their behalf and they have not otherwise participated further in

this action.  (ECF Nos. 45, 65).  The District Court subsequently granted Plaintiffs' motion for

partial summary judgment against Defendant Evdokimov on the breach of contract claims, and referred the matter to the undersigned for an inquest on damages and attorneys' fees and costs. (ECF Nos. 69, 71).

Now before the Court is Plaintiffs' motion for default judgment as to ICOBOX, ICOBOX HUB, Evdokimov, and Moskovsky (the "Default Motion"), (ECF Nos. 72–73), and Plaintiffs' motion for an order of examination and attachment, which seeks an examination of Evdokimov concerning his assets and an order restraining him from disposing of any assets (the "Attachment Motion").  (ECF No. 77).  For the reasons set forth below, I respectfully recommend that the District Court:  (1) GRANT IN PART the Default Motion and enter a default judgment against Evdokimov only, awarding Plaintiffs:  (i) damages in the amount of $354,500; (ii) attorneys' fees in the amount of $63,810; and (iv) costs in the amount of $6,815; and (2) GRANT Plaintiffs' Attachment Motion.

## II.    BACKGROUND

Because of the Defaulting Defendants' default, the Court accepts as true all well-pleaded factual allegations in Plaintiffs' complaint, except as to damages.  See City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011) ("it is an 'ancient common law axiom' that a defendant who defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint.") (quoting Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004)); Whitehead v. Mix Unit, LLC, No. 17 Civ. 9476 (VSB) (JLC), 2019 WL 384446, at *1 (S.D.N.Y. Jan. 31, 2019).

### A.  Factual Background

Morozov is a United States citizen who resides in San Francisco.  (ECF No. 24 ¶ 9).

Morozov has multiple accounting degrees and has previously been employed as the Chief Executive Officer ("CEO") of Overseas Media Inc., Chief Financial Officer of VisaHQ.com Inc., managing director of Standard Capital Group, and as a financial analyst at Deutsche Bank, JP Morgan, and Coopers & Lybrand.  (Id. ¶ 10).  Morozov owns and operates MEM, a management and financial consulting company based in New York.  (Id. ¶ 13)

In November 2017, Plaintiffs entered into a series of agreements with Defendants ICOBOX Hub and Evdokimov for employment and consulting services with respect to cryptocurrencies and initial coin offerings ("ICOs").  (ECF No. 24 ¶ 1).  Pursuant to an employment agreement dated January 1, 2018 (the "Employment Agreement"), Morozov was to serve as the CEO of ICOBOX HUB, "a U.S.-based ICO incubator" formed by Evdokimov "for Defendant ICOBOX and its Russian owners," with locations in San Francisco and at Trump Tower in New York.  (Id. at ¶¶ 11, 16–17).  ICOBOX Hub conducted "[v]irtually all" of its transactions in the United States in Bitcoins, Ethers, or other cryptocurrencies.  (Id. ¶ 18).  Morozov alleges that ICOBOX HUB was his "employer" under the definition in the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA") and New York Labor Laws, Article 6 §§ 190 et seq. ("NYLL").  (Id. ¶ 21).  Pursuant to a services agreement also effective January 1, 2018 (the "Services Agreement"), MEM agreed to provide management consulting services to ICOBOX HUB in the financial and reporting areas.  (Id. ¶ 14).

## 1.  The Employment Agreement

Pursuant to the Employment Agreement, Morozov was to serve as CEO of ICOBOX Hub for a three-year term from January 1, 2018 until December 31, 2020 at an annual base salary of $80,000.  (ECF Nos. 79 ¶¶ 8, 13; 79-2 at 2–3).  Morozov was also entitled to reimbursement for travel expenses, as well as healthcare and other benefits.  (ECF Nos. 79 ¶¶ 17–18; 79-2 at 2–3).

The Employment Agreement also contemplated reimbursement for expenses Morozov and his family incurred in moving from New York to San Francisco, up to $10,000.  (ECF Nos. 79 ¶ 21; 79-2 at 3).

Under the Employment Agreement, ICOBOX HUB had the right to terminate Morozov's employment with 30 days' written notice if it determined "in its sole discretion" that Morozov was "not fully performing his duties."  (ECF Nos. 79 ¶ 10; 79-2 at 3).

The Employment Agreement also provides that, "[i]n the event of a dispute arising out of the interpretation or enforcement of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees and costs."  (ECF Nos. 79 ¶ 36; 79-2 at 6).

## 2. The Services Agreement

Pursuant to the Services Agreement, MEM was to provide financial reporting consulting services to ICOBOX HUB for a three-year period from January 1, 2018 until December 31, 2020, in exchange for a monthly payment of $20,417 payable in equal installments twice per month. (ECF Nos. 79 ¶¶ 27–28; 79-3 at 2).   ICOBOX HUB had the right to terminate the Services Agreement with 30 days' written notice to MEM, but if it did so, would be required to pay MEM a prorated amount for the services MEM had performed through the date of termination, plus expenses and a cancellation fee of $81,668 (the "Cancellation Fee").  (ECF Nos. 79 ¶¶ 29–31; 79-2 at 2–3).

Similar to the Employment Agreement, the Services Agreement provides that "[i]n the event of legal action arising from or out of this Agreement or the relationship of the parties created hereby, the trier thereof may award to any party any reasonable attorneys' fees and other costs incurred in connection therewith."  (ECF Nos. 79 ¶ 37; 79-3 at 5).

### 3.  **Morozov's employment with ICOBOX HUB**

Morozov alleges that when he began working as CEO of ICOBOX Hub in January 2018, "he quickly discovered that the Defendants were prone to cutting corners in their compliance with the U.S. labor, immigrations, tax and sanctions laws."  (ECF No. 24 ¶ 2).  For example, Morozov became concerned that ICOBOX HUB's Russian shareholders and directors were associated with individuals on a list of prominent Russian business and political figures whom the United States Congress intended to sanction "for Russia's election meddling."  (Id. ¶ 77–78).  He reported his concerns about the violations to Defendants in an effort to "persuade them that in the U.S., the business must be carried out in a legal way even if that means having to spend more money for compliance."  (Id. ¶ 2; see also id. ¶¶ 63–82).  On February 22, 2018, Morozov sent an email to Evdokimov stating, "I ask the current ICOBOX HUB INC shareholders to consider alternative funding sources which would allow for successful launch of our wonderful project without taking money from individuals on the US Congress sanctions list."  (Id. ¶ 80).  Morozov retained legal, accounting, and tax advisors to bring ICOBOX HUB into compliance with U.S. law.  (Id. ¶ 2).

Morozov alleges that, following his reporting of his concerns about the violations of U.S. law, ICOBOX HUB terminated his employment on February 9, 2018, with no prior warning or explanation, and therefore breached the Employment Agreement.  (ECF Nos. 79 ¶¶ 11, 20; 79-1 ¶ 4 ("First Morozov Affidavit")).  Before his termination, he had been paid only one month's salary, or $6,666.  (ECF No. 79 ¶ 14; 79-1 ¶ 6).  He estimates that his healthcare and other benefits were worth $2,000 per month, or $72,000 for the three-year term under the Employment Agreement.  (ECF Nos. 79 ¶¶ 18–19; 79-1 ¶¶ 13–14).  He estimates the amount of salary and benefits he would have received under the remainder of the three-year term totals $318,812.

(ECF Nos. 79 ¶ 25; 83 ¶ 3).

Following his termination in February 2018, Morozov sought and partially obtained other employment, earning $53,600 in the 18 months thereafter.  (ECF Nos. 79 ¶¶ 22–23; 79-1 ¶¶ 7–9).  In early 2020, due to the coronavirus pandemic, he lost his job.  (ECF No. 83 ¶ 4 ("Second Morozov Affidavit").  As of April 2020, he had earned $16,800, and expected to earn substantially less for the remainder of 2020.  (Id.)  He now estimates that the amount he "had earned and could with reasonable diligence earn during the remaining contractual term is $86,000 rather than $107,200" as stated in his prior affidavit.  (Id. ¶ 5; see ECF No. 79 ¶ 24; 79-1 ¶ 9).

#### 4.  MEM's services to ICOBOX HUB

MEM provided services to ICOBOX HUB during the month of January 2018, for which MEM received one monthly payment of $20,417.  (ECF No. 79 ¶ 32).  On February 9, 2018, ICOBOX HUB terminated the Services Agreement without providing MEM with the required 30-day notice and without paying MEM its prorated fee through the date of termination or the Cancellation Fee.  (ECF No. 79 ¶ 33).

#### 5.  Alter ego allegations

Plaintiffs allege that Evdokimov is the CEO of ICOBOX (the parent of ICOBOX HUB), holds shares in ICOBOX HUB, and owns residences in Beverly Hills, California, Russia, and Thailand.  (Id. ¶¶ 22–24).  Plaintiffs allege on information and belief that Evdokimov caused ICOBOX HUB to issue shares to, among others, ICOBOX, which is an "alter ego" of its shareholders and beneficial owners, who include Evdokimov as well as Defendants Daria Generalova, Anar Babayev, Alex Moskovsky, and Michael Raitsin.  (Id. ¶ 20).

### 6. Plaintiffs' requested damages

#### a. Morozov

As damages for breach of the Employment Agreement, Morozov seeks to recover the benefit-of-the-bargain contractual damages he would have received during the remainder of his three-year term.  (ECF No. 79 ¶ 11).  These damages include the amount of salary and benefits he would have been paid during the remainder of his three-year term as CEO of ICOBOX Hub, reduced by amounts he has earned, will earn, or could earn during that period, as well as reimbursement for his moving and travel expenses.  (ECF Nos. 79 ¶¶ 7, 13–14, 17, 19, 21; 79-1 ¶¶ 6–14).  These amounts are itemized as follows:

(1) Salary and benefits: $232,812 ($318,812 less $86,000) (ECF No. 83 ¶ 5);

(2) Travel and business expenses: $3,478 (ECF Nos. 79 ¶ 17; 79-1 ¶ 12); and,

(3) Moving expenses: $10,000 (ECF Nos. 79 ¶ 21; 79-1 ¶ 11).

#### b. MEM

As damages for ICOBOX HUB's breach of the Services Agreement, MEM seeks to recover the pro-rated portion of its fees through the termination date, including the 30-day notice period, plus the Cancellation Fee.  (ECF No. 79 ¶ 26).  From the date of termination plus the 30-day notice period, MEM counts a total of 39 days, and, based on the monthly fee of $20,417, calculates its prorated fee as $26,542.  (ECF No. 79 ¶ 34).  Added to the Cancellation Fee of $81,668, MEM seeks total damages of $108,210 ($26,542 plus $81,668).  (ECF No. 79 ¶ 35).

### B. Procedural Background

On April 18, 2018, Plaintiffs filed the original complaint naming as defendants ICOBOX HUB Inc., ICOBOX, Alex Moskovsky, Daria Generalova, Anar Babayev, Nickolay Evdokimov,

Michael Raitsin, 1280 Ventures LLC, and GVA Vestor.IN Partners Fund, L.P. (ECF No. 1). Plaintiffs asserted six causes of action: (1) breach of contract with respect to Morozov's Employment Agreement (Count I) (ECF No. 1 ¶¶ 108–13); (2) breach of contract with respect to MEM's Services Agreement (Count II) (id. ¶¶ 114–19); (3) failure to pay Morozov wages under FLSA (Count III) (id. ¶¶ 120–25); (4) failure to pay Morozov wages under NYLL (Count IV) (id. ¶¶ 126–30); (5) retaliatory discharge of Morozov under FLSA (Count V) (id. ¶¶ 131–36); and (6) retaliatory discharge of Morozov under NYLL (Count VI)[1] (id. ¶¶ 137–44).

On May 21, 2018, counsel Roman Leonov of Lust & Leonov, P.C., entered his appearance on behalf of all Defendants and filed an acknowledgment of service of the summonses and complaint on all Defendants. (ECF Nos. 19, 20). On June 13, 2018, Defendants filed their answer. (ECF No. 23). On June 26, 2018, Plaintiffs filed the First Amended Complaint ("FAC"), asserting the same six causes of action, which Defendants answered on July 10, 2018. (ECF Nos. 24, 25). On October 3, 2018, Defendants amended their answer to the FAC. (ECF No. 29).

On October 8, 2018, Plaintiffs filed a motion for attachment of Defendants' assets, which Defendants subsequently opposed. (ECF Nos. 30, 34–35). Following oral argument, Judge Daniels denied Plaintiffs' motion to attach. (ECF No. 42).

On November 27, 2018, Leonov moved to withdraw as counsel to Moskovsky. (ECF No. 39). At Judge Daniels' direction, Leonov send a letter to Moskovsky advising him of the risk of default judgment if he failed to appear, and Judge Daniels granted Leonov's motion to withdraw. (ECF Nos. 43–45, 48 at 2–3). Thereafter, Moskovsky did not retain other counsel, appear to

---

[1] Plaintiffs incorrectly number this cause of action as "Count IV." (ECF No. 1 at 30).

defend himself, provide his address to the Court or Plaintiffs' counsel, or participate in discovery. (ECF Nos. 48 at 3; 72 at 2).

On February 25, 2019, Plaintiffs notified the Court that they had reached a settlement with the Settling Defendants.  (ECF No. 50).  The Settling Defendants agreed to pay Plaintiffs $45,000 in full satisfaction of all FLSA and NYLL claims.  (ECF No. 50 at 4).  Following review of the settlement agreement under Cheeks v. Freeport Pancake House, Inc., 796 F.3d 199 (2d Cir. 2015), Judge Daniels approved the settlement and dismissed the action as against the Settling Defendants.  (ECF Nos. 51, 53).

After several adjournments of the discovery deadlines and conference dates at the parties' requests during the first half of 2019 (ECF Nos. 54–61), on June 14, 2019 the parties completed discovery and submitted a joint proposed briefing schedule for motions for partial summary judgment, which Judge Daniels adopted.  (ECF Nos. 62–63).  On August 27, 2019, Leonov moved to withdraw from representing ICOBOX HUB, ICOBOX, and Evdokimov.  (ECF No. 64).  Attached to the motion were Leonov's letters to these Defendants warning them that their failure to appear and defend themselves may result in Plaintiffs' prevailing by default on their partial summary judgment motion or "other forms of relief for which [they] may be liable."  (ECF No. 64-3).  Leonov's motion proposed granting ICOBOX HUB, ICOBOX, and Evdokimov 30 days to obtain new counsel, noting in his supporting declaration that Evdokimov had not been in contact with him for nearly two months and that he doubted "whether he ever intends to show up again." (ECF No. 64-1 ¶ 6).  On August 27, 2019, Judge Daniels granted Leonov's motion to withdraw. (ECF No. 65).

On August 30, 2019, Plaintiffs filed their motion for partial summary judgment with respect to their breach of contract claims, "seeking to hold Defendant Evdokimov liable for [breach of contract] as an alter ego of" ICOBOX HUB ("Plaintiffs' Summary Judgment Motion"). (ECF No. 66 at 5).  On September 18, 2019, Judge Daniels held a status conference, at which none of the Defaulting Defendants appeared in person or through counsel.  (See ECF No. 72 at 3).  On September 27, 2019, in the absence of any opposition, Judge Daniels granted Plaintiffs' Summary Judgment Motion against Evdokimov and referred the matter to the assigned Magistrate Judge for an inquest on damages and attorneys' fees and costs.  (ECF Nos. 69, 70).

On October 18, 2019, Plaintiffs filed the Default Motion, which seeks a default judgment against the Defaulting Defendants.  (ECF Nos. 72 at 1).  On October 22, 2019, this Court issued an order with respect to the Default Motion directing Plaintiffs to submit proposed findings of fact and conclusions of law concerning damages, and ordering the Defaulting Defendants to respond to Plaintiffs' submissions.  (ECF No. 74).  The Court warned the Defaulting Defendants that the failure to respond or contact the Court to request an in-court hearing would result in the Court issuing a report and recommendation based on Plaintiffs' submissions alone without an in-court hearing.  (Id.)  On November 22, 2019, Plaintiffs submitted their proposed findings of fact and conclusions of law ("Plaintiffs' Proposed Findings") (ECF No. 79), but, to date, none of the Defaulting Defendants have filed a response or contacted the Court.

Separately, on November 5, 2019, Plaintiffs filed the Attachment Motion, (ECF No. 77), which Judge Daniels also referred to the undersigned for a report and recommendation.  (ECF No. 78).  On February 18, 2020, Plaintiffs filed a letter-motion seeking to expedite the Attachment Motion, which the Court denied.  (ECF Nos. 80–81).

On April 2, 2020, the Court issued an order directing Plaintiffs to file invoices, redacted if necessary, showing the work performed by Plaintiffs' counsel in this case, to facilitate the Court's determination of attorneys' fees and costs.  (ECF No. 82).  On April 13, 2020, Plaintiffs filed an affidavit from Morozov that updated his calculation of his damages but did not include any legal invoices or other billing records.  (ECF No. 83).  Instead, Morozov represented that he did not receive any invoices for Plaintiffs' counsel's work performed in this case, and that Plaintiffs had agreed to pay Plaintiffs' counsel "30% of any actual recovery in this" action.  (Id. ¶ 6).

### III.   DISCUSSION

#### A.  Default Motion

##### 1.  Legal standards applicable to default judgment and liability

A default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability.  See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992).  A defendant's default is deemed "a concession of all well-pleaded allegations of liability," but it is not deemed an admission of damages.  Rovio Entm't, Ltd. v. Allstar Vending, Inc., 97 F. Supp. 3d 536, 545 (S.D.N.Y. 2015).  Although the default equates to a concession of the truth of the allegations as to liability, a court must still examine the pleadings to determine whether a plaintiff's allegations are prima facie sufficient to demonstrate liability for the cause of action as to which they are seeking a default judgment.  See Taizhou Zhongneng Imp. & Exp. Co. v. Koutsobinas, 509 F. App'x 54, 56 (2d Cir. 2013) (liability of defaulting defendant depends on whether "allegations are sufficient to state a cause of action"); Lenard v. Design Studio, 889 F. Supp. 2d 518, 528 (S.D.N.Y. 2012) ("Without a response from Defendants, this Court must first determine whether the allegations in Plaintiff's Complaint are sufficiently pleaded to establish

Defendants' liability."); Bleecker v. Zetian Sys., Inc., No. 12 Civ. 2151 (DLC), 2013 WL 5951162, at *4–5 (S.D.N.Y. Nov. 1, 2013) (evaluating whether plaintiff had adequately pled federal jurisdiction and elements of breach of contract claim).

Once liability has been established, the court must "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." Am. Jewish Comm. v. Berman, No. 15 Civ. 5983 (LAK) (JLC), 2016 WL 3365313, at *3 (S.D.N.Y. June 15, 2016) (quoting Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999)), adopted by 2016 WL 4532201 (S.D.N.Y. Aug. 29, 2016). The plaintiff "bears the burden of establishing [its] entitlement to recovery and thus must substantiate [its] claim with evidence to prove the extent of damages." Dunn v. Advanced Credit Recovery Inc., No. 11 Civ. 4023 (PAE) (JLC), 2012 WL 676350, at *2 (S.D.N.Y. Mar. 1, 2012). The plaintiff must demonstrate that the compensation it seeks "relate[s] to the damages that naturally flow from the injuries pleaded." Am. Jewish Comm., 2016 WL 3365313, at *3 (quoting Greyhound, 973 F.2d at 159). Where the damages are "not susceptible to simple mathematical calculation, Federal Rule of Civil Procedure 55(b)(2) gives courts discretion to determine whether an evidentiary hearing is necessary or whether to rely on detailed affidavits or documentary evidence." Id. at *4 (internal citation omitted). If the documents the plaintiff has submitted provide a "sufficient basis from which to evaluate the fairness of" the requested damages, the court need not conduct an evidentiary hearing. Fustok v. ContiCommodity Servs. Inc., 873 F.2d 38, 40 (2d Cir. 1989); see Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc., 109 F.3d 105, 111 (2d Cir. 1997) (court may determine appropriate damages based on affidavits and documentary evidence "as long as

[the court has] ensured that there [is] a basis for the damages specified in the default judgment")
(internal citation omitted).

### 2. **Defaulting Defendants' liability**

Despite warnings that non-participation in this litigation could lead to entry of a default
judgment against them, the Defaulting Defendants made no appearances following Leonov's
withdrawal as their counsel.  (See ECF Nos. 48 at 2–3; 45; 65; 69; 72 at 2–3).  By discontinuing
their participation in this litigation, the Defaulting Defendants have conceded the truth of the
allegations in Plaintiffs' FAC, other than as to damages.  See Greyhound Exhibitgroup, 973 F.2d
at 158; Rovio Entm't, 97 F. Supp. 3d at 545.

Although the allegations themselves are deemed undisputed, the Court still may not
recommend an award of damages unless Plaintiffs' allegations are prima facie sufficient to
demonstrate liability as to each of the Defaulting Defendants for the breach of contract claims as
to which they are seeking a default judgment.  Taizhou Zhongneng Imp. & Exp. Co., 509 F. App'x
at 56; Lenard, 889 F. Supp. 2d at 528; Bleecker, 2013 WL 5951162, at *4–5.  As to Evdokimov,
Judge Daniels' order granting Plaintiffs' Motion for Summary Judgment constitutes a conclusive
determination of his liability for breach of the Employment Agreement and the Services
Agreement.  (ECF No. 69).

Plaintiffs' Motion for Summary Judgment did not, however, seek a finding as to liability of
ICOBOX, ICOBOX HUB, or Moskovsky.  (See ECF No. 66).  Therefore, Judge Daniels' order does not
constitute a finding of liability as to any Defendant other than Evdokimov.  Although the Default
Motion seeks judgment against all of the Defaulting Defendants, Plaintiffs' Proposed Findings
makes no mention of seeking damages against ICOBOX, ICOBOX HUB, or Moskovsky.  (ECF No.

79).  In fact, Plaintiffs' Proposed Findings do not even mention Moskovsky.  (Id.)  Accordingly, the Court recommends that any default judgment be entered against Evdokimov only.

### 3.  Calculation of damages

The remaining question is whether Plaintiffs have provided sufficient evidence to support their claim for damages.  Transatlantic Marine, 109 F.3d at 111; Bleecker, 2013 WL 5951162, at *6.  Plaintiffs' Proposed Findings are supported by affidavits and documentary evidence.  (See ECF 79).  The Court finds that Plaintiffs have met this burden and that a hearing is unnecessary because its submissions constitute a "sufficient basis from which to evaluate the fairness" of its damages request.  Fustok, 873 F.2d at 40; Boston Scientific Corp. v. New York Ctr. For Specialty Surgery, No. 14 Civ. 6170 (RRM), 2015 WL 13227994, at *3 (E.D.N.Y. Aug. 31, 2015).  From Plaintiffs' written submissions, the Court will next analyze the appropriate amount of compensatory damages.

### a.  Compensatory damages

"The general rule for measuring damages . . . is the amount necessary to put the plaintiff in the same economic position he would have been in had the [d]efendant fulfilled his contract." Boston Scientific, 2015 WL 13227994, at*4 (internal citation omitted).

Plaintiffs have alleged that Defendant Evdokimov breached the Employment Agreement when he terminated Morozov's employment "without warning" and failed to pay Morozov amounts due.  (ECF No. 79 ¶ 20).  As damages for breach of the Employment Agreement, Morozov seeks to recover the benefit-of-the-bargain contractual damages he would have received during the remainder of his three-year term.  (ECF No. 79 ¶ 12).  These damages include the amount of salary and benefits he would have been paid during the remainder of his three-

year term as CEO of ICOBOX Hub, reduced by amounts he has earned, will earn, or could earn during that period, as well as reimbursement for his moving and travel expenses.  (ECF Nos. 79 ¶¶ 7, 13–14, 17, 19, 21; 79-1 ¶¶ 6–14).  These amounts are itemized as follows:

> (1)    Salary and benefits: $232,812 ($318,812 less $86,000) (ECF No. 83 ¶ 5);

> (2)    Travel and business expenses: $3,478 (ECF Nos. 79 ¶ 17; 79-1 ¶ 12); and,

> (3)    Moving expenses: $10,000 (ECF Nos. 79 ¶ 21; 79-1 ¶ 11).

Accordingly, the Court recommends that Morozov be awarded damages in the sum of these three amounts, $246,290.

Plaintiffs also allege that ICOBOX HUB terminated the Services Agreement.  (ECF No. 79 ¶ 33).  As set forth above, Judge Daniels has determined that Evdokimov is liable for the acts of ICOBOX HUB.  (ECF No. 69).  As damages for ICOBOX HUB's breach of the Services Agreement, MEM seeks the pro-rated portion of its fees through the termination date, including the 30-day notice period, plus the Cancellation Fee.  (ECF No. 79 ¶ 26).  From the date of termination plus the 30-day notice period, MEM counts a total of 39 days, and, based on the monthly fee of $20,417, calculates its prorated fee as $26,542.  (ECF No. 79 ¶ 34).  Added to the Cancellation Fee of $81,668, MEM seeks total damages of $108,210 ($26,542 plus $81,668).  (ECF No. 79 ¶ 35).  Accordingly, the Court recommends that MEM be awarded damages in the amount of $108,210.

Together, the total recommended award of damages to Plaintiffs is $354,500.[2]

---

[2] Plaintiffs total damages request is $319,822 (see ECF No. 79 ¶ 61), but the Court calculates the number as $354,500 ($246,290 + $108,210).

### 4. **Attorneys' fees**

Plaintiffs request an award of attorneys' fees in the amount of 30% of the total damages award, which they calculate as $95,946.  (ECF No. 79 ¶ 39).  Based on the Court's calculation of Plaintiffs' combined damages discussed above, however, the Court calculates this amount as $106,350 ($354,500 x .30).

### a. **Legal standard**

The Employment Agreement and Services Agreement provide for the application of New York law.  (ECF Nos. 79-2 ¶ 6.7; 79-3 ¶ 12).  "Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contract language is sufficiently clear."  NetJets Aviation Inc. v. Metro Found. Contractors, Inc., LLC, 537 F.3d 168, 175 (2d Cir. 2008).

Here, the Employment Agreement entitles the prevailing party in any dispute "to recover reasonable attorney's fees and costs."  (ECF No. 79-2 ¶ 6.8).  The Services Agreement permits "the trier" of any "legal action arising from or out of this Agreement or the relationship of the parties" to "award to any party any reasonable attorneys' fees and other costs incurred in connection therewith."  (ECF No. 79-3 ¶ 12).  The Court may therefore award reasonable attorneys' fees and costs.  See LG Capital Funding v. Energy Edge Tech. Corp., No. 17 Civ. 9021 (AKH), 2018 WL 4278344, at *2 (S.D.N.Y. Aug. 28, 2018) (awarding reasonable attorneys' fees contemplated by terms of notes on which suit was based); Merchant Cash & Capital LLC v. Edgewood Group, LLC, No. 14 Civ. 03497 (JGK) (DF), 2015 WL 4430643, at *12 (S.D.N.Y. July 2, 2015) (awarding reasonable attorneys' fees contemplated by parties' contract).

The party seeking to recover attorneys' fees bears the burden of demonstrating that the fees are reasonable.  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).  The district court has broad discretion to determine the amount to be awarded.  Vincent v. Comm'r of Soc. Sec., 651 F.3d 299, 307 (2d Cir. 2011).  In Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany, 522 F.3d 182 (2d Cir. 2008), the Second Circuit articulated the method for calculating reasonable attorney's fees, which starts with the calculation of a reasonable hourly rate multiplied by a reasonable number of hours extended on the work to result in the "presumptively reasonable fee," also known as the "lodestar."  Kreisler v. Second Avenue Diner Corp., No. 10 Civ. 7592 (RJS), 2013 WL 3965247, at *1 (S.D.N.Y. July 31, 2013).  A court sets the lodestar, then considers "whether, in light of variables such as the difficulty of the case, it should adjust the lodestar before settling on the reasonable fee."  Arbor Hill, 522 F.3d at 187.

To aid in the court's analysis, a fee application should be supported by "contemporaneous time records" relaying the rates charged and hours worked by each attorney.  N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1154 (2d Cir. 1983); Genger v. Genger, No. 14 Civ. 5683 (KBF), 2015 WL 1011718, at *1 (S.D.N.Y. Mar. 9, 2015) ("Contemporaneous billing records are required.").  The attorneys "should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims."  Hensley, 461 U.S. at 437; see Themis Capital v. Democratic Republic of Congo, No. 09 Civ. 1652 (PAE), 2014 WL 4379100, at *7 (S.D.N.Y. Sept. 4, 2014) (reducing hours by twenty percent for "impermissibly broad" block billing).  A court should look at the "nature of the legal matter and context of the fee award in considering the reasonable rate and reasonable time spent on the matter."  Tessemae's LLC v. Atlantis Capital LLC, No. 18 Civ. 4902 (KHP), 2019 WL 2635956, at *3 (S.D.N.Y. June 27, 2019).

To determine the hourly rate, a court considers "what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr., 652 F.3d 277, 289–90 (2d Cir. 2011) (internal citation omitted).  In addition, the Second Circuit has a "forum rule" requiring the use of "hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee." Id. at 289 (internal citation omitted). The court's determination of the reasonable hourly rate is aided by the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984).   "Courts in this District have determined that hourly rates ranging from $250 to $1,260 per hour, for attorneys' work on a commercial litigation matter were reasonable" depending on complexity, experience, and skill required. Tessemae's LLC, 2019 WL 2635956, at *4 (collecting cases).  The court may adjust base hourly rates to account for case specific variables such as the complexity of the issues and attorneys' experiences. See MSC Mediterranean Shipping Co. Holding S.A. v. Forsyth Kowancki LLC, No. 16 Civ. 8103 (LGS), 2017 WL 1194372, at *3 (S.D.N.Y. Mar. 30, 2017) (adjusting fees based on case specific matters).

To determine the reasonable number of hours worked, the court should strike a balance "between principles of thoroughness and efficiency." LCS Grp. LLC v. Shire LLC, 383 F. Supp. 3d 274, 280 (S.D.N.Y. 2019).  The court must examine the amount of time spent on each task and decide "how much of that time was reasonably expended given the scope and complexity of the litigation." Pichardo v. C.R. Bard, Inc., No. 09 Civ. 7653 (SHS), 2015 WL 13784565, at *4 (S.D.N.Y. Jan. 26, 2015) (internal citation omitted).  The court should also consider the number of attorneys

involved. <u>Tessemae's LLC</u>, 2019 WL 2635956, at *5. The court can rely on "its own familiarity with the case, as well as its experience with the parties' evidentiary submissions and arguments." <u>Kreisler</u>, 2013 WL 3965247, at *3. Time spent preparing a fee application may be awarded. <u>See Dorchester Fin. Holdings Corp. v. Banco BRJ, S.A.</u>, No. 11 Civ. 1529 (KMW) (KNF), 2015 WL 1062327, at *3 (S.D.N.Y. Mar. 3, 2015).

The court may reduce the hours spent on the litigation to exclude excessive, redundant, or otherwise unnecessary time. <u>Kirsch v. Fleet St., Ltd.</u>, 148 F.3d 149, 173 (2d Cir. 1998) (citing <u>Hensley</u>, 461 U.S. at 434); <u>see LCS Grp. LLC</u>, 383 F. Supp. 3d at 281 ("A court may apply an across-the-board reduction to effectuate the reasonable imposition of fees."); <u>see MSC Mediterranean Shipping Co. Holding S.A.</u>, 2017 WL 1194372, at *3 (reducing fees for an unopposed motion for default judgment in a breach of contract case; excluding a senior partner's time because "the matter did not warrant the involvement of two senior partners"; and cutting paralegal's time in half); <u>Source Vagabond Sys. V. Hydrapak, Inc.</u>, No. 11 Civ. 5379 (CM) (JLC), 2013 WL 136180, at *13 (S.D.N.Y. Jan. 11, 2013) (collecting cases approving 15–30% across-the-board reductions for block billing), <u>adopted in part as modified on other grounds</u>, 2013 WL 634510 (S.D.N.Y. Feb. 21, 2013); <u>see also Pichardo</u>, 2015 WL 13784565, at *7 (reducing attorneys' hours by forty percent because the recorded time addressed only one relevant issue).

Ultimately, "[t]he essential goal in shifting fess (to either party) is to do rough justice, not to achieve auditing perfection." <u>Fox v. Vice</u>, 563 U.S. 826, 838 (2011).

### b.  <u>Application</u>

In the First Morozov Affidavit, which accompanied Plaintiffs' Proposed Findings, Morozov represented that Plaintiffs had agreed to pay their counsel "30% of any recovery in this Action."

(ECF No. 79-1 ¶ 15).  Although no billing records were included, Morozov represented that

Plaintiffs' counsel:

> conducted pre-filing settlement negotiations; drafted the original and the
> amended complaint in this action; participated in the Court-ordered mediation;
> conducted document and deposition discovery (including taking deposition of
> Defendant Evdokimov in Los Angeles; taking two third-party depositions, and
> defending my deposition); negotiated two settlement agreements with other
> defendants; attended two Court conferences; engaged in motion practice,
> including Plaintiffs' motions for attachment, motion for a default judgment, and a
> motion for partial summary judgment; and has been in communication with me
> by phone or email at least once every week since my termination.

(Id.)

Given the absence of billing records to support the request for attorneys' fees as required

in this Circuit, see N.Y. State Ass'n for Retarded Children, 711 F.2d at 1154, this Court ordered

Plaintiffs to submit invoices, redacted if necessary, showing the work performed by Plaintiffs'

counsel in this case, to facilitate the Court's determination of attorneys' fees and costs.  (ECF No.

82).  Plaintiffs did not do so, instead submitting only the Second Morozov Affidavit, in which he

represents that, because Plaintiffs had an agreement to pay their counsel 30% of any actual

recovery in this action, "counsel did not bill us for his work in this case, nor did we require or

receive any invoices from counsel for the work performed."  (ECF No. 83 ¶ 6).

While that may well be true, Plaintiffs do not explain why, in the absence of invoices, they

have not provided the required billing records of Plaintiffs' counsel's hourly rates and hours

expended in litigating this action that could have been submitted in the alternative to facilitate

the Court's analysis of attorneys' fees.  As noted above, it is well-settled that "[t]he party seeking

fees bears the burden of demonstrating that the fees are reasonable . . . and the party's fee

application must be supported by contemporaneous time records that '[specify], for each

attorney, the date, the hours expended, and the nature of the work done." Bhungalia Family, LLC v. Agarwal, 317 F. Supp. 3d 727, 739 (S.D.N.Y. 2018) (quoting Marion S. Mishkin Law Office v. Lopalo, 767 F.3d 144, 148 (2d Cir. 2014)).  Plaintiffs have given the Court no supporting documentation to use in calculating the lodestar amount, which is the required "starting point for the determination of a reasonable fee." Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999).

In the absence of contemporaneous billing records to evaluate the reasonableness of Plaintiffs' request for attorneys' fees, and in the interest of efficient implementation of an award that represents "rough justice" Fox, 563 U.S. at 838, the Court recommends "an across-the-board reduction to effectuate the reasonable imposition of fees." Clarke v. Hudson Valley Fed. Credit Union, No. 14 Civ. 5291 (KBF), 2016 WL 884667, at *3–8 (S.D.N.Y. Mar. 8, 2016) (applying 15%–40% across-the-board reductions in fees).  The Court therefore recommends a 40% reduction in the amount of attorneys' fees, that is, a reduction of $42,540 ($106,350 x .40), for an award of $63,810 ($106,350 less $42,540).  See Source Vagabond Sys., 2013 WL 136180, at *14 (reducing attorneys' hours by 20–50%); see also Matusick v. Erie Cty. Water Auth., 757 F.3d 31, 64–65 (2d Cir. 2014) (approving 50% reduction in fee award where billing records were deficient); Pichardo, 2015 WL 13784565, at *7 (reducing attorneys' hours by 40%).  Should Plaintiffs disagree with this amount, it remains their burden to demonstrate to the District Court, supported by the required contemporaneous billing records, any entitlement to a higher fee.

### 5.  Costs

Plaintiffs also seek reimbursement of costs in the amount of $6,815, consisting of:  (1) the docketing fee of $400 (ECF Nos. 79-1 ¶ 19; 79-9); (2) deposition transcription and translator costs

of $5,475.35 (ECF Nos. 79-1 ¶¶ 16, 18; 79-6; 79-8); and (3) Plaintiffs' counsel's travel expenses for the deposition of Evdokimov in Los Angeles in the amount of $941. (ECF Nos. 79 ¶ 40; 79-7).

Unlike their request for attorneys' fees, Plaintiffs substantiated each of these three categories of costs with contemporaneous documentation showing that their counsel paid the amounts for which they are now seeking reimbursement.  See Sanchez v. Jyp Foods Inc., No. 16 Civ. 4472 (JLC), 2018 WL 4502008, at *17 (S.D.N.Y. Sept. 20, 2018) (noting that adequate substantiation is required for an award of costs); Raymond James & Assocs., Inc. v. Vanguard Funding, LLC, No. 17 Civ. 3327 (VSB) (SDA), 2018 WL 8758763, at *6 (Apr. 16, 2018) (awarding documented expenses for, inter alia, filing and service of process fees).  The Court may also take judicial notice of the filing fees reflected on the docket as a support for an award of those costs, which are awardable under this Court's Local Civil Rule 54.1(c)(10).  See Whitehead, 2019 WL 384446, at *6 (taking judicial notice of $400 filing fee and awarding costs in that amount).  Finally, the Court notes that the deposition transcription and interpreter costs are also recoverable under this Court's Local Civil Rule 54.1(c)(2), and Plaintiffs' counsel's travel expenses are recoverable under Local Civil Rule 30.1.

Accordingly, the Court finds that Plaintiffs have sufficiently substantiated their request for costs and recommends that they be awarded $6,815 in costs.

### B.  **Attachment Motion**

In the Attachment Motion, Plaintiffs seek an order under N.Y. C.P.L.R. § 5229: (i) "restraining Defendants from making or suffering any sale, assignment, transfer or interference with any property in which they have an interest, except pursuant to an order of the Court, until a damages judgment is entered," and (ii) requiring Defendants to produce

documents, answer interrogatories and appear for deposition regarding their finances and assets, including their digital assets."  (ECF No. 77 at 8).

### 1.  Legal standards

Federal Rule of Civil Procedure 64 permits federal courts to grant certain provisional remedies in accordance with state law, as follows:

> At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment.

> The remedies available under this rule include . . . arrest; attachment; garnishment; replevin; sequestration; and other corresponding or equivalent remedies.

Fed. R. Civ. P. 64.  The New York law remedy Plaintiffs invoke provides that "before a judgment is entered, upon motion of the party in whose favor a verdict or decision has been rendered, the trial judge may order examination of the adverse party and order him restrained with the same effect as if a restraining notice had been served upon him after judgment."  N.Y. C.P.L.R. § 5229. District courts within the Second Circuit have concluded that "§ 5229 is a remedy within the meaning of Rule 64."  Demirovic v. Ortega, 296 F. Supp. 3d 477, 481 (E.D.N.Y. 2017); Coley v. Vannguard Urban Improvement Ass'n, Inc., No. 12 Civ. 5565 (PKC) (RER), 2016 WL 7217641, at *6 (E.D.N.Y. Dec. 13, 2016) (collecting cases); Sequa Capital Corp. v. Nave, 921 F. Supp. 1072, 1076 (S.D.N.Y. 1996).  The purpose of the remedy in § 5229 is to "'secur[e] satisfaction of the judgment ultimately to be entered in the action' as provided for in [Rule] 64."  Id. (quoting Fed. R. Civ. P. 64).

A plaintiff is entitled to the benefit of § 5229 "under the law of the state where the court is located."  Fed. R. Civ. P. 64; see Sequa, 921 F. Supp. at 1076.  "Other than having received a

favorable verdict or decision, there are no prerequisites to obtaining the relief provided in [§] 5229." Id. The district court has "discretion whether to grant relief and the manner and limitations in which relief is granted." Id. "'The court must exercise its discretion in light of the object of [the statute to] prevent the party against whom a verdict or decision has been rendered from secreting or conveying his property to avoid payment of the judgment.'" Demirovic, 296 F. Supp. 3d at 482 (quoting Weinstein, Korn & Miller, New York Civil Practice: CPLR ¶ 5229.02 (David L. Ferstendig ed., 2d ed.)).

In exercising this discretion, district courts have considered several factors, including (1) "whether there are any inconsistencies or misrepresentations by the party against whom relief is sought" such that the court has reason "'to believe the danger exists that defendants may dispose or divert assets to avoid a potential judgment,'" Demirovic, 296 F. Supp. 3d at 482 (quoting Gallegos v. Elite Model Mgmt. Corp., 1 Misc.3d 200, 202 (N.Y. Sup. Ct. 2003)); (2) whether the "adverse party is in financial distress," Demirovic, 296 F. Supp. 3d at 483, and (3) "whether there is a danger that [the adverse party] will dispose of his assets." Sequa, 921 F. Supp. at 1076.

### 2. Application

Here, the District Court has granted summary judgment against Evdokimov and in favor of Plaintiffs, but the award of damages has not been finally determined and a final default judgment has not yet been entered. (See supra § II.B). The posture of this case is therefore similar to the circumstances in Coley, in which the Honorable Pamela K. Chen authorized examination and restraint of the assets of the defaulting defendants. See Coley, 2016 WL 7217641, at *7. Because judgment against Evdokimov "is not just potential, it is certain,"

Plaintiffs have met the only prerequisite to obtaining relief under § 5229.  Sequa, 921 F. Supp. at 1075–76.

Turning to the factors relevant to the Court's exercise of its discretion to provide relief under § 5229, Plaintiffs do not point to nor is the Court aware of any "inconsistencies or misrepresentations" by Evdokimov that would give the Court reason "to believe the danger exists that" he would "dispose or divert assets to avoid a potential judgment."  Demirovic, 296 F. Supp. 3d at 482 (having overseen four days of trial, court "observed numerous inconsistencies and misrepresentations" by defendants).  Therefore, this factor does not support exercise of the Court's discretion to award § 5229 remedies.

Second, Plaintiffs have not made any showing that Evdokimov is "in financial distress" such that he would not have sufficient assets to satisfy the likely six-figure judgment in this case.  Demirovic, 296 F. Supp. 3d at 483.  To the contrary, Plaintiffs allege that Evdokimov has homes in Beverly Hills, Russia, and Thailand, (ECF No. 24 ¶¶ 22–24), giving rise to the inference that he owns valuable real property in the United States, at a minimum, against which a judgment might be satisfied.  Therefore, this factor does not support exercise of the Court's discretion to award § 5229 remedies.

Third, although Plaintiffs "need not make a particular showing of the danger of dissipation of assets," Coley, 2016 WL 7217641, at *6, they have made such a showing here.  Apart from Evdokimov's default in this action, Plaintiffs assert that he failed to respond and appear in a civil enforcement action brought by the United States Securities Exchange Commission, which has also secured a default judgment against him.  (ECF No. 77 at 7).  Plaintiffs assert that Evdokimov is a Russian citizen who does not reside in New York, and that they have "significant doubts about

his current whereabouts." (Id.)  Plaintiffs also point out that ICOBOX, of which Evdokimov owns

at least 95%, is an offshore company with "its main office in Moscow" and no United States

operations.  (Id.; ECF No. 66-5 at 15).   Finally, Plaintiffs refer to Evdokimov's testimony that

ICOBOX transacted only in Bitcoin, "a completely decentralized currency, operating free of nation

states or central banks," United States v. Ulbricht, 858 F.3d 71, 83 n.3 (2d Cir. 2017), and offering

"users increased anonymity."   United States v. Lebedev, 932 F.3d 40, 46 n.2 (2d Cir. 2019).

Considering this evidence, the Court agrees that there is a not insubstantial danger that

Evdokimov will transfer assets to avoid having to pay any judgment in this action, and that

"[d]etecting such transfers after the fact could be difficult." Demirovic, 296 F. Supp. 3d at 484.

Accordingly, to mitigate the risk that a judgment against Evdokimov would not be satisfied, the

Court respectfully recommends that Evdokimov:  (1) be enjoined and restrained, with the same

effect as if a restraining notice had been served on him after judgment, from making or suffering

any sale, assignment, transfer or interference with any property in which he has an interest, until

such time as final judgment in this action has been entered, see Sequa, 921 F. Supp. at 1076; and

(2) appear for an examination and produce documents concerning his finances and assets to be

used to satisfy the final judgment in this matter, within 45 days of the District Court's Order with

respect to this Report and Recommendation.  See Coley, 2016 WL 7217641, at *6.

## IV.    CONCLUSION

For the reasons set forth above, I recommend that the District Court:

(1) GRANT Plaintiffs' Default Motion and enter an award in favor of Plaintiffs and against

Defendant Evdokimov as follows: (i) damages on Plaintiffs' breach of contract claims in the

amount of $354,500; (ii) attorneys' fees in the amount of $63,810; and (iii) costs in the amount of $6,815; and

(2) GRANT Plaintiffs' Attachment Motion and ORDER that Evdokimov: (i) be enjoined and restrained, with the same effect as if a restraining notice had been served on him after judgment, from making or suffering any sale, assignment, transfer or interference with any property in which he has an interest, until such time as final judgment in this action has been entered; and (ii) appear for an examination and produce documents concerning his finances and assets to be used to satisfy the final judgment in this matter, within 45 days of the District Court's Order with respect to this Report and Recommendation.

The Clerk of Court is respectfully directed to terminate ECF No. 72 and ECF No. 77.

Dated:      New York, New York
            May 5, 2020

                                        SO ORDERED

                                        _____
                                        SARAH L. CAVE
                                        United States Magistrate Judge

            *                    *                    *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).  A party may respond to another party's objections within fourteen (14) days after being served with a

copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Daniels.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).